**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------x
                                           :

FIONA HAVLISH, individually and on behalf of   :
the ESTATE OF DONALD G. HAVLISH, JR.,    :    NO.:_____
Deceased, *et al.*                              :

                      Plaintiffs,      :

                    v.            :

CLEARSTREAM BANKING S.A., a Luxembourg   :
banking corporation; BANCA UBAE, SpA, an    :
Italian banking corporation; and JP MORGAN   :
CHASE BANK, N.A., a United States banking    :
association; Central Bank of Iran, a/k/a Bank Markazi; :
and the Islamic Republic of Iran,         :

                  Defendants     :
-------------------------------------------------------------------x

## COMPLAINT

## PRELIMINARY STATEMENT

1.     Plaintiffs are the Havlish Judgment Creditors ("Havlish Plaintiffs"), who are

representatives of 47 Decedents' Estates and 110 individual family members of such Decedents,

all of whom are victims of the terrorist attacks of September 11, 2001, upon the United States.

In *Havlish, et al. v. bin Laden, et al.*, 1:03-cv-09848 (GBD) (FM) (the "Havlish Litigation"), the

Havlish Plaintiffs obtained a judgment in the amount of $6,580,655,671.66, comprised of

$1,362,277,884 in compensatory damages, pre-judgment interest of $532,141,866.67 (on

$968,000,000 in pain-and-suffering damages at 4.96% annually), and $4,686,235,921 in punitive

damages, plus post-judgment interest, against sixteen (16) defendants who are the Islamic

Republic of Iran, its political subdivisions, or agencies and instrumentalities of the Islamic Republic of Iran, for their provision of direct and material support to al-Qaeda in carrying out the terrorist attacks of September 11, 2001.  A copy of the Order and Judgment ("Havlish Judgment") entered by this Court on October 12, 2012, listing each plaintiff in the Havlish Litigation and establishing the amount of each such plaintiff's damages is attached hereto as Exhibit 1.  This Court has also authorized the Havlish Plaintiffs to execute the Havlish Judgment against assets belonging to Iran, Markazi, and any of the other judgment debtors.  A copy of the Order issued by this Court on September 12, 2013, pursuant to 28 U.S.C. 1610(c) permitting the Havlish Plaintiffs to attach and execute upon the assets of the Islamic Republic of Iran is attached hereto as Exhibit 2.

2.      Aware of the Havlish Plaintiffs' impending multibillion dollar judgment, Defendants Islamic Republic of Iran; Bank Markazi, the central bank of Iran; Clearstream Banking, S.A., and Banca UBAE, SpA entered into a conspiracy with the actual intent to hinder, delay, and defraud the Havlish Plaintiffs, and other Iranian judgment creditors, by attempting to conceal Markazi's interest in securities entitlements relating to certain global bonds and then claim the financial assets cannot be attached because they are outside the jurisdiction of United States Courts.

3.      As a result of that knowing and intentional, fraudulent conduct, this Complaint seeks to (i) set aside the fraudulent transfers and (ii) turn those fraudulently transferred assets over to the Havlish Plaintiffs.

4.      The Complaint also seeks a declaration that (i) certain fraudulent transfers undertaken in October 2012 violated Executive Order 13559, which blocked all financial assets belonging to Iran and Bank Markazi in the United States, (ii) the financial assets fraudulently

transferred must be unwound pursuant to 31 C.F.R. 560.211-212, and (iii) the financial assets

must be turned over to the Havlish Plaintiffs.

## THE PARTIES

5.      The names of the Havlish Plaintiffs are individually identified in the Havlish

Judgment attached hereto as Exhibit 1.

6.      Defendant Clearstream Banking S.A. ("Clearstream") is a banking corporation

organized under the laws of the Grand Duchy of Luxembourg.  Clearstream provides

international financial services for the financial industry, including securities settlement and

custody-safe keeping services.  Clearstream maintains its main office at 42 Avenue John F.

Kennedy, L-1855 Luxembourg, Luxembourg.  Clearstream maintains a New York

Representative Office at 60 Broad Street, 31st Floor, New York, NY 10004.

7.      Defendant UBAE, SpA ("UBAE") is a banking corporation organized under the

laws of Italy.  UBAE maintains its principal office in Rome, Italy.

8.      Defendant JP Morgan Chase Bank, N.A. ("JPM") is banking association

organized under the laws of the United States.  JPM maintains its principal office at 270 Park

Avenue, New York, New York.  JPM maintains a correspondent account in the name of

Clearstream at 4 New York Plaza, 15th Floor, New York, New York 10004.

9.      Defendant Islamic Republic of Iran ("Iran") is a judgment debtor pursuant to the

Havlish Judgment.  Iran is a foreign sovereign and has been a U.S. government-designated state

sponsor of terrorism every year since 1984.  Accordingly, Iran is not immune from suit or

execution in connection with its support for international acts of terrorism.

10.     Defendant, Central Bank of Iran, a/k/a Bank Markazi, ("Markazi") is a judgment

debtor pursuant to the Havlish Judgment.  Markazi is the Central Bank of Iran.  Markazi is an

agent, instrumentality, and alter ego of Iran. Markazi engaged in the conduct described in this Complaint at the direction and for the benefit of Iran. Iran directed Markazi to engage in the conduct and supervised Markazi's performance. On November 18, 2011, the U.S. Department of the Treasury issued a finding that Iran is a "jurisdiction of primary money laundering concern" as a result of its illegal and deceptive efforts to facilitate Iran's support for global terrorism and its pursuit of weapons of mass destruction, including nuclear and ballistic missile capabilities.

11.     The United States Department of Treasury found that Markazi, among other state-owned Iranian banks, "willingly engage[s] in deceptive practices to disguise illicit conduct, evade international sanctions, and undermine efforts of responsible regulatory agencies."

12.     In addition, Iran has failed to comport with the strict anti-money laundering and counter-terrorism financing controls in place worldwide, and has failed to comply with the Basal III standards which govern risk management, corporate governance, bankruptcy laws, and other bank safety requirements.

13.     Markazi is an agency or instrumentality of lran and is, as a result, an alter ego of Iran. Iran controls Markazi to such an extent that Markazi maintains no independence or free will. The U.S. Department of Treasury recognizes Markazi's status as Iran's alter ego in§ 535.433 of the U.S. Iranian Assets Control Regulations, which state, "The Central Bank of Iran (Bank Markazi Iran) is an agency, instrumentality and controlled entity of the government of Iran for all purposes under this part [i.e., 31 C.P.R. Part 535]." Accordingly, for purposed of this Complaint, the term "Markazi" will refer to Iran and Markazi collectively.

## SUBJECT MATTER JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1331 because this action arises out of the laws of the United States, specifically the International Emergency

Powers Act, 50 U.S.C. §1701 *et seq.*, Executive Order 13599 of February 5, 2012, issued by President Obama, Exec. Order 77 Fed. Reg. 6659 (Feb. 8, 2012), and the regulations promulgated thereunder by the Office of Foreign Assets Control, of the U.S. Department of the Treasury ("OFAC") at 31 C.F.R. §§560.211 and 560.212.

15.     This Court also has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1605(a)(1), 1605(a)(2), 1605(a)(7), 1605A, 1610(a) and (g), and TRIA because this actions seeks to enforce a judgment arising from violations of 18 U.S.C. § 1605A(a)(1).

16.     This Court has subject matter jurisdiction over the Havlish Plaintiffs' request for a declaratory judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, and Fed. R. Civ. P. 57, declaring void (i) certain transfers of securities entitlements in various bonds from Markazi's account at Clearstream to a different account opened in the name of UBAE, for the sole benefit of Markazi, at Clearstream; (ii) certain financial transfers of interest and principal payments relating to those bonds from a Clearstream account at JPM in New York to the UBAE account opened and/or a segregated, blocked account at Clearstream in Luxembourg,  (iii) certain financial transfers in October 2012 of additional interest and principal payments relating to those same bonds in violation of Executive Order 13599 from Clearstream's account at JPM in New York to the UBAE account opened and/or a segregated, blocked account at Clearstream in Luxembourg, in violation of state and federal law.

17.     This Court has supplemental, or ancillary, enforcement jurisdiction over this cause of action pursuant to 28 U.S.C. §1367, because this suit is brought to enforce an unsatisfied judgment.

18.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) and (d).

## PERSONAL JURISDICTION

**A.     Clearstream Is Subject to Personal Jurisdiction.**

19.     This Court has specific personal jurisdiction over Clearstream pursuant to CPLR § 302(a)(1)-(3), the New York long-arm statute.

20.     <u>CPLR § 302(a)(1)</u>.  Clearstream is subject to personal jurisdiction in this district pursuant to CPLR 302(a)(1) because it transacts business in the State of New York within the meaning of CLPR 302(a)(1) and because the Havlish Plaintiffs' claims arise from specific business transactions that Clearstream conducted in the State.  Among other things,

     i.     Clearstream is registered to do business in the State of New York and is also registered with the New York State Department of Financial Services to operate a representative banking office in New York.

     ii.     Clearstream operates a representative office in the district, from which it conducts business in New York and services its clients' needs.

     iii.     Clearstream uses its New York office to engage in and support the sales, marketing, and administration of its international financial services business.

     iv.     Clearstream uses its New York office as an extension of its Luxembourg-based financial operations, to seek additional business for its international financial services business, and to ensure seamless service to its clients by maintaining points of contact in the United States banking and financial markets.

     v.     Clearstream employs New York-based individuals and provides those employees with access to resources and facilities that enable them to provide sales, marketing, and administrative services to Clearstream's international financial services

operations.  The facilities and resources include office space in New York, telephones, email access and email addresses, and fax lines.

vi.  Clearstream pays its New York-based employees out of bank accounts maintained in New York.

vii.  Clearstream maintains, among other accounts in New York, a bank account within this district with JP Morgan ("NY JPM Account").  For more than twenty-five years, Clearstream has conducted its business, and serviced its clients' needs through the NY JPM Account.

viii.  Clearstream sends and receives hundreds of transactions, totaling billions of dollars, through the NY JPM Account each day.  The transactions often involve the deposit and transfer of bond-related payments.

ix.  The Havlish Plaintiffs' claims, as more particularly described below, arise from business transactions Clearstream conducted on behalf of Markazi using the NY JPM Account between 2008 and 2012.  During that time period, Clearstream received into the NY JPM Account more than $1.68 billion in bond proceeds in which Markazi held a beneficial interest and subsequently transferred the assets outside the jurisdiction of the United States.

21.  CLPR § 302(a)(2).  Clearstream is also subject to personal jurisdiction in this district pursuant to CLPR § 302(a)(2) because it committed a tortious act in the State of New York when, as more particularly described below, it entered into, and purposefully acted in furtherance of, a conspiracy with Markazi and UBAE to facilitate Markazi's effort to fraudulently hinder, delay, and defraud Iran's judgment creditors, including the Havlish Plaintiffs, and to unlawfully help Iran and Markazi evade sanctions imposed by the United

States, the European Union, and other international sanctions.  Among other things, Clearstream knowingly and intentionally helped Markazi conceal its ownership of approximately $4.6 billion in securities that were being processed by banks in New York and then transfer outside the United States jurisdiction more than $1.5 billion in Markazi funds relating to those securities entitlements that were subject to attachment and execution by judgment creditors of Iran and Markazi.

22.    CLPR § 302(a)(3). Clearstream is also subject to personal jurisdiction in this district pursuant to CLPR § 302(a)(3) to the extent it committed a tortious act outside the State of New York knowing that it would cause injury within the State of New York.  As more particularly described below, it entered into, and purposefully acted in furtherance of, a conspiracy with Markazi and UBAE to help Markazi's effort to hinder, delay, and defraud Iran's and Markazi's judgment creditors, including the Havlish Plaintiffs, and to unlawfully help Iran and Markazi evade sanctions imposed by the United States, the European Union, and other international sanctions.  Among other things, Clearstream knowingly and intentionally helped Markazi conceal its ownership of approximately $4.6 billion in securities that were being processed by banks in New York and then transfer outside the United States jurisdiction more than $1.5 billion in Markazi funds relating to those securities entitlements that were subject to attachment and execution by judgment creditors of Iran and Markazi.

23.    To the extent Clearstream is not subject to specific personal jurisdiction pursuant to CPLR 302(a)(1)-(3), this Court has personal jurisdiction over Clearstream pursuant to Fed. R. Civ. P. 4(k)(2) because the Havlish Plaintiffs' claims arise under federal law and exercising jurisdiction over Clearstream based on the conduct described in this Complaint is consistent with the United States Constitution and laws.

**B.      UBAE Is Subject To Personal Jurisdiction.**

24.      This Court has specific personal jurisdiction over UBAE pursuant to CLPR

302(a)(3) because it committed a tortious act outside the State of New York that caused injury

within the State of New York.  As more particularly described below, it knowingly and

intentionally entered into, and purposefully took actions in furtherance of, a conspiracy with

Markazi and Clearstream to help Markazi hinder, delay, and defraud Iran's judgment creditors,

including the Havlish Plaintiffs, to prevent them from enforcing their judgments and to

unlawfully help Iran's effort to unlawfully help Iran and Markazi evade sanctions imposed by the

United States, the European Union, and other international sanctions.  Among other things,

UBAE knowingly and intentionally helped Markazi and Clearstream conceal Markazi's

ownership of approximately $4.6 billion in securities that were being processed by banks in New

York and then transfer outside the United States jurisdiction more than $1.5 billion in Markazi

funds relating to those securities entitlements that were subject to attachment and execution by

judgment creditors of Iran and Markazi.  UBAE joined the conspiracy and helped further the

conspiracy's goals knowing that the conspiracy would cause harm to the Havlish Plaintiffs in

New York.

25.      To the extent UBAE is not subject to specific personal jurisdiction pursuant to

CPLR 302(a)(3), this Court has personal jurisdiction over UBAE pursuant to Fed. R. Civ. P.

4(k)(2) because the Havlish Plaintiffs' claims arise under federal law and exercising jurisdiction

over UBAE based on the conduct described in this Complaint is consistent with the United States

Constitution and laws.

**C.      JPM Is Subject to Personal Jurisdiction.**

26.      This Court has general personal jurisdiction over JP Morgan because its principal

place of business is in New York, New York.

## FACTUAL BACKGROUND

**A.      Iran Has Been Designated a State Sponsor of Terrorism by Both the United States and Has Been Sanctioned by the European Union For Its Participation in Acts of International of Terrorism.**

27.      Iran has been using acts of international terrorism to wage an undeclared,

surreptitious war against the United States and Israel for more than thirty (30) years.  Iran wages

this undeclared war through asymmetrical, or unconventional, strategies and terrorism, often

through proxies such as Hezbollah, Hamas, al-Qaeda and others.  Iran provides extensive

funding, training, and weaponry to its proxies for the purpose of promoting, facilitating, and

carrying out violent and deadly acts of international terrorism.  As part of its strategy, Iran has

been actively seeking to acquire or develop nuclear weapons.

28.      The Secretary of State officially designated Iran as a state sponsor of terrorism on

January 19, 1984.  State sponsors of terrorism are countries the United States has found to have

repeatedly provided support for acts of international terrorism.  The Secretary of State has

renewed Iran's designation as a state sponsor of terrorism every year since 1984.  Iran is

currently still designated a state sponsor of terrorism.

29.      The European Union has also condemned Iran's history of participating in, and

supporting, acts of international terrorism.  As a consequence, the European Union has

implemented a variety of sanctions against Iran with the purpose of dissuading it from

participating in or supporting international terrorism.

30.     In addition to the United States and the European Union, the governments of almost every country in the world condemn Iran's participation in, and support for, acts of international terrorism.

31.     At all times relevant to the allegations of this Complaint, the Defendants had actual knowledge that Iran participated in, supported, and facilitated violent and deadly acts of international terrorism.  Defendants gained their knowledge about Iran's participation in, and support for, international terrorism in many ways.  Among others, the Defendants learned about Iran's support for international terrorism through widespread news reporting in almost every country of the world, including the news media in countries were Defendants do business.

**B.      The United States and the European Union Have Imposed a Series Of Ever Increasing Economic Sanctions Against Iran**

32.     In addition to designating Iran a state sponsor of terrorism, the United States has attempted to prevent Iran from continuing its support acts of international terrorism and from pursing nuclear weapons by imposing increasingly severe economic sanctions against it.  Among other sanctions, the United States imposed the following:

i.      On November 14, 1979, the United States blocked all property of Iran, including Markazi, in the United States in response to the hostage crisis.  Executive Order 12170, 44 Fed. Reg. 65729 (Nov. 14, 1979).  Though disputes relating to the blocked assets have been, and continue to be, resolved through a dispute resolution process known as the Algiers Accords, Executive Order 12170 remains in effect.

ii.      On March 15, 1995, the United States prohibited United States persons from directly or indirectly developing or financing the development of petroleum resources inside Iran.  Executive Order 12957, 60 Fed. Reg. 12957 (Mar. 15, 1995). Executive Order 12957 remains in effect.

iii.      On May 6, 1995, the United States prohibited trade with and investment in Iran.  Executive Order 12959, 60 Fed. Reg. 24757 (May 6, 1995).

iv.      May 22, 2006, the United States Treasury Department amended the Iranian Transaction Regulation, 31 C.F.R. Part 560, to increase civil and criminal penalties for violation trade sanctions against Iran.  Amendment of Iranian Transactions Regulations, 31 CFR part 560, 71 Fed. Reg. 29251 (2006).

v.      On September 12, 2006, the United States Treasury Department amended the Iranian Transaction Regulations, 31 C.F.R. Part 560, to cut off Bank Saderat, a major Iranian bank, and various of its subsidiary banks from the U.S. financial system because it was a significant facilitator of Hizballah's financial activities and has served as a conduit between the Government of Iran and Hizballah, Hamas, the Popular Front for the Liberation of Palestine- General Command, and Palestinian Islamic Jihad.  Amendment of Iranian Transactions Regulations, 31 CFR part 560, 71 Fed. Reg. 53569 (2006).

vi.      On January 7, 2007, the United States Treasury Department placed Bank Sepah, an Iranian state-run bank, on its Specially Designated Nationals List for helping Iran in developing missiles that could carry nuclear weapons.  As a result of the designation, all of Bank Sepah's branches and subsidiaries in Italy, UK, France and Germany were to have their assets frozen by the United States.  Additional Designation of Entities Pursuant to Executive Order 13382, 72 Fed. Reg. 7919 (2007).

vii.      On October 25, 2007, the United States Treasury Department imposed sanctions on Bank Melli, including various subsidiary banks, because it provided financial services to Iran's nuclear and ballistic missile programmes and also sent at least $100 million to Hamas, Palestinian Islamic Jihad, Hezbollah and other terrorist groups

from 2002 to 2006.  Among other things, Bank Melli employed deceptive banking

practices to obscure its involvement from the international banking system.  Additional

Designation of Entities Pursuant to Executive Order 13382, 72 Fed. Reg. 62520 (2007);

Fact Sheet: Designation of Iranian Entities and Individuals for Proliferation Activities

and Support for Terrorism, October 25, 2007, https://www.treasury.gov/press-

center/press-releases/Pages/hp644.aspx.

viii.　　By the end of 2007, the United States Treasury Department had sanction-

designated eleven Iranian banks, including state-owned banks.  Fact Sheet: Overview of

Iranian-Linked Financial Institutions Designated by The United States,

https://www.treasury.gov/press-center/press-releases/Documents/012312_Fact_Sheet_-

_Designated_Iranian_Financial%20Institutions.pdf.

33.　　As a result of the Sanctions, the United States imposed greater obligations on

banking and financial institutions to forebear from engaging in or facilitating, transactions

involving Iran or Iranian counterparties.

34.　　Like the United States, the European Union has also attempted to prevent Iran

from continuing its support acts of international terrorism and from pursing nuclear weapons by

imposing its own set of increasingly severe economic sanctions against Iran.  Among other

sanctions, the European Union has imposed the following:

i.　　On April 19, 2007, the European Union prohibited any individual or entity

from engaging in the sale of goods or technology that could contribute to Iran's

enrichment-related, reprocessing, or heavy water-related activities, or to the development

of nuclear weapon delivery systems.  Regulation (EC) No. 423/2007, promulgated April

19, 2007.

13

ii.        On July 26, 2010, the European Union again expanded the sanctions

imposed by Regulation (EC) No. 423/2007 to restrict (i) trade in dual-use goods and

technology, as well as equipment which might be used for internal repression, (ii) trade in

key equipment and technology for, and restrictions on investment in the Iranian oil and

gas industry, (iii) restrict investments in the uranium mining and nuclear industry, (iv)

restrict transfers of funds to and from Iran, (v) restrict transactions involving the Iranian

banking sector, (vi) restrict Iran's access to the insurance and bonds markets of the Union

and (vii) restrict transactions relating to services involving Iranian ships and cargo

aircraft.  Decision 2010/413/CFSP, dated July 26, 2010.

iii.        On October 25, 2010, the European Union again expanded economic

sanctions against Iran.  Among other things, the European Union restricted financial

transactions with Iranian individuals and entities, prohibited the purchase or sale of

public-guaranteed bonds to or from Iranian individuals and entities, prohibited the

provision of brokerage services to Iran or Iranian individual and entities relating to

public-guaranteed bonds.  Regulation (EU) No 961/2010, dated October 25, 2010.

iv.        On January 23, 2012, the European Union expanded the sanctions to (i)

prohibit trade in dual-use goods and technology, as well as on key equipment and

technology which could be used in the petrochemical industry; (ii) ban the import of

Iranian crude oil, petroleum products and petrochemical products, as well as a prohibition

of investment in the petrochemical industry; (iii) prohibit trade in gold, precious metals

and diamonds with the Government of Iran,; and (iv) prohibit the delivery of newly

printed banknotes and coinage to or for the benefit of the Central Bank of Iran.  Decision

2012/35/CFSP, dated January 23, 2012.  In particular, the European Union froze all
assets belonging to Markazi.  Id.

   v.  On March 23, 2012, the European Union significantly expanded the
economic sanctions against Iran to include a broader array of goods, services, technology,
and financial support.  In particular, the European Union precluded transferring any
funds, securities, or other financial instruments to or from Iran or any Iranian person or
entity and purchasing or selling bonds from or to Iran or any Iranian person or entity.
Regulation (EU) 267/2012, dated March 23, 2012.

  35.  The United States and European Union sanctions imposed compliance obligations
on Defendants.  As financial institutions operating in the world marketplace, Defendants were
notified of, and obligated to comply with, the sanctions.  Therefore, Defendants had actual
knowledge of the sanctions and their obligations to comply with them.  To ensure compliance,
Defendants implemented internal procedures and systems to monitor financial transactions
conducted through their respective banking systems.

  **C.**  **United States Courts Have Repeatedly Held Iran Civilly Liable for
Supporting Acts of International Terrorism and Authorized Judgment
Creditors to Execute On Iranian Assets in the United States.**

  36.  United States Courts have also repeatedly found Iran civilly liable for supporting
and facilitating acts of international terrorism that resulted in the death and injury of thousands of
United States citizens and employees of the United States government.  Judgment has been
entered against Iran and its various political subdivisions, and agencies and instrumentalities,
over seventy times for its role in the violent and deadly acts of international terrorism such as the
1983 suicide bombing of the U.S. Marine Barracks in Beirut, the 1983 and 1984 bombings of the
U.S. Embassy and Embassy Annex in Beirut, the 1998 twin U.S. Embassy bombings in Kenya

and Tanzania, the 1996 bombing of Khobar Towers in Saudi Arabia, which housed U.S. Air Force personnel, the terrorist attacks of September 11, 2001, and numerous kidnappings, hijackings, assassinations, and suicide bombings both here in the United States and abroad.

37.     The compensatory damages amounts entered against Iran for its terrorist acts currently exceed $25 billion in the aggregate.

38.     The Defendants were aware of the judgments against Iran and knew that victims of Iranian-supported acts of international terrorism were actively seeking to enforce their judgments against Iranian assets in the United States.

39.     Clearstream, in particular, had direct knowledge that terrorism victims were seeking to enforce judgments against Iranian assets in the United States.  On June 13, 2008, Citibank in New York City was served with a writ of execution by plaintiffs in *Peterson, et al. v. Islamic Republic of Iran, et al.*, No. 10 Civ. 4518 (KBF) (S.D.N.Y.) ("Peterson Plaintiffs"), compelling Citibank to turnover what amounted to almost $2 billion in Iranian assets held by Clearstream in a Citibank account.  On June 16, 2008, the Peterson Plaintiffs served a restraining notice on Clearstream.  On June 19, 2008, Clearstream was served with writ of execution seeking turnover of Markazi's assets.

**D.     The Terrorist Attacks on September 11, 2001 and the Havlish Litigation.**

40.     On September 11, 2001, nineteen members of the al Qaeda terrorist network hijacked four United States passenger airplanes and flew two of them into the twin towers of the World Trade Center in New York City and another into the Pentagon in Arlington, Virginia. Due to the courageous actions of passengers, the fourth plane crashed into an open field near Shanksville, Pennsylvania.

41.     Thousands of people on the planes, in the buildings, and on the ground were killed in those attacks, countless others were injured, and billions of dollars of property was destroyed.

**E.     The Havlish Plaintiffs File Suit Seeking a Multi-billion Judgment Against Iran for Its Role in the September 11 Terrorist Attacks.**

42.     On February 19, 2002, the Havlish Plaintiffs filed their complaint against Iran, the Iranian Ministry of Information and Security ("MOIS"), the Iranian Revolutionary Guard Corps ("IRGC"), the Ministry of Petroleum ("MOP"), the Ministry of Economic Affairs and Finance ("MEAF"), Ministry of Commerce ("MOC"), the Ministry of Defense and Armed Forces Logistics ("MOD"), and the Ayatollah Ali Hosseini-Khamenei.  The complaint sought billions of dollars in damages, and was one of many lawsuits seeking more than $100 billion in damages from the governments, terrorist organizations, and individuals responsible for carrying out, financing, and facilitating the attacks on September 11, 2001 ("9/11 Litigation").

43.     News of the 9/11 Litigation, including the Havlish Plaintiffs' claims, and its potential financial impact on defendants spread throughout the world.

44.     Iran, together with its political subdivisions, agencies, and instrumentalities, were served with notice of the Havlish Litigation and the Havlish Plaintiffs' claim for billions of dollars in damages in conformity with the Foreign Sovereign Immunities Act.  Iran and Markazi monitored the progress of the 9/11 Litigation and Havlish Litigation as they proceeded through the United States court system.

45.     On September 7, 2006, the Havlish Plaintiffs amended their complaint to add Markazi, the National Iranian Tanker Corporation ("NITC"), the National Iranian Oil Corporation ("NIOC"), the National Iranian Gas Company ("NIGC"), the National Iranian Petrochemical Company ("NIPC"), Iran Airlines ("Iran Air"), and Ali Akbar Hashemi

Rafsanjani ("Rafsanjani") as defendants.  All of the new Defendants were properly served pursuant to the Foreign Sovereign Immunities Act.

46.     On October 29, 2007, the Havlish Plaintiffs filed a motion asking the Court to enter default against Iran, Markazi, and the other Iranian Defendants so they could, thereafter, seek a multi-billion dollar judgment for compensatory and punitive damages.

### F.   Congress Enhances And Expands The Ability Of Terrorism Victims To Enforce Their Judgments Against Iranian Assets.

47.     In September 2007, as the Havlish Plaintiffs and other 9/11 Plaintiffs were beginning to ask that multi-billion dollar judgments be entered against Iran, Congress began considering amendments to the Foreign Sovereign Immunities Act ("FSIA") that would enhance and expand the ability of victims of terrorism to collect judgments against state sponsors of terrorism, like Iran ("FSIA Amendments").  Senate Amendment; H.R. 1585, 110th Cong., 1st Sess., § 1087, *et. seq.*, 2007 HR Cong US 1585 (Oct. 1, 2007).

48.     The FSIA Amendments were intended, among other things, to permit judgment creditors of Iran to levy assets belonging to any of Iran's political subdivisions, agencies, or instrumentalities – including Markazi -- regardless whether the judgment creditors had judgments specifically against any of those juridical entities.

49.     The FSIA Amendments received wide-spread attention in the world-wide news media.

50.     Iran, Markazi, and their counsel were closely following the FSIA Amendment process in Congress and were aware of the impact the FSIA Amendments would have on their ability to hide Iran's assets from existing and future judgment creditors.  Iran has long sought to protect its assets from efforts by victims of its acts of terrorism to collect on the substantial judgments against it and its political subdivisions, agencies, and instrumentalities.  Iran has

attempted to evade collection efforts by maneuvering its assets outside the reach of United States' judgment creditors. Iran and Markazi recognized that the FSIA Amendments would place at risk assets they had previously thought to be outside the reach of judgment creditors.

51.     The FSIA Amendments became law on January 28, 2008 and were enacted as 28 U.S.C. § 1605A and incorporated into 28 U.S.C. § 1610. National Defense Authorization Act for 2008, Pub.L.No. 110-181, § 1083, 122 Stat. 3.

**G.     The United States Government Warns Clearstream About Doing Business With Iran And Markazi.**

52.     During the same period of time Congress was considering the FSIA Amendments, the United States Department of Treasury, Office of Foreign Asset Control ("OFAC")[1] began to investigate Clearstream's business dealings with Iran and Markazi. Among other things, OFAC met with Clearstream to (a) discuss United States sanctions regimes restricting economic activity with Iran, including the Iranian Transactions Regulations, 31 C.F.R. § 560.101, et seq. (2008) ("ITR"); (b) place Clearstream on notice of its apparent violations of those regulations through its ongoing business dealings with, and provision of financial services to, Iran and Markazi; and (c) warn Clearstream about the consequences of continuing to violate U.S. sanctions laws in connection with its Iranian business dealings ("OFAC Inquiry").

53.     As a result of the OFAC Inquiry, Clearstream represented to OFAC in December 2007 that it would terminate its business dealings with Iranian clients.

54.     However, contrary to its representations to OFAC, Clearstream did not terminate its business dealings with Markazi.

---

[1]OFAC administers and enforces economic sanctions against targeted foreign countries, regimes, terrorists, international narcotics traffickers, and persons engaged in activities related to the proliferation of weapons of mass destruction, among others. OFAC acts under Presidential national emergency authorities, as well as authority granted by specific legislation, to impose controls on transactions and freeze assets under U.S. jurisdiction.

**H.     Markazi And Clearstream Enter Into A Conspiracy To Conceal U.S. Dollar-Denominated Assets From Iran's Judgment Creditors And From the United States Government**.

55.     Instead of terminating its business relationship with Iran and Markazi, Clearstream entered into a conspiracy with Markazi to (i) conceal Markazi's assets from the United States Government, from the Havlish Plaintiffs, and other judgment creditors of Iran and (ii) place Markazi's assets outside the reach of United States courts where Iran's and Markazi's judgment creditors were seeking to enforce their judgments (the "Conspiracy").

56.     Clearstream and Markazi entered into the Conspiracy with full knowledge that (i) Iran was a designated state sponsor of terrorism; (ii) financial transactions involving Iran were severely restricted, and often prohibited, by U.S., European Union, and other international economic sanctions; (iii) OFAC was investigating Clearstream specifically for violating U.S. sanctions law in connection with its business dealings with Iran and Markazi; (iv) the FSIA Amendments were about to become law and would expose Markazi's assets in the United States to judgment creditors; (v) the Havlish Plaintiffs were proceeding to judgment on a multi-billion damages claim; (vi) other 9/11 Plaintiffs were likewise proceeding to judgment against Iran; (vii) existing judgment creditors were actively seeking to enforce their judgments against Iranian assets; and (viii) many additional victims of Iran-sponsored acts of international terrorism were filing complaints and obtaining judgments against Iran.

57.     Clearstream, Iran, and Markazi, entered into the Conspiracy with the specific intent to (i) conceal Iran's and Markazi's assets from the United States government, (ii) enable Iran and Markazi to continue investing through Clearstream in bonds denominated in U.S. dollars while simultaneously enabling Clearstream to represent to the United States government that it no longer provided services to Iran or Markazi, and (iii) hinder, delay, and defraud Iran's

and Markazi's creditors, including the Havlish Plaintiffs who had filed suit against Iran and

Markazi and who were, at that time, proceeding to a multi-billion judgment.

58.     Clearstream has long assisted Iran and Markazi to launder U.S. dollar ("USD")

assets through the American financial system.

59.     The panoply of international economic sanctions caused Iran and Markazi to rely

heavily on a small group of financial institutions to assist them in laundering money and in

conducting the financial activity relating to Iran's substantial international sales of oil.  The same

financial network conducts money laundering activities that support Iran's international terrorism

and its attempts to acquire and develop weapons of mass destruction, including nuclear weapons.

60.     Clearstream's loyalty to Iran in the face of mounting international sanctions

allowed it to develop a significant business relationship with Iran and Markazi.  Between the

early 1996 and 2008, Markazi substantially increased its business with Clearstream.

61.     In late 2007 and early 2008, Markazi held, among other assets invested with

Clearstream, beneficial interests in at least two sets of U.S. dollar-denominated sovereign and

corporate bonds.

### 1.     Markazi's Citibank Bonds.

62.     Markazi owned securities entitlements recorded as book entries in Clearstream

Luxembourg in connection with certain corporate and sovereign bonds held in the United States

("Citibank Bonds").

63.     Central securities depositories in the United States served as the ultimate place of

safekeeping for the Citibank Bonds.  Issuers of the Citibank Bonds deposited interest and

principle payments relating to those bonds into a bank account Clearstream maintained at

Citibank in New York City ("Citibank Account").  Markazi's securities entitlements in the Citibank Bonds had an aggregate, nominal value of approximately $2.813 billion.

64.     By virtue of its securities entitlements, Markazi had a beneficial interest in the Citibank Bonds, together with the principal and interest deposited into the Citibank Account.

65.     The deposits of principal and interest into the Citibank Account relating to the Citibank Bonds were a financial asset owned by Markazi by virtue of its security entitlements in the Citibank Bonds.

66.     Clearstream acted as the securities intermediary for Markazi in connection with the Citibank Bonds.  In that capacity, Clearstream provided custody and related financial services from the United States to Markazi.  In furtherance of the Conspiracy, Clearstream enabled Markazi to hold interests in the Citibank Bonds, as well as the principle and interest deposited into the Citibank Account, and provided means to enable Iran and Markazi to conceal Markazi's interest in the Citibank Bonds from Iran's judgment creditors and from the United States government.

### 2.     Markazi's JPM Bonds.

67.     Markazi also owned securities entitlements in connection with certain other bonds issued by foreign entities ("JPM Bonds").  The JPM Bonds were issued by non-U.S. sovereigns or "supranationals" like the European Investment Bank.

68.     Each JPM Bond was issued in either the physical form of one or more global notes or in a dematerialized form that was registered and deposited with a foreign affiliate of a United States bank, acting as depository or sub-depository for Clearstream, who acted as depository.

69.     Markazi's ownership in JPM Bonds was recorded as book entries in Clearstream Luxembourg.

70.     Issuers of the JPM Bonds deposited interest and principle payments relating to those bonds into a bank account maintained by Clearstream at JPM in New York City ("JPM Account").

71.     The deposits of principal and interest payments relating to the JPM Bonds into the JPM Account were a financial asset owned by Markazi by virtue of its security entitlements in the JPM Bonds.  Therefore, Markazi had a beneficial interest in the JPM Bonds, together with the related principal and interest payments deposited into Clearstream's JPM Account.

72.     A prospectus for a bond issued by the United Kingdom, bearing International Securities Identification Number XS0171740961 is an exemplar of the language creating Markazi's beneficial interest in the JPM Bonds.  It states in relevant part:

> Ownership of beneficial interests in the Global Notes will be limited to persons that have accounts with Euroclear, Clearstream, Luxembourg, or DTC or persons that may hold interests through such accountholders.  Beneficial interests in the Global Notes will be shown on, and transfers thereof will be effected only through, records maintained in book entry form by Euroclear, Clearstream, Luxembourg or DTC and their account holders, as applicable.

> * * *

> Payments shall be made in U.S. dollars by cheque drawn on a bank in New York City and mailed to the account holder (or to the first named of joint holders) of such Notes at its address appearing in the Register.  Upon application by the holder to the specified office of the Registrar before the Record Date, such payment may be made by transfer to a U.S. dollar accounted maintained by the payee with a bank in New York City.

> * * *

> Each of the persons shown in the records of Euroclear, Clearstream, Luxembourg or DEC as holders of a Note represented

> by a Global Note must look solely to Euroclear, Clearstream,
> Luxembourg, or DCT (as the case may be) for his share of each
> payment made by H.M. Treasury to the holder of such Global Note
> and in relation to all other rights arising under the Global Note,
> subject to and in accordance with the respective rules and
> procedures of Euroclear, Clearstream, Luxembourg or DTC (as the
> case may be).

73.     Clearstream acted as the securities intermediary for Markazi in connection with

the JPM Bonds.  In that capacity, Clearstream provided financial services in the United States to

Markazi in connection with the JPM Bonds.  Clearstream's role as securities intermediary

enabled Markazi to hold interests in the JPM Bonds, as well as the principle and interest

deposited into Clearstream's JPM Account, and, in furtherance of the Conspiracy, also provided

means to enable Iran and Markazi to conceal Markazi's interest in the JPM Bonds from Iran's

judgment creditors and from the United States government.

I.     **Markazi, Clearstream, And UBAE Attempt To Hinder, Delay, And Defraud
Iran's Judgment Creditors.**

74.     In furtherance of the Conspiracy to place Markazi's financial assets, including the

Citibank Bonds and the JPM Bonds, beyond the reach of United States judgment creditors and

conceal them from both judgment creditors and the United States government, Markazi and

Clearstream enlisted UBAE as a co-conspirator.

75.     UBAE is a small bank that was, at the time, controlled by the regime of Libyan

dictator Muammar Gaddafi.  UBAE agreed to participate in the Conspiracy by, among other

things, holding the assets that Iran and Markazi had invested with Clearstream in accounts

opened in UBAE's name, but created solely for the benefit of Iran and Markazi.

76.     Other than surreptitiously holding Markazi's assets, UBAE served no financial or

business purpose and UBAE provided no additional financial services to Markazi.  Markazi

would have continued to conduct transactions relating to the Citibank Bonds and JPM Bonds in

its own Clearstream account but for the fear that the financial assets would be subject to seizure if Markazi continued to own the bonds directly.

77.     Markazi agreed to pay UBAE substantial fees as compensation for serving as Markazi's undisclosed agent in connection with the Citibank Bonds and the JPM Bonds.

78.     As a result, UBAE joined the Conspiracy.

79.     At the time, it joined the Conspiracy, UBAE knew the goals of the Conspiracy and joined it for the express purpose of helping Markazi and Clearstream to accomplish the goals of the Conspiracy.  UBAE also joined the Conspiracy knowing and intended that Iran's and Markazi's judgment creditors would be harmed in New York.

80.     On January 17, 2008, only days before the FSIA Amendments become law and less than one month after Clearstream fraudulently represented to OFAC that it was terminating all business relationships with Iran and Markazi, Markazi opened an account with UBAE.  The account was opened in furtherance of the Conspiracy and for the specific purpose of acting as Markazi's custodial account in connection with Markazi's securities positions at Clearstream.

81.     On January 18, 2008, the day after Markazi opened an account at UBAE, UBAE opened Account No. 13061 at Clearstream Luxembourg.   During the preceding 25 years, UBAE had maintained only one account at Clearstream.  Account 13061 was opened in UBAE's name in furtherance of the Conspiracy.  Markazi, Clearstream, and UBAE agreed that Iran and Markazi would be the sole beneficial owners of any financial assets deposited into Account No. 13061.

82.     In furtherance of the Conspiracy, Markazi instructed Clearstream to transfer $4.6 billion in securities from its account at Clearstream to Account 13061 ("2008 Fraudulent Transfers").  Markazi's securities entitlements in the Citibank Bonds and the JPM Bonds were

among the financial assets transferred to Account 13061.  The securities were transferred "free of payment" ("FOP"), meaning that there was no exchange of cash or other payment from UBAE to Markazi within Clearstream's settlement system.

83.    The 2008 Fraudulent Transfers were accomplished by internal accounting entries on Clearstream's books in Luxembourg.  Although the book entries changed the record ownership in order to make it appear as though Markazi did not have any interest in the financial assets in Account 13061, the beneficial ownership of the transferred assets did not change.  As Markazi, Clearstream, and UBAE intended, Markazi continued to own the sole beneficial interest in the Citibank Bonds, JPM Bonds, together with all principal and interest payments relating to them, as well as the sole beneficial ownership of any other financial assets transferred from Markazi's Clearstream account to Account 13061.

84.    Markazi maintained full control over all financial assets transferred into Account 13061 and full authority to direct the disposition of all financial assets maintained in Account 13061.  At all times, Clearstream and UBAE acted as Markazi's agents in connection with the financial assets in Account 13061, including specifically the Citibank Bonds and JPM Bonds.

85.    Markazi, Clearstream, and UBAE made the 2008 Fraudulent Transfers for the specific purposes of concealing Iran's and Markazi's continued financial activity in the United States and with the actual intent to hinder, delay, and defraud Iran's and Markazi's judgment creditors, including the Havlish Plaintiffs.

J.      **The Fraudulent Transfers Enabled Markazi To Continue Receiving Principal And Interest Payments Relating To The Citibank Bonds and the JPM Bonds In the United States.**

86.     Both before and after the 2008 Fraudulent Transfers, significant commercial activity occurred in the United States to provide Markazi the financial remuneration arising from its beneficial ownership in the Citibank Bonds and the JPM Bonds.

87.     The Citibank Bonds and the JPM Bonds were all denominated in U.S. dollars. The Citibank Bonds were physically held for safekeeping in the United States. The JPM Bonds were foreign branches or affiliates of United States financial institutions.

88.     The terms of the Citibank Bonds and the JPM Bonds provided that all payments of periodic interest and payments of principal at maturity were to be made by the issuers were sent from a bank in New York in U.S. dollars and were to be received by Clearstream into accounts at banks in New York in U.S. dollars.

89.     In conformity with those terms, Clearstream, received all payments of periodic interest and payments of principal at maturity at its Citibank Account (in the case of the Citibank Bonds) and at its JPM Account (in the case of the JPM Bonds). Upon receipt by Clearstream, Markazi was the sole beneficial owner of the interest and principal payments held in the respective bank accounts.

90.     Before the 2008 Fraudulent Transfers, Clearstream credited Markazi's Clearstream Luxembourg account with the full value of each deposit of interest or principal relating to the Citibank Bonds and the JPM Bonds. After the Fraudulent Transfers, and with the intent to further the Conspiracy, Clearstream credited Account 13061 with the full value of each deposit of interest or principal relating to the Citibank Bonds and the JPM Bonds.

91.     Clearstream did so knowing that the assets credited to Account 13061 belonged solely to Markazi despite being held in an account in the name of UBAE.

92.     Clearstream's acts to credit the interest and principal payments to Account 13061 was intended to give the false appearance that UBAE, and not Markazi, owned all right, title, and interest in the Citibank Bonds and the JPM Bonds.

93.     Nevertheless, both before and after the 2008 Fraudulent Transfers, Markazi, Clearstream, and UBAE knew, and intended, that Markazi owned the sole beneficial interest in all interest and principal payments relating to the Citibank Bonds and the JPM Bonds.

94.     The actions undertaken by Clearstream, Markazi, and UBAE to credit Account 13061 with the full value of each deposit of interest and principal was in furtherance of the Conspiracy and intended to hinder, delay, and defraud Iran's and Markazi's judgment creditors, including the Havlish Plaintiffs, by attempting to (1) hide Markazi's beneficial ownership in the financial assets maintain in Account 13061 and (2) place the financial assets in Account 13061, together with any payments of interest and principal relating to the JPM Bonds beyond the reach of United States' courts.

**K.     The Citibank Bonds, The JPM Bonds, Together With Any Payments Of Interest Or Principal Relating To Either Set Of Bonds Were Restrained In June 2008.**

95.     On June 13, 2008, victims of Iran's terrorist activities relating to the 1983 bombing of the United States Marine Corps Barracks in Beirut, Lebanon ("Peterson Plaintiffs")[2] served Citibank with a writ of execution issued by this Court seeking to execute on the Markazi-

---

[2] The Peterson Plaintiffs hold a September 7, 2007 judgment in the amount of $2,656,944,877.00 against Iran and the Iranian Ministry of Information and Security arising from Iran's participating in, and support for, the bombing of the United States Marine Barracks. *Peterson v. Islamic Republic of Iran*, Case Nos. 01-cv-2094 and 01-cv-2684 (RCL) (D.D.C.).

Citibank Bonds, together with any payments of interest or principal on deposit in Clearstream's Citibank Account.

96.     On June 16, 2008, the Peterson Plaintiffs served Clearstream with a restraining notice pursuant to NY CPLR 5222.  Under New York and federal law, the restraining notice restrained any transfer of the Citibank Bonds, the JPM Bonds, any payments of interest or principal relating to either set of bonds, and any other asset of any kind in which Markazi held any right or interest.

97.     On October 27, 2008, the Peterson Plaintiffs served Clearstream with a writ of execution issued by this Court seeking to execute on, among other things, any property in which Markazi had an interest, which by definition would also include the Citibank Bonds, the JPM Bonds, and any payments of interest or principal relating to the bonds.

98.     Under New York and federal law, the writs of execution and restraining notices (collectively, "Restraints") restrained the Citibank Bonds, the JPM Bonds, and any payments of interest or principal relating to those bonds.  The Restraints have been extended by court order and remain in effect.

99.     In June 2008, after being served with the Restraints, Clearstream opened Account 13675, which it has identified as a "sundry blocked account" created for the purpose holding any payments of interest or principal relating to the Citibank Bonds and the JPM Bonds after June 2008.  After opening Account 13675, Clearstream credited Account 13675 with all payments of interest or principal relating to the Citibank Bonds and the JPM Bonds and stopped crediting Account No. 13061.

**L.     Markazi, Clearstream, and UBAE Continued Their Efforts To Hinder, Delay, And Defraud Judgment Creditors After The Markazi-Clearstream Bonds and Markazi-JPM Bonds Were Restrained.**

100.    Between July 8, 2008 and January 31, 2012, issuers of the JPM Bonds deposited 60 payments of principal and interest totaling more than $1.5 billion into Clearstream's JPM Account ("2008-2012 JPM Bond Proceeds").  Because Markazi, and only Markazi, possessed the beneficial ownership interest in the 2008-2012 Bond JPM Proceeds, each payment, upon deposit, became property of Markazi and, as a consequence, became subject to the Restraints.

101.    In knowing violation of the Restraints, and in furtherance of the Conspiracy to hinder, delay, and defraud Iran's and Markazi's judgment creditors, including the Havlish Plaintiffs, Clearstream knowingly and intentionally transferred the 2008-2012 JPM Bond Proceeds out of Clearstream's JPM Account to Account 13675 at Clearstream Luxembourg. ("2008-2012 Fraudulent Transfers").

102.    As a result of the 2008-2012 Fraudulent Transfers, and in furtherance of their Conspiracy, Markazi, Clearstream, and UBAE assert that the 2008-2012 JPM Bond Proceeds are outside this Court's jurisdiction and are no longer subject to execution in United States courts by Iran's and Markazi's judgment creditors, including the Havlish Plaintiffs.

**M.     On February 5, 2012 President Obama Signed Executive Order 13599 Freezing All of Bank Markazi's Funds in the United States.**

103.    On December 31, 2011, President Obama signed the National Defense Authorization Act of 2012 into law.  Among other provisions, Congress adopted a November 21, 2011 United States Department of Treasury finding that Markazi had used a variety of schemes to help other sanctioned Iranian banks to transfer billions of dollars in an effort to "evade sanctions."  Congress also adopted the Treasury Department's finding that Markazi posed "terrorist financing, proliferation financing, and money laundering risks for the global financial

30

system." National Defense Authorization Act for Fiscal Year 2012, Pub. L. No. 112-81, §
1245(a)(1)-(3), 125 STAT. 1647. Congress directed President Obama to freeze all of Markazi's
assets in the United States or otherwise within the control of a U.S. person. National Defense
Authorization Act for Fiscal Year 2012, Pub. L. No. 112-81, § 1245(c)-(d), 125 STAT. 1647-48.

104.    President Obama implemented § 1245 of the NDAA of 212 by issuing Executive
Order 13599 on February 5, 2012. E.O. 13599 freezes all assets in the United States or
otherwise within the control of a United States person in which Markazi or any other Iranian
bank had an interest.

105.    Clearstream and JPM are both United States persons within the meaning of
Executive Order 13599 and, therefore, were obligated to block all assets coming into their
custody or possession in which Markazi had any interest. Moreover, Clearstream and JPM were
obligated to block all Markazi assets deposited into the JPM Account because the JPM Account
is located "in the United States." Executive Order 13599, § 1.

106.    Clearstream and JPM had actual knowledge of Executive Order 13599 and their
obligations to comply with its directive to freeze Markazi's assets. To ensure compliance with
Executive Order 13599, Clearstream and JPM implemented internal procedures and systems to
monitor financial transactions conducted through their respective banking systems.

**N.     Even After Executive Order 13599, Clearstream, Markazi, and UBAE
Continued Their Efforts to Hinder, Delay, and Defraud Judgment Creditors
by Transferring More than $100 Million USD Outside the United States.**

107.    On or about October 15, 2012, Clearstream received into its JPM Account
approximately $104 million USD relating to the JPM Bonds for the benefit of Markazi. ("Oct
2012 Bond Proceeds").

108.     Defendants knew the Oct 2012 Bond Proceeds belonged to Markazi and that Executive Order 13599 required them to block the funds.

109.     In knowing and intentional violation of Executive Order 13599, and in furtherance of the Conspiracy to hinder, delay, and defraud Iran's and Markazi's judgment creditors, including the Havlish Plaintiffs, Clearstream transferred the Oct 2012 Bond Proceeds out of Clearstream's JPM Account to Account 13675 at Clearstream Luxembourg ("Oct 2012 Fraudulent Transfers").

110.     In violation of Executive Order 13599, JPM failed to block the Oct 2012 Fraudulent Transfers despite knowing that the Oct 2012 JPM Bond Proceeds belonged to Markazi and were to have been blocked.

111.     As a result of the Oct 2012 Fraudulent Transfers, and in furtherance of the Conspiracy, Defendants now assert that the Oct 2012 Bond Proceeds are outside this Court's jurisdiction and are no longer subject to execution in United States courts by Iran's and Markazi's judgment creditors, including the Havlish Plaintiffs.

**O.     The U.S. Government OFAC and Criminal Investigations Into Clearstream's Illegal Conduct.**

112.     As a result of Clearstream's knowing and intentional violations of U.S. sanctions, OFAC investigated the illegal transactions by Clearstream, Markazi, and UBAE.

113.     On or about January 15, 2014, Clearstream and OFAC entered into a settlement agreement under which Clearstream agreed to pay $151,902,000 in connection with its potential civil violations of U.S. sanctions against Iran.

114.     On or about April 2, 2014, the United States Attorney for the Southern District of New York opened a criminal investigation into Clearstream's participation in the Conspiracy. The criminal investigation is still ongoing.

**MARKAZI'S ASSETS AND INTERESTS ARE NOT IMMUNE FROM EXECUTION**

115.    Pursuant to 28 U.S.C. § 1610(a)(7), the 2008-2012 JPM Bond Proceeds and Oct 2012 JPM Bond Proceeds are not immune from execution in satisfaction of the Havlish Judgment because the Havlish Judgment relates to claims against the Judgment Debtors for which they are not immune under 28 U.S.C. §1605(a)(7) or Section 1605A.

116.    Pursuant to 28 U.S.C. Sections 1610(a)(l) and 1611(b), the 2008-2012 JPM Bond Proceeds and Oct 2012 JPM Bond Proceeds are not immune from execution because Iran has, explicitly and implicitly, waived any immunity that might otherwise apply to Markazi or Iran's other agencies and instrumentalities.

117.    The JPM Bonds, the 2008-2012 JPM Bond Proceeds and the Oct 2012 JPM Bond Proceeds are also not immune from execution because the immunity provided to central banks by the FSIA does not apply to Markazi.  In particular, Markazi does not hold the 2008-2012 JPM Bond Proceeds and Oct 2012 JPM Bond Proceeds for its own account because they are not held for normal central banking functions.

118.    Among other reasons, Markazi cannot demonstrate that the JPM Bonds, the 2008-2012 JPM Bond Proceeds and the Oct 2012 JPM Bond Proceeds were used for legitimate central banking purposes because:

      i.    Markazi held the JPM Bonds, the 2008-2012 JPM Bond Proceeds and the Oct 2012 JPM Bond Proceeds for commercial purposes.

      ii.    Markazi cannot pledge any of the assets held in its Clearstream account.

      iii.    Markazi does not segregate its foreign currency reserve funds from money that it (i) utilizes to facilitate Iran's illicit efforts to develop WMDs and support international terrorism; (ii) maintains for the benefit of lran and Iran's agencies and

instrumentalities; (iii) derives from its role as the commercial banker involved in Iran's sale of oil.

119.    Among other reasons, Markazi is not entitled to the immunity afforded legitimate central banks because it is a rogue financial institution because:

      i.   On November 21, 2011, three governments announced sanctions against Iran, Markazi, and other Iranian financial institutions.

         a)   the United States Treasury Department designated Iran a jurisdiction of "primary money laundering concern" and imposed sanctions on Iran and Markazi under § 311 of the USA Patriot Act.  It found that Markazi had a long history of (i) engaging in illegal and deceptive actions to evade U.S. sanctions, finance terrorism, spread technology relating to weapons of mass destruction, and other, illicit Iranian government conduct and (ii) encourages Iranian state-owned banks to engage in those illicit practices.  Finding that the Islamic Republic of Iran is a Jurisdiction of Primary Money Laundering Concern, a copy of which is attached as Exhibit 3.

         b)   The United Kingdom announced that British financial institutions would cut all financial ties with Iran's banks, including Markazi. The British government's announcement highlighted that its measures represented the "first time the British government has cut an entire country's banking sector off from the UK's financial sector."[3]

---

[3]http://www.telegraph.co.uk/news/worldnews/middleeast/iran/8904713/Britain-to-cut-financial-ties-with-Iranbanks-George-Osborne-announces.html

        c)      The Canadian government adopted similar sanctions against Iran and Markazi.[4]

ii.    When announcing the United States Treasury Department's sanctions against Markazi, then Secretary of the Treasury, Timothy Geithner, stated, "If you are a financial institution and you engage in any transaction involving [Markazi] or any other Iranian bank operating inside or outside Iran, you are at risk of supporting Iran's illicit activities: its pursuit of nuclear weapons, its support for terrorism, and its efforts to deceive responsible financial institutions and evade sanctions."[5] He further stated that "[a]ny and every financial transaction with Iran poses grave risk of supporting" the same illicit activities and that "[f]inancial institutions around the world should think hard about the risks of doing business with Iran."

iii.   Markazi is the principal financier of the Iranian oil supply chain, which is controlled by, and funds, the efforts of lran's Islamic Revolutionary Guard Corps ("IRGC"), which the United States Treasury Department designated a global terrorist organization on August 15, 2007 for its role in supporting terrorism and the acquisition and proliferation of weapons of mass destruction.[6]

---

[4] http://www.washingtonpost. com/world/middle-east/canada-joins-us-britain-to-impose-more-sanctions-on-iran-over-nuclear-program/2011/11/21/gIQAOvDfiN_story.html

[5] http://www.treasury.gov/press-center/press-releases/Pages/tg1368.aspx

[6] http://www.washingtonpost.com/wp-dyn/content/article/2007/08/14/AR200708140 1662.html.  On August 15, 2007, the U.S. Department of Treasury named the IRGC as a Specially Designated National ("SDN") for the IRGC's role in supporting global terrorism and proliferation of weapons of mass destruction. http://www.washingtonpost.com/wp-dyn/content/article/2007/08/14/AR2007081401662 .html

    iv.    Markazi is a financial facilitator for more than twenty state-owned Iranian financial institutions that help to fund the terrorist activities by the IRGC;

    v.    Markazi provides financing to Khatam al-Anbiya ("KAA"), a massive IRGC-controlled conglomerate, which has been sanctioned by the United Nations, the United States and the European Union for its role in supporting Iran's WMD proliferation activities.[7]  Indeed, the United Nations, the United States, the European Union, Canada, Japan, and South Korea have designated KAA as a terrorist entity for its role in running Iran's nuclear and ballistic missile programs.[8]

    vi.    Markazi launders the funds that Iran uses to underwrite its sponsorship of international terrorism and its efforts to acquire weapons of mass destruction.

120.    Markazi is not entitled to the immunity afforded to legitimate central banks because of the extensive efforts it undertook to hide its ownership of the JPM Bonds, the 2008-2012 JPM Bond Proceeds, and the Oct 2012 JPM Bond Proceeds.  No legitimate central bank would have engaged in the subterfuge practiced by Markazi in order to hinder, delay, and defraud judgment creditors and conceal financial transactions in the United States.

121.    As a consequence, the Oct 2012 JPM Bond Proceeds are not immune from execution.  The Havlish Plaintiffs are, therefore, entitled to enforce the Havlish Judgment pursuant to 28 U.S.C. § 1610.

---

[7] http://online.wsj.com/article/SB10001424052970204443404577051061458557058.html?mod=googlenews_wsj

[8] U.S. Treasury, Executive Order 13382, October 25, 2007; UNSC Resolution 1929, June 9, 2010; EU Commission Regulation No. 532/2010.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
(Set Aside All Fraudulent Transfer -- NY Debtor & Creditor Law § 278)

122.    Plaintiffs repeat and re-allege each of the preceding Paragraphs as if fully set forth herein.

123.     Markazi, Clearstream, and UBAE knowingly and intentionally entered into the Conspiracy to make the 2008 Fraudulent Transfers and the Oct 2012 Fraudulent Transfers (collectively, the "Markazi Fraudulent Transfers").

124.    Markazi, Clearstream, and UBAE undertook the Markazi Fraudulent Transfers with the actual intent to hinder, delay, and defraud the Havlish Plaintiffs, and other Markazi judgment creditors, within the meaning of NY Debtor & Creditor Law § 276, and to evade the United States, European Union, and other international sanctions.

125.    Markazi, Clearstream, and UBAE further undertook the Markazi Fraudulent Transfers with the actual knowledge that Iran and Markazi were defendants *Havlish v. bin Laden*, Case No. 1:03-cv-9848 (S.D.N.Y. 2003), which is an action for money damages within the meaning of NY Debtor & Creditor Law § 273-a.

126.    Defendants knew Iran, Markazi, and the other Iranian Judgment Debtors, were in the process of being found civilly liable for money damages to the Havlish Plaintiffs before they made the Markazi Fraudulent Transfers.  In addition, the Markazi Fraudulent Transfers were made without fair consideration.

127.    The Markazi Fraudulent Transfers, therefore, constitute fraudulent conveyances within the meaning of NY Debtor & Creditor Law § 270, *et seq.*

128.    The Havlish Plaintiffs' Judgment is final and all amounts owing under that judgment remain unsatisfied.  In addition, the Havlish Plaintiffs have obtained an order from the Court

pursuant to 28 U.S.C. § 1610(c) authorizing them to enforce their Judgment against Iran and Markazi.

129.    Pursuant to NY Debtor & Creditor Law § 278, the Havlish Plaintiffs are entitled to set aside or annul each of the Markazi Fraudulent Transfers.

130.    The Havlish Plaintiffs are, therefore, entitled to an Order from the Court setting aside or annulling the Markazi Fraudulent Transfers, and each of them, and Markazi's effort to conceal its ownership interests in the JPM Bonds and Oct 2012 JPM Bond Proceeds.

131.    The Havlish Plaintiffs are also entitled to an Order compelling Defendants to disregard the Markazi Fraudulent Transfers and directing them restore all Markazi assets to Clearstream's JPM Account so that the Havlish Plaintiffs can be execute upon those assets in satisfaction of their Judgment.

132.    Alternatively, the Havlish Plaintiffs are entitled to compensatory damages against Markazi, Clearstream, and UBAE in an amount equal to the Havlish Judgment, limited only by the value of the Markazi Fraudulent Transfers.

133.    Pursuant to NY Debtor & Creditor Law § 276-a, the Havlish Plaintiffs are entitled to an aware of attorney's fees and costs of suit against Markazi, Clearstream, and UBAE.

**SECOND CLAIM FOR RELIEF**
(Declaratory Judgment re Violation of ITSR, 31 C.F.R. § 560.212)

134.    The Havlish Plaintiffs repeat and re-allege each of the preceding Paragraphs as if fully set forth herein.

135.    Executive Order 13599, and ITSR 31 C.F.R. Part 360, § 211. blocked all assets belonging to Markazi in the United States effective February 6, 2012.  As a result, on and after February 6, 2012, it became illegal for Markazi, Clearstream, UBAE, and JPM to transfer any funds received into Clearstream's JPM Account relating to the JPM Bonds or the proceeds of those bonds.

136.    In furtherance of the Conspiracy to hinder, delay, and defraud Iran's and Markazi's creditors, and evade United States, European Union, and other international sanctions, Defendants knowingly and intentionally violated Executive Order 13599 by making the Oct 2012 Fraudulent Transfers.

137.    Pursuant to ITSR 31 C.F.R. 560.212(b) the Oct 2012 Fraudulent Transfers are "null and void."  Consequently, as a matter of law, the transfers cannot "be the basis for the assertion or recognition of any interest in or right, remedy, power, or privilege with respect to such property or property interests." *Id.*

138.    An actual controversy now exists between the Havlish Plaintiffs and the Defendants concerning the validity of the Oct 2012 Fraudulent Transfers.

139.    Pursuant to 28 U.S.C. § 2201, the Havlish Plaintiffs are entitled to a declaration that the Oct 2012 Fraudulent Transfers (1) violated Executive Order 13599 and ITSR 31 C.F.R. § 560.212(b); (2) are null and void; and (3) must be unwound and the funds returned to Clearstream's JPM Account.

140.    Pursuant to 28 U.S.C. § 2202, the Havlish Plaintiffs are also to further relief compelling Defendants to comply with the Court's declarations.

## THIRD CLAIM FOR RELIEF
### (Turnover – CPLR § 5225(b))

141.    The Havlish Plaintiffs repeat and re-allege each of the preceding Paragraphs as if fully set forth herein.

142.    Markazi has a beneficial interest in the Oct 2012 JPM Bond Proceeds, which Markazi and Clearstream contend are currently located in Account 13765 at Clearstream Luxembourg.

143.    Pursuant to NY Debtor & Creditor Law § 278, the Markazi Fraudulent Transfers must be set aside and annulled.   All funds relating to the Markazi Fraudulent Transfers must be returned to Clearstream's JPM Account.

144.    Under such circumstances, Clearstream is a person in possession of assets belonging to Markazi within the meaning of CPLR 5225(b).

145.    CPLR 5225(b) provides, in relevant part, as follows:

> (b)  Property not in the possession of judgment debtor.  Upon a special proceeding commenced by the judgment creditor, against a person in custody of money or other personal property in which the judgment debtor has an interest, or against a person who is a transferee of money or other personal property from the judgment debtor, where it is shown that the judgment debtor is entitled to the possession of such property or that the judgment creditor's rights to the property are superior to those of the transferee, the court shall require such person to pay the money, or so much of it as sufficient to satisfy the judgment, to the judgment creditor and, if the amount so paid is insufficient to satisfy the judgment, to deliver any other personal property, or so much of it as is of sufficient value to satisfy the judgment, to a designated sheriff.

146.    Litigants in federal court, such as the Havlish Plaintiffs, need not commence a "special proceeding" as contemplated by CPLR article 52.  *See Northern Mariana Islands v. Millard*, 287 F.R.D. 204, 208 (S.D.N.Y. 2012).

147.    The Havlish Plaintiffs' rights to funds returned to Clearstream's JPM Account are superior to the rights of Clearstream, UBAE, or JPM, who are merely stakeholders or account keepers.

148.    Pursuant to Fed. R. Civ. P. 69(a) and CPLR § 5225, the Havlish Plaintiffs are entitled to an Order enforcing their Judgment by conveying, assigning, and directing payment to them all of Markazi's right, title, and interest in the assets returned to Clearstream's JPM Account, as well as any proceeds thereof.

149.    The Havlish Plaintiffs are entitled to an award of attorneys' fees and costs of suit against Markazi, Clearstream, and UBAE.

## FOURTH CLAIM FOR RELIEF
(Turnover – CPLR § 5227)

150.    The Havlish Plaintiffs repeat and re-allege each of the preceding Paragraphs as if fully set forth herein.

151.    Pursuant to NY Debtor & Creditor Law § 278, the Markazi Fraudulent Transfers must be set aside and annulled and all funds relating to the Markazi Fraudulent Transfers must be returned to Clearstream's JPM Account.

152.    Accordingly, Clearstream is a person who either is or will become indebted to Markazi within the meaning of CPLR § 5227.

153.    Civil Practice Law and Rules 5227 of the New York Code provides, in relevant part, as follows:

> Upon a special proceeding commenced by the judgment creditor, against any person who it is shown is or will become indebted to the judgment debtor, the court may require such person to pay to the judgment creditor the debt upon maturity, or so much of it as is sufficient to satisfy the judgment, and to execute and deliver any document necessary to effect payment; or it may direct that a judgment be entered against such person in favor of the judgment creditor. Costs of the proceeding shall not be awarded against a person who did not dispute the indebtedness.

154.    Litigants in federal court, such as the Havlish Plaintiffs, need not commence a "special proceeding" as contemplated by CPLR article 52.  See *Northern Mariana Islands v. Millard*, 287 F.R.D. 204, 208 (S.D.N.Y. 2012).

155.    Pursuant to Fed. R. Civ. P. 69(a) and CPLR § 5227, the Havlish Plaintiffs are entitled to an Order enforcing their Judgment by conveying, assigning, and directing payment to them all of Markazi's right, title, and interest in the assets returned to Clearstream's JPM Account, as well as any proceeds thereof.

156.    The Havlish Plaintiffs are also entitled to an award of attorneys' fees and costs of suit against Markazi, Clearstream, and UBAE.

41

## FIFTH CLAIM FOR RELIEF
### (Turnover – TRIA)

157.    The Havlish Plaintiffs repeat and re-allege each of the preceding Paragraphs as if they were fully set forth herein.

158.    The Havlish Plaintiffs hold judgments for compensatory damages against the Judgment Debtors, including Markazi, based on an act of terrorism or for which Iran and Markazi are not immune under 28 U.S.C. § 1605A or §1605(a)(7) (as such section was in effect on January 27, 2008).

159.    Iran has been designated a terrorist party pursuant to Section 6(j) of the Export Administration Act of 1979, 50 U.S.C. App. § 2405(j), beginning January 19, 1984, and therefore is a "terrorist party" as defined by TRIA § 201(d)(4), 116 Stat. at 2340.

160.    As set forth above, Markazi is an alter ego, agency or instrumentality of Iran.

161.    JPM and/or Clearstream, both of which are United States persons as defined in Section 7 of Executive Order 13599, control or will control the payments of principle and interest relating to the JPM Bonds.  Moreover, payments of principal and interest relating to the JPM Bonds, which were deposited into the JMP Account, constituted, upon deposit, "property and interests in property of the government of Iran, including the Central Bank of Iran, that [were] in the United States" within the meaning of Executive Order 13599, § 1.

162.    Consequently, the Oct 2012 JPM Bond Proceeds deposited into Clearstream's JPM Account in October 2012 were blocked assets as defined in TRIA.

163.    Similarly, all funds returned to Clearstream's JPM Account pursuant to NY Debtor & Creditor Law § 278, and by virtue of this Court's judgment, will be, upon deposit, blocked assets as defined in TRIA.

164. Plaintiffs are, therefore, entitled to an Order pursuant to TRIA, directing JPM and/or Clearstream to turn over to the Havlish Plaintiffs all assets returned to Clearstream's JPM Account, as well as any proceeds thereof.

165. The Havlish Plaintiffs are also entitled to an award of attorneys' fees and costs of suit against Markazi, Clearstream, and UBAE.

**SIXTH CLAIM FOR RELIEF**
(Rescission of All Markazi Fraudulent Transfers)

166. The Havlish Plaintiffs repeat and re-allege each of the preceding Paragraphs as if fully set forth herein.

167. If, and to the extent that, any of the Oct 2012 Bond Proceeds are located outside the United States, the Court has the power to set aside any transfer made by Markazi, Clearstream, and UBAE that resulted those proceeds being removed from the United States pursuant to New York Debtor and Creditor Law §§ 273-a, 276 278, and New York common law.

168. Markazi, Clearstream, and UBAE had actual knowledge of attempts by judgment creditors to execute on the 2008-2012 JPM Bond Proceeds and the Oct 2012 Bond Proceeds as early as June 16, 2008 when the Peterson Plaintiffs served a restraining notice on Clearstream.

169. The restraining notice had the effect of restraining Clearstream from transferring any of the 2008-2012 JPM Bond Proceeds and the Oct 2012 JPM Bond Proceeds from its JPM Account.

170. At all times since March, 2008, Clearstream knew that Markazi beneficially owned the 2008-2012 JPM Bond Proceeds and the Oct 2012 Bond Proceeds.

171. After June, 2008, any transfer of the 2008-2012 JPM Bond Proceeds and the Oct 2012 Bond Proceeds from Clearstream's JPM Account to Luxembourg, or any other location,

was made as agent for Markazi, with intent to hinder, delay or defraud the Havlish Plaintiffs, and other judgment creditors, and was made without fair consideration.

172.     Clearstream, as agent for Markazi, is in possession or control of the 2008-2012 JPM Bond Proceeds and the Oct 2012 Bond Proceeds even after the Markazi Fraudulent Transfers.

173.     As a result, the Court has the power to direct Clearstream and Markazi to take such actions as may be required to set aside the Markazi Fraudulent Transfers and return the October 2012 JPM Bond Proceeds to Clearstream's JPM Account.

174.     The Havlish Plaintiffs are also entitled to an award of attorneys' fees and costs of suit against Markazi, Clearstream, and UBAE.

**SEVENTH CLAIM FOR RELIEF**
(Equitable Relief)

175.     The Havlish Plaintiffs repeat and re-allege each of the preceding Paragraphs as if fully set forth herein.

176.     Pursuant to Fed. R. Civ. P. 69(a), federal and New York state common law, and the inherent equitable power of the Court, the Havlish Plaintiffs are, as an alternative remedy, entitled to a Creditor's Bill to reach the equitable interest of the Judgment Debtors in the Oct 2012 JPM Bond Proceeds.

177.     To the extent that enforcement of the Havlish Judgment against the Oct 2012 JPM Bond Proceeds is unavailable through remedies at law, the Court should exercise its equitable powers to grant the Havlish Plaintiffs a Creditor's Bill.

178.     The Havlish Plaintiffs are entitled to a declaration by the Court that the Judgment Debtors have an ownership interest in the Oct 2012 JPM Bond Proceeds.

179.    An objective weighing of the equities underlying the terrorism exception to the FSIA and TRIA, on the one hand, and those underlying any applicable legal remedies, on the other, compels the conclusion that the Court should use its equitable powers to grant the Havlish Plaintiffs a Creditor's Bill that will allow them to enforce their judgment against the Oct 2012 JPM Bond Proceeds.

180.    The Court's exercise of discretion to grant a Creditor's Bill is reasonable and equitable here because, among other factors: (a) the Oct 2012 JPM Bond Proceeds are readily traced by Clearstream; (b) Markazi, Clearstream, and UBAE entered into a conspiracy to knowingly and intentionally disguise and secret Markazi's identity as beneficial owner of the JPM Bonds and the Oct 2012 JPM Bond Proceeds in order to hinder, delay or defraud creditors, including the Havlish Plaintiffs; (c) Clearstream and UBAE knew, or should have known, that Markazi was the beneficial owner of the JPM Bonds and the Oct 2012 JPM Bond Proceeds; (d) Defendants have knowingly and intentionally conspired to evade United States, European Union, and international sanctions imposed because of Iran's long history of state sponsored terrorism against U.S. nationals, and aggressive and illicit efforts to develop WMDs; (e) applying that exception will serve the important policy interests codified in the FSIA, which promotes compensation of the victims of terrorism and the punishment of rogue terrorist nations, while doing no damage to the policies of fostering finality and speed in securities transactions.

181.    Moreover, applying a narrow exception in these circumstances is consistent with U.C.C. 8-112(e), which provides that "[a] creditor whose debtor is the owner of a ... security entitlement is entitled to aid from a court of competent jurisdiction, by injunction or otherwise, in reaching the security entitlement or in satisfying the claim by means allowed at law or in equity in regard to property that cannot readily be reached by other legal process."

182.    Pursuant to the Court's equitable powers embodied in a Creditor's Bill and otherwise, the Havlish Plaintiffs are further entitled to an order directing Defendants to turnover to the Plaintiffs the Oct 2012 JPM Bond Proceeds in partial satisfaction of the Judgment.

183.    The Havlish Plaintiffs are also entitled to an award of attorneys' fees and costs of suit against Markazi, Clearstream, and UBAE.

### EIGHTH CLAIM FOR RELIEF
(Prima Facie Tort)

184.    The Havlish Plaintiffs repeat and re-allege each of the preceding Paragraphs as if fully set forth herein.

185.    Markazi, Clearstream, and UBAE entered into the Conspiracy, and undertook the Markazi Fraudulent Transfers, with the actual intent to hinder, delay, defraud the Havlish Plaintiffs.  Markazi, Clearstream, and UBAE.  Thus, Markazi, Clearstream, and UBAE acted with the intent to inflict harm on the Havlish Plaintiffs.

186.    Markazi, Clearstream, and UBAE did not have any excuse or justification for the harm they intended to cause, and have in fact caused, by participating in the Conspiracy and undertaking the Markazi Fraudulent Transfers.

187.    Markazi, Clearstream, and UBAE undertook the Markazi Fraudulent Transfers with the malicious intent to harm the Havlish Plaintiffs by preventing them from enforcing the Havlish Judgment.

188.    As a direct and proximate cause of the Conspiracy and the Markazi Fraudulent Transfers, the Havlish Plaintiffs have suffered the following special damages as a result of Markazi, Clearstream, and UBAE putting the JPM Bonds and the Oct 2012 JPM Bond Proceeds beyond the jurisdiction of United States courts: (i) compensatory damages awarded in the Havlish Judgment in the amount of $1,362,277,884; (ii) pre-judgment interest of current amount

46

of $532,141,866.67 (based on $968,000,000 in pain-and-suffering damages bearing interest at 4.96% per year); (iii) punitive damages awarded in the Havlish Judgment in an amount equal to $4,686,235,921; and (iv) accruing post-judgment interest.

189.    The Conspiracy and the Markazi Fraudulent Transfers were undertaken with malice, spite, ill will, vengeance or deliberate intent to harm the Havlish Plaintiffs. Accordingly, the Havlish Plaintiffs are entitled to an award of punitive damages.

190.    The Havlish Plaintiffs are also entitled to an award of attorneys' fees and costs of suit against Markazi, Clearstream, and UBAE.

WHEREFORE, the Havlish Plaintiffs ask the Court to enter Judgment against Defendants, and each of them, as follows:

1.    An Order setting aside all Markazi Fraudulent Transfers.

2.    An Order conveying, assigning, and directing the transfer to the Havlish Plaintiffs of all rights, title and interest of Markazi in the 2008-2012 JPM Bond Proceeds and the Oct 2012 JPM Bond Proceeds.

3.    An award of compensatory damages against Defendants, together with interest at the legal rate.

4.    An Order declaring that the Oct 2012 Fraudulent Transfers (1) violated Executive Order 13599 and ITSR 31 C.F.R. § 560.212(b); (2) are null and void; and (3) must be unwound and the funds returned to Clearstream's JPM Account.

5.    Alternatively, a Creditor's Bill allowing the Havlish Plaintiffs to attach the 2008-2012 JPM Bond Proceeds and the Oct 2012 JPM Bond Proceeds if they are not otherwise reachable by any legal remedy.

6.    An award of attorney's fees and costs incurred by the Havlish Plaintiffs in connection with prosecuting the claims in this Complaint.

7.      For such other and further relief as the Court may deem appropriate under the

circumstances.

Dated: October 14, 2016                      Respectfully submitted,

**BOIES, SCHILLER & FLEXNER LLP**


By:  s/ Douglass A. Mitchell
        Douglass A. Mitchell, Esq.
        300 South Fourth St. Suite 800
        Las Vegas, NV 89101
        Telephone: (702) 382-7300
        Facsimile:  (702) 382-2755
        Email: dmitchell@bsfllp.com

        Stuart H. Singer, Esq.
        401 East Las Olas Boulevard, Suite
        1200 Fort Lauderdale, Florida 33301
        Telephone: (954) 356-0011
        Facsimile: (954) 356-0022
        Email: ssinger@bsfllp.com

        *Attorneys for Havlish Plaintiffs*