# EXHIBIT 3

# EXHIBIT 3

(BILLINGCODE: 4810-02)

**DEPARTMENT OF THE TREASURY**

**Finding that the Islamic Republic of Iran is a Jurisdiction of Primary Money Laundering Concern**

**AGENCY:** The Financial Crimes Enforcement Network ("FinCEN"), Treasury.

**ACTION:** Notice of finding.

**SUMMARY:** Pursuant to the authority contained in 31 U.S.C. 5318A, the Secretary of the Treasury, through his delegate, the Director of FinCEN, finds that reasonable grounds exist for concluding that the Islamic Republic of Iran is a jurisdiction of primary money laundering concern.

**DATES:** The finding made in this notice is effective as of [INSERT DATE OF PUBLICATION OF THIS DOCUMENT IN THE FEDERAL REGISTER].

**FOR FURTHER INFORMATION CONTACT:** Regulatory Policy and Programs Division, FinCEN, (800) 949-2732.

**SUPPLEMENTARY INFORMATION:**

I.       **Background**

         A.       Statutory Provisions

         On October 26, 2001, the President signed into law the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (the "USA PATRIOT Act"), Public Law 107-56. Title III of the USA PATRIOT Act amends the anti-money laundering provisions of the Bank Secrecy Act ("BSA"), codified at 12 U.S.C. 1829b, 12 U.S.C. 1951-1959, and 31 U.S.C. 5311-5314 and 5316-5332, to promote prevention, detection, and prosecution of international money

laundering and the financing of terrorism.  Regulations implementing the BSA appear at 31 CFR Chapter X.

Section 311 of the USA PATRIOT Act ("section 311") added 31 U.S.C. section 5318A to the BSA, granting the Secretary of the Treasury (the "Secretary") the authority, upon finding that reasonable grounds exist for concluding that a foreign jurisdiction, institution, class of transactions, or type of account is of "primary money laundering concern," to require domestic financial institutions and financial agencies to take certain "special measures" against the primary money laundering concern.  Section 311 identifies factors for the Secretary to consider and requires Federal agencies to consult before the Secretary may conclude that a jurisdiction, institution, class of transaction, or type of account is of primary money laundering concern.  The statute also provides similar procedures, *i.e.,* factors and consultation requirements, for selecting the specific special measures to be imposed against the primary money laundering concern.  For purposes of the finding contained in this notice, the Secretary has delegated his authority under section 311 to the Director of FinCEN.[1]

Taken as a whole, section 311 provides the Secretary with a range of options that can be adapted to target specific money laundering and terrorist financing concerns most effectively.  Through the imposition of various special measures, the Secretary can gain more information about the jurisdictions, institutions, transactions, or accounts of concern; can more effectively monitor the respective jurisdictions, institutions, transactions, or accounts; or can prohibit U.S. financial institutions from involvement

---

[1] Therefore, references to the authority and findings of the Secretary in this document apply equally to the Director of FinCEN.

with jurisdictions, institutions, transactions, or accounts that pose a money laundering concern.

Before making a finding that reasonable grounds exist for concluding that a jurisdiction is of primary money laundering concern, the Secretary is required to consult with both the Secretary of State and the Attorney General. The Secretary is also required by section 311, as amended,[2] to consider "such information as the Secretary determines to be relevant, including the following potentially relevant factors," which extend the Secretary's consideration beyond traditional money laundering concerns to issues involving, inter alia, terrorist financing and weapons proliferation:

- evidence that organized criminal groups, international terrorists, or entities involved in the proliferation of weapons of mass destruction ("WMD") or missiles, have transacted business in that jurisdiction;

- the extent to which that jurisdiction or financial institutions operating in that jurisdiction offer bank secrecy or special regulatory advantages to nonresidents or nondomiciliaries of that jurisdiction;

- the substance and quality of administration of the bank supervisory and counter-money laundering laws of that jurisdiction;

- the relationship between the volume of financial transactions occurring in that jurisdiction and the size of the economy of the jurisdiction;

---

[2] 31 U.S.C. 5318A was amended by section 501 of the Iran Freedom Support Act of 2006, Public Law 109-293.

- the extent to which that jurisdiction is characterized as an offshore banking or secrecy haven by credible international organizations or multilateral expert groups;

- whether the United States has a mutual legal assistance treaty with that jurisdiction, and the experience of U.S. law enforcement officials and regulatory officials in obtaining information about transactions originating in or routed through or to such jurisdiction; and

- the extent to which that jurisdiction is characterized by high levels of official or institutional corruption.

If the Secretary determines that reasonable grounds exist for concluding that a jurisdiction is of primary money laundering concern, the Secretary is authorized to impose one or more of the special measures in section 311 to address the specific money laundering risks. Section 311 provides a range of special measures that can be imposed individually, jointly, in any combination, and in any sequence.[3] Before imposing special measures, the statute requires the Secretary to consult with appropriate federal agencies and other interested parties[4] and to consider the following specific factors:

---

[3] Available special measures include requiring: (1) recordkeeping and reporting of certain financial transactions; (2) collection of information relating to beneficial ownership; (3) collection of information relating to certain payable-through accounts; (4) collection of information relating to certain correspondent accounts; and (5) prohibition or conditions on the opening or maintaining of correspondent or payable-through accounts. 31 U.S.C. § 5318A(b)(1)-(5). For a complete discussion of the range of possible countermeasures, *see* 68 FR 18917 (April 17, 2003) (proposing special measures against Nauru).

[4] Section 5318A(a)( 4)(A) requires the Secretary to consult with the Chairman of the Board of Governors of the Federal Reserve System, any other appropriate Federal banking agency, the Secretary of State, the Securities and Exchange Commission ("SEC"), the Commodity Futures Trading Commission ("CFTC"), the National Credit Union Administration ("NCUA"); and, in the sole discretion of the Secretary, "such other agencies and interested parties as the Secretary may find to be appropriate." The consultation process must also include the Attorney General if the Secretary is considering prohibiting or imposing conditions on domestic financial institutions opening or maintaining correspondent account relationships with the targeted entity.

- Whether similar action has been or is being taken by other nations or multilateral groups;

- Whether the imposition of any particular special measures would create a significant competitive disadvantage, including any undue cost or burden associated with compliance, for financial institutions organized or licensed in the United States;

- The extent to which the action or the timing of the action would have a significant adverse systemic impact on the international payment, clearance, and settlement system, or on legitimate business activities involving the particular jurisdiction; and

- The effect of the action on U.S. national security and foreign policy.

**Iran**

Iran's banking sector comprises Iranian state-owned commercial banks, specialized Iranian government banks, and privately owned Iranian financial institutions.[5] Some of these Iranian financial institutions[6] operate multiple overseas branches and subsidiaries in Asia, Europe, and the Middle East[7] and maintain relationships in key global financial centers.[8]

In recent years, many international financial institutions have severed ties with Iranian banks and entities because of a growing body of public information about their illicit and deceptive conduct designed to facilitate the Iranian government's support for

---

[5] Central Bank of the Islamic Republic of Iran. (http://www.cbi.ir/simplelist/1462.aspx). At various points in this finding, FinCEN references public media sources to support statements of fact. FinCEN has utilized both public and non-public sources in reaching such conclusions.
[6] *Id.*
[7] The Bankers Almanac, September 2011.
[8] *Id.*

terrorism and its pursuit of nuclear and ballistic missile capabilities.  This illicit conduct

by Iranian banks and companies has been highlighted in a series of United Nations

Security Council ("UN Security Council") resolutions related to Iranian proliferation

sensitive activities.  The Financial Action Task Force[9] ("FATF") has also warned

publicly of the risks that Iran's deficiencies in countering money laundering and,

particularly, terrorism finance, pose to the international financial system, and has called

on FATF members and all jurisdictions to implement counter measures to protect against

these risks.  Despite the resulting reduction in Iranian financial institutions' access to

correspondent and other financial relationships with major financial institutions,[10] both

designated and non-designated Iranian banks continue to maintain a presence in the

international financial system.

## II.    Analysis of Factors

Based upon a review and analysis of the administrative record in this matter,

consultations with relevant Federal agencies and departments, and after consideration of

the factors enumerated in section 311, the Director of FinCEN has determined that

reasonable grounds exist for concluding that Iran is a jurisdiction of primary money

laundering concern. While FinCEN has considered all potentially relevant factors set

forth in Section 5318A, a discussion of those most pertinent to this finding follows.

FinCEN has reason to believe that Iran directly supports terrorism and is pursuing

nuclear/ballistic missile capabilities, relies on state agencies or state-owned or controlled

financial institutions to facilitate WMD proliferation and financing, and uses deceptive

---

[9] The Financial Action Task Force is an inter-governmental body whose purpose is the development and promotion of national and international policies to combat money laundering and terrorist financing. The FATF is therefore a "policy-making body" that works to generate the necessary political will to bring about legislative and regulatory reforms in these areas. (http://www.fatf-gafi.org).

[10] "Sanctions Against Iran: A Promising Struggle," The Washington Quarterly, Summer 2008.

financial practices to facilitate illicit conduct and evade sanctions. All of these factors, when taken together, make the international financial system increasingly vulnerable to the risk that otherwise responsible financial institutions will unwittingly participate in Iran's illicit activities.

    A.    Evidence that organized criminal groups, international terrorists, or entities involved in the proliferation of weapons of mass destruction or missiles, have transacted business in that jurisdiction.

    1.    Iran's support for terrorism and pursuit of nuclear and ballistic missile capabilities

**Support for Terrorism:** The Department of State designated Iran as a state sponsor of international terrorism in 1984,[11] and has reiterated this designation every year since 2000 in its annual Country Reports on Terrorism.[12] Iran remains the most active of the listed state sponsors of terrorism, routinely providing substantial resources and guidance to multiple terrorist organizations.[13] Iran has provided extensive funding, training, and weaponry to Palestinian terrorist groups, including Hamas and the Palestinian Islamic Jihad ("PIJ").[14] In fact, Hamas,[15] PIJ,[16] and Hizballah[17] have maintained offices in Tehran to help coordinate Iranian financing and training of these groups.

    Iran's Islamic Revolutionary Guard Corps ("IRGC") was founded in the aftermath of the 1979 Islamic Revolution to defend the government against internal and external

---

[11] See "State Sponsors of Terrorism," U.S. Department of State, August 18, 2011 (http://www.state.gov/s/ct/rls/crt/2010/170260.htm).
[12] Id.
[13] Id.
[14] Id.
[15] "Ex-Iranian President Offers Mediation Between Hamas, Fatah, Kuwait KUNA," KUNA, June 30, 2007.
[16] See "Palestine Islamic Jihad envoy to Tehran says moderate Arabs hamper victory," Tehran Jomhouri-ye Eslami. December 10, 2007.
[17] See "Hezbollah's hate, made in Iran," National Post, July 28, 2006.

threats.[18]  Since then, it has expanded far beyond its original mandate and evolved into a social, military, political, and economic force with strong influence on Iran's power structure.[19]  In addition, elements of the IRGC have been directly involved in the planning and support of terrorist acts throughout the Middle East region.[20]

In particular, Iran has used the IRGC-Qods Force[21] ("Qods Force") to cultivate and support terrorists and militant groups abroad.  The Qods Force reportedly has been active in the Levant, where it has a long history of supporting Hizballah's military, paramilitary, and terrorist activities, and provides Hizballah with as much as $200 million in funding per year.[22]  Additionally, the Qods Force provides the Taliban in Afghanistan with weapons, funding, logistics, and training in support of anti-U.S. and anti-coalition activity.[23]  Information dating from at least 2006 indicates that Iran has arranged frequent shipments to the Taliban of small arms and associated ammunition, rocket propelled grenades, mortar rounds, 107 mm rockets, and plastic explosives.[24]  Iran also has helped train Taliban fighters within Iran and Afghanistan.[25]  Taliban commanders have stated that they were paid by Iran to attend three month training courses within Iran.[26]  In August 2011, a Taliban commander claimed to have trained in Iran and been offered

---

[18] See "Iran's Revolutionary Guards," Council on Foreign Relations, June 22, 2009 (http://www.cfr.org/publication/14324/irans_revolutionary_guards.html).
[19] Id.
[20] See "Country Reports on Terrorism 2010," U.S. Department of State, August 18, 2011 (http://www.state.gov/s/ct/rls/crt/2010/170260.htm).
[21] IRGC-Qods Force was designated under E.O. 13224 for providing material support for the Taliban and other terrorist groups.  See "Fact Sheet: Designation of Iranian Entities and Individuals for Proliferation Activities and Support for Terrorism," U.S. Treasury, October 25, 2007 (http://www.treasury.gov/press-center/press-releases/Pages/hp644.aspx).
[22] See "Islamic Revolutionary Guards Corps," Anti-Defamation League, May 26, 2010.
[23] See "Country Reports on Terrorism 2010," U.S. Department of State, August 18, 2011 (http://www.state.gov/s/ct/rls/crt/2010/170260.htm).
[24] Id.
[25] "Taliban Fighters Training in Iran, U.S. Officials Say," CNN, March 23, 2010 (http://articles.cnn.com/2010-03-23/world/iran.taliban_1_taliban-fighters-afghan-taliban-iranian-official?_s=PM:WORLD).
[26] "Iranians Train Taliban to Use Roadside Bombs," The Sunday Times, March 21, 2010.

$50,000 by Iranian officials in return for destroying a dam in Afghanistan.[27] Most recently, on October 11, 2011, the Department of Justice charged two individuals for their alleged participation in a plot directed by the Qods Force to murder the Saudi ambassador to the United States with explosives while the Ambassador was in the United States.[28] On the same day, the Treasury Department announced the designation of five individuals, including the commander of the Qods Force and three other senior Qods Force officers connected to the assassination plot, as well as the individual responsible for arranging the assassination plot on behalf of the Qods Force.[29] Iran has also permitted al-Qaida to funnel funds and operatives through its territory. In July 2011, the U.S. Department of the Treasury ("Treasury") designated an al-Qa'ida network headed by an individual living and operating in Iran under an agreement between al-Qa'ida and the Iranian government.[30] The designation of six members of this network illustrated Iran's role as a critical transit point for funding to support al-Qa'ida's activities in Afghanistan and Pakistan as this network serves as a pipeline through which al-Qa'ida moves money, facilitators, and operatives from across the Middle East to South Asia.[31]

Finally, Iran is known to have used state-owned banks to facilitate terrorist financing. In 2007, the Treasury designated Bank Saderat under E.O. 13224 for its

[27] See "Captured Taliban Commander: 'I Received Iranian Training'," Radio Free Europe, August 23, 2011.
[28] See "Attorney General Holder Holds National Security Enforcement Press Conference," October 11, 2011 (http://www.justice.gov/iso/opa/ag/speeches/2011/ag-speech-111011.html).
[29] See "Treasury Sanctions Five Individuals Tied to Iranian Plot to Assassinate the Saudi Arabian Ambassador to the United States," October 11, 2011 (http://www.treasury.gov/press-center/press-releases/pages/tg1320.aspx).
[30] See "Treasury Targets Key Al-Qa'ida Funding and Support Network Using Iran as a Critical Transit Point," Press Release, July 28, 2011 (http://www.treasury.gov/press-center/press-releases/Pages/tg1261.aspx).
[31] Id.

financial support of terrorist organizations, noting that from 2001 to 2006 Bank Saderat transferred $50 million from the Central Bank of Iran through its subsidiary in London to its branch in Beirut for the benefit of Hizballah fronts in Lebanon that support acts of violence.[32]

**Pursuit of nuclear/ballistic missile capabilities:**  Iran also continues to defy the international community by pursuing nuclear capabilities and developing ballistic missiles in violation of seven UNSCRs.[33]  Iran's failure to comply with these resolutions has resulted in the UN Security Council's imposition of sanctions against Iran.  These have included specific provisions aimed at preventing Iran from accessing the international financial system in order to pursue nuclear capabilities and to develop ballistic missiles.[34]   To date, Iran has not complied with the UN Security Council resolutions regarding its nuclear and missile activities,[35] and continues to assert that it will not abandon its program to create nuclear fuel and enrich uranium.[36]  This summer, Iran announced that it would triple production of its most concentrated uranium fuel, which is enriched to near 20% purity, and that some of this production would be transferred to Iran's facility near Qom.[37]  This is a significant development because the

---

[32] *See* Treasury's "Fact Sheet: Treasury Designation of Iranian Entities and Individuals for Proliferation Activities and Support for Terrorism," October 25, 2007 (http://www.treasury.gov/press-center/press-releases/Pages/hp644.aspx).
[33] *See* UNSCRs 1696, 1737, 1747, 1803, 1835, 1887, and 1929 (http://www.un.org/documents/scres.htm).
[34] *Id.*
[35] "Iran's Nuclear Program," New York Times, June 8, 2011 (http://topics.nytimes.com/top/news/international/countriesandterritories/iran/nuclear_program/index.html?scp=1-spot&sq=iran%20nuclear%20program&st=cse).
[36] "Iran Claims Progress Speeding Nuclear Program" Wall Street Journal, August 4, 2011 (http://online.wsj.com/article/SB10001424053111903454504576486663881270144.html?mod=googlenews_wsj).
[37] "Iran's Uranium Enrichment Will Increase, It Says," New York Times, June 8, 2011 (http://www.nytimes.com/2011/06/09/world/middleeast/09iran.html).

technical work required to produce 20% enriched uranium from 3.5% is more difficult than that required to advance from 20% to the 90% weapons-grade level.[38]

    2.    <u>Use of government agencies and state-owned or controlled financial institutions to facilitate WMD proliferation and financing</u>

Iran uses government agencies and state-owned or controlled financial institutions to advance its nuclear and ballistic missile ambitions.  Specifically, the government agencies rely on state-owned Iranian financial institutions to help finance illicit procurement activities related to WMD proliferation.

**Government Agencies:**  Iran has used the Atomic Energy Organization of Iran ("AEOI"), which was designated by Treasury as the main Iranian organization for research and development activities in the field of nuclear technology, including Iran's uranium enrichment program, to manage the country's overall nuclear program.[39]

Additionally, Iran has relied on the Ministry of Defense and Armed Forces Logistics ("MODAFL"), which was designated by the State Department under Executive Order ("E.O.") 13382 for proliferation activities.[40]  Iran also controls the Defense Industries Organization ("DIO"), which has been designated by the UN[41] and the United States,[42] and the Aerospace Industries Organization ("AIO"), which is identified in the Annex to E.O. 13382 for its role in overseeing Iran's missile industries.[43]  AIO, the parent entity to

---

[38] Iran Claims Progress Speeding Nuclear Program" Wall Street Journal, August, 4, 2011 (http://online.wsj.com/article/SB10001424053111903454504576486663881270144.html?mod=googlenews_wsj).

[39] "Treasury Designates Iranian Nuclear and Missile Entities," August 12, 2008 (http://www.treasury.gov/press-center/press-releases/Pages/hp1113.aspx).

[40] "Fact Sheet: Designation of Iranian Entities and Individuals for Proliferation Activities and Support for Terrorism," U.S. Treasury, October 25, 2007 (http://www.treas.gov/press/releases/hp644.htm).

[41] United Nations Security Council Resolution 1737, December 23, 2006 (https://www.un.org/News/Press/docs/2006/sc8928.doc.htm).

[42] "Iran's Defense Industries Organization Designated by State," U.S. Department of State, March 30, 2007 (http://2001-2009.state.gov/r/pa/prs/ps/2007/mar/82487.htm).

[43] Executive Order 13382 of June 28, 2005. (http://www.fas.org/irp/offdocs/eo/eo-13382.htm).

Shahid Hemat Industrial Group (SHIG),[44] which is also listed in the Annex to E.O. 13382, was identified for its ballistic missile research, development, and production activities, in addition to overseeing all of Iran's missile industries.[45]

**State-owned or controlled banks:** Multiple Iranian financial institutions have been directly implicated in facilitating Iran's nuclear and ballistic missile activities.  For example, Iranian state-owned Bank Sepah was designated by the Treasury Department under E.O. 13382 and designated in UNSCR 1747 for providing direct and extensive financial services to Iranian entities responsible for developing ballistic missiles, including AIO and SHIG.[46] Iran's state-owned Bank Melli, which was identified in UNSCR 1803,[47] has also facilitated numerous purchases of sensitive materials for Iran's nuclear and missile programs on behalf of UN-designated entities.[48] Treasury found that Bank Melli has provided a range of financial services to known proliferators, including opening letters of credit and maintaining accounts.[49] Additionally, Treasury found, following the designation of Bank Sepah under UNSCR 1747 for its support for AIO and AIO's subordinates, Bank Melli took precautions not to identify Bank Sepah in transactions.[50] Treasury designated Bank Melli and associated subsidiaries and front companies under E.O. 13382 for its financial support to entities involved in the proliferation of weapons of

---

[44] *Id.*
[45] Fact Sheet: Designation of Iranian Entities and Individuals for Proliferation Activities and Support for Terrorism," U.S. Treasury, October 25, 2007 (http://www.treas.gov/press/releases/hp644.htm).
[46] *See* "Testimony of Stuart Levey, Under Secretary for Terrorism and Financial Intelligence, Before the Senate Committee on Banking, Housing and Urban Affairs," Treasury Press Release, March 21, 2007 (http://www.treasury.gov/press-center/press-releases/Pages/hp325.aspx); and U.S. Treasury, "Iran's Bank Sepah Designated by Treasury Sepah Facilitating Iran's Weapons Program," January 9, 2007 (http://www.treasury.gov/press-center/press-releases/Pages/hp219.aspx).
[47] *See* UNSCR 1803. (http://www.un.org/Docs/sc/unsc_resolutions08.htm).
[48] "Fact Sheet: Designation of Iranian Entities and Individuals for Proliferation Activities and Support for Terrorism," U.S. Treasury, October 25, 2007 (http://www.treas.gov/press/releases/hp644.htm).
[49] *Id.*
[50] *Id.*

mass destruction.[51]  Multiple jurisdictions also have designated Bank Melli under their respective legal authorities.[52]

Treasury has also designated under E.O. 13382 Bank Mellat, another Iranian state-owned bank, for financially facilitating Iran's nuclear and proliferation activities by supporting AEOI and its main financial conduit, Novin Energy Company ("Novin").[53] Specifically, the designation noted that as of October 2007, Bank Mellat had facilitated the movement of millions of dollars for Iran's nuclear program since at least 2003.[54]  In November 2009, First East Export Bank was designated pursuant to E.O. 13382 as a subsidiary and for its support of Bank Mellat.[55]  Furthermore, the international community has raised concerns and taken action against Bank Mellat. In October 2009, the United Kingdom's ("UK") HM Treasury issued an order to all of its financial and credit institutions to cease all business with Bank Mellat, based on its connection to Iran's proliferation activities and for being involved in transactions related to financing Iran's nuclear and ballistic missile program.[56]  Noting that Bank Mellat itself has facilitated hundreds of millions of dollars in transactions for Iranian nuclear, missile, and defense entities, UNSCR 1929 designated First East Export Bank, a Bank Mellat

[51] See "Fact Sheet: Designation of Iranian Entities and Individuals for Proliferation Activities and Support for Terrorism," U.S. Treasury, October 25, 2007 (http://www.treas.gov/press/releases/hp644.htm); "Treasury Designates Iran-Controlled Bank for Proliferation Future Bank Controlled by Iran's Bank Melli," U.S. Treasury, March 12, 2008 (http://www.treasury.gov/press-center/press-releases/Pages/hp869.aspx); and "Treasury Designates Companies Tied to Iran's Bank Melli as Proliferators," U.S. Treasury, March 3, 2009 (http://www.treasury.gov/press-center/press-releases/Pages/tg46.aspx).
[52] See e.g., "Media Release: Australia Imposes New Broad-Ranging Sanctions Against Iran," Australian Minister for Foreign Affairs and Trade, July 29, 2010 (http://foreignminister.gov.au/releases/2010/fa-s100729.html).
[53] See "Fact Sheet: Designation of Iranian Entities and Individuals for Proliferation Activities and Support for Terrorism," U.S. Treasury, October 25, 2007 (http://www.treasury.gov/press-center/press-releases/Pages/hp644.aspx).
[54] Id.
[55] See." Treasury Designates Bank Mellat Subsidiary and Chairman Under Proliferation Authority," U.S. Treasury, November 5, 2009 (http://www.treasury.gov/press-center/press-releases/Pages/tg355.aspx).
[56] Id.

subsidiary in Malaysia.[57]  Since the adoption of UNSCR 1929, the European Union ("EU"), Japan, South Korea, Australia, Canada, Norway, and Switzerland have implemented measures against Bank Mellat.[58]

In October 2008, Treasury designated the Export Development Bank of Iran ("EDBI") under E.O. 13382 for providing or attempting to provide financial services to MODAFL.[59]  The designation further asserted that EDBI provides financial services to multiple MODAFL-subordinate entities and facilitated the ongoing procurement activities of various front companies associated with MODAFL-subordinate entities.[60]  Treasury's designation also noted that, since Bank Sepah's designation by the United States and identification by the UN Security Council, EDBI has served as one of the leading intermediaries handling Bank Sepah's financing, including WMD-related payments, and has facilitated transactions for other sanctioned proliferation-related entities.[61]

As the Iranian banks described above have become increasingly isolated from the international financial system due to international sanctions, other Iranian banks have

---

[57] *See* UNSCR 1929 (http://www.un.org/Docs/sc/unsc_resolutions10.htm).

[58] *See* "Council Implementing Regulation (EU) No 668/2010," European Union, July 26, 2010 (http://eur-lex.europa.eu/LexUriServ/LexUriServ.do?uri=OJ:L:2010:195:0025:0036:EN:PDF); "Accompanying Measures Pursuant to United Nations Security Council Resolution 1929," Ministry of Foreign Affairs of Japan, September 3, 2010 (http://www.mofa.go.jp/region/middle_e/iran/measures_unsc_1009.html); "Government Regarding the Implementation of UNSCR 1929," Republic of Korea, September 8, 2010; "Charter of the United Nations (Sanctions – Iran) (Specified Entities) List 2010, Government of Australia, August 4, 2010 (http://www.comlaw.gov.au/Details/F2010L02236); Special Economic Measures (Iran) Regulations, Government of Canada, August 4, 2010 (http://canadagazette.gc.ca/rp-pr/p2/2010/2010-08-04/html/sor-dors165-eng.html); "Press Release," Government of Norway, Ministry of Foreign Affairs, January 14, 2011 (http://www.regjeringen.no/mobil/en/dep/ud/press/news/2011/sanctions_iran_adopted.html?id=630820); "Iran: Federal Council Takes Steps to Improve Legal Certainty and Prevent Possible Evasion," January 19, 2011, The Federal Authorities of the Swiss Federation (http://www.admin.ch/aktuell/00089/index.html?lang=en&msg-id=37283).

[59] "Export Development Bank of Iran Designated as a Proliferator," U.S. Treasury, October 22, 2008 (http://www.treasury.gov/press-center/press-releases/Pages/hp1231.aspx).

[60] *Id.*

[61] *Id.*

begun to play a larger role in Iran's illicit activities and efforts to circumvent sanctions.[62]

The Treasury Department has continued to target Iranian banks that engage in illicit

behavior and act on behalf of U.S.-designated, Iranian-linked banks. Treasury designated

Post Bank for operating on behalf of Bank Sepah;[63] the Iranian-owned German bank EIH

for providing financial services to Bank Mellat, Persia International Bank, EDBI, and

Post Bank;[64] Bank Refah for providing financial services to MODAFL;[65] Bank of

Industry and Mine for providing financial services to Bank Mellat and EIH;[66] and Ansar

Bank and Mehr Bank for providing financial services to the IRGC.[67]  The EU and other

jurisdictions have recognized the risks posed by the vast majority of these financial

institutions and have imposed similar measures to prohibit banks in their jurisdictions

from doing business with these entities.[68]  As recently as May 2011, the EU designated

EIH for playing a "key role in assisting a number of Iranian banks with alternative

options for completing transactions disrupted by EU sanctions targeting Iran."[69]

---

[62] *See* "Testimony of Stuart Levey, Under Secretary of Terrorism and Financial Intelligence, before the Senate Foreign Relations Committee," June 22, 2010 (http://foreign.senate.gov/imo/media/doc/Levey,%20Stuart.pdf).

[63] *See* "Fact Sheet: U.S. Treasury Department Targets Iran's Nuclear and Missile Programs," U.S. Treasury, June 16, 2010 (http://www.treasury.gov/press-center/press-releases/Pages/tg747.aspx).

[64] *See* "Treasury Department Targets Iranian-Owned Bank in Germany Facilitating Iran's Proliferation Activities," U.S. Treasury, September 7, 2010 (http://www.treasury.gov/press-center/press-releases/Pages/tg847.aspx).

[65] *See* "Treasury Targets Iranian Bank for Providing Financial Services to Designated Entities Connected to Iran's Proliferation Activities," U.S. Treasury, February 17, 2011 (http://www.treasury.gov/press-center/press-releases/Pages/tg1067.aspx).

[66] *See* "Treasury Designates Iranian State-Owned Bank for Facilitating Iran's Proliferation Activities," U.S. Treasury, May 17, 2011 (http://www.treasury.gov/press-center/press-releases/Pages/tg1178.aspx).

[67] *See* "Fact Sheet: Treasury Designated Iranian Entities Tied to the IRGC and IRISL," U.S. Treasury, December 21, 2010 (http://www.treasury.gov/press-center/press-releases/pages/tg1010.aspx).

[68] *See* "Council Implementing Regulation (EU) No 668/2010," European Union, July 26, 2010 (http://eur-lex.europa.eu/LexUriServ/LexUriServ.do?uri=OJ:L:2010:195:0025:0036:EN:PDF); "Council Implementing Regulation (EU) No. 2011/301/CFSP," European Union, May 23, 2011 (http://eur-lex.europa.eu/LexUriServ/LexUriServ.do?uri=OJ:L:2011:136:0087:0090:EN:PDF); "Charter of the United Nations (Sanctions – Iran) (Specified Entities) List 2010, Government of Australia, August 4, 2010 (http://www.comlaw.gov.au/Details/F2010L02236).

[69] *See* "Council Implementing Regulation (EU) No. 2011/299/CFSP," European Union, May 23, 2011 (http://eur-lex.europa.eu/LexUriServ/LexUriServ.do?uri=OJ:L:2011:136:0087:0090:EN:PDF).

3.   The Iranian government's use of deceptive financial practices

Since 1979, Iran long has been subject to a variety of U.S. sanctions that have significantly expanded over time, including prohibition of the importation of Iranian-origin goods and services, prohibitions on certain transactions with respect to the development of Iranian petroleum resources, and prohibitions on exports and re-exports to Iran. Today, most trade-related transactions with Iran are prohibited, and U.S. financial institutions are generally prohibited, with only limited exceptions, from doing business with Iranian financial institutions.[70]

To further amplify financial pressure on Iranian financial institutions involved in Iran's support for terrorism and weapons proliferation, President Obama signed into law the Comprehensive Iran Sanctions, Accountability, and Divestment Act of 2010 ("CISADA") on July 1, 2010, which includes a provision that authorizes the Secretary of the Treasury to impose sanctions on foreign financial institutions that knowingly facilitate certain activities related to Iran.[71] On August 16, 2010, Treasury's Office of Foreign Assets Control ("OFAC") published a final rule implementing certain aspects of CISADA,[72] and on October 5, 2011, FinCEN published a final rule to implement section

[70] On November 14, 1979, the President issued E.O. 12170 blocking Iranian government property. *See* (http://www.archives.gov/federal-register/codification/executive-order/12170.html). The Iranian Transactions Regulations ("ITR"), 31 CFT part 560, implement a series of Executive Orders that began with E.O. 12613 issued in 1987, which prohibit the importation of Iranian-origin goods and services. In response to Iran's continued support of international terrorism and active pursuit of weapons of mass destruction, U.S. sanctions have expanded to include E.O. 12957 (March 1997), which imposed prohibition on certain transactions with respect to the development of petroleum resources, and in May 1995, E.O. 12959, which imposed comprehensive trade and financial sanctions on Iran. In August 1997, E.O. 13059 was issued consolidating and clarifying the previous orders. *See* (http://treasury.gov/resource-center/sanctions/Programs/Documents/iran.pdf).

[71] For a full discussion of CISADA and its provisions, *see* the U.S. Department of the Treasury website (http://www.treasury.gov/resource-center/sanctions/Documents/hr2194.pdf).
[72] *See* OFAC CISADA regulations at 75 FR 49836 (August 16, 2010) or 31 CFR part 561 (http://edocket.access.gpo.gov/2010/pdf/2010-20238.pdf).

104(e) of CISADA to complement Treasury's ongoing efforts to protect the international financial system from abuse by Iran.[73]

As a result of the strengthened U.S. sanctions and similar measures taken by the United Nations and other members of the global community, Iran now faces significant barriers to conducting international transactions. In response, Iran has used deceptive financial practices to disguise both the nature of transactions and its involvement in them in an effort to circumvent sanctions. This conduct puts any financial institution involved with Iranian entities at risk of unwittingly facilitating transactions related to terrorism, proliferation, or the evasion of U.S. and multilateral sanctions. Iranian financial institutions, including the Central Bank of Iran ("CBI"), and other state-controlled entities, willingly engage in deceptive practices to disguise illicit conduct, evade international sanctions, and undermine the efforts of responsible regulatory agencies around the world.

**Iranian financial institutions:** Iran employs numerous deceptive practices to disguise the Iranian origin of transactions in order to avoid scrutiny and evade international sanctions. These practices include the transfer of funds from Iran to exchange houses outside Iran and the use of back-to-back letters of credit. Iranian foreign bank branches transfer funds to local banks in the same jurisdiction for onward payments that may conceal the Iranian origin of funds.

In other examples, Bank Sepah has requested that its name be removed from transactions in order to make it more difficult for intermediary financial institutions to

---

[73] See Fact Sheet "FinCEN Implements Provision of the Comprehensive Iran Sanctions, Accountability, and Divestment Act of 2010," October 5, 2011 (http://www.fincen.gov/news_room/nr/html/20111005.html).

determine the true parties to a transaction.[74]  As noted in Treasury's designation, Bank

Melli took precautions not to identify Bank Sepah in transactions following Bank Sepah's

designation under UNSCR 1747 and employed similar deceptive banking practices to

obscure its involvement from non-Iranian financial institutions when handling financial

transactions on behalf of the IRGC.[75]

   In June 2010, Post Bank of Iran was designated by the Treasury Department

under E.O. 13382[76] for facilitating transactions on behalf of Bank Sepah after Bank

Sepah was designated by the UN and United States.[77]  The designation further notes that,

in 2009, Post Bank facilitated business on behalf of Bank Sepah between Iran's defense

industries and overseas beneficiaries and transacted millions of dollars worth of business

between U.S.-designated Hong Kong Electronics and other overseas beneficiaries.[78]

   The Central Bank of Iran, which regulates Iranian banks, has assisted designated

Iranian banks by transferring billions of dollars to these banks in 2011.  In mid-2011, the

CBI transferred several billion dollars to designated banks, including Saderat, Mellat,

EDBI and Melli, through a variety of payment schemes.  In making these transfers, the

CBI attempted to evade sanctions by minimizing the direct involvement of large

international banks with both CBI and designated Iranian banks.  Additionally, the CBI

transfers funds to designated Iranian bank branches outside Iran via non-Iranian foreign

banks, often involving deliberate attempts on its part to conceal that the recipient is a

---

[74] "Testimony of Stuart Levey, Under Secretary for Terrorism and Financial Intelligence, Before the Senate
Committee on Banking, Housing and Urban Affairs," March 21, 2007 (http://www.treasury.gov/press-
center/press-releases/Pages/hp325.aspx).
[75] "Fact Sheet: Designation of Iranian Entities and Individuals for Proliferation Activities and Support for
Terrorism," U.S. Treasury, October 25, 2007 (http://www.treasury.gov/press-center/press-
releases/Pages/hp644.aspx).
[76] "Fact Sheet: U.S. Treasury Department Targets Iran's Nuclear and Missile Programs," U.S. Treasury,
June 16, 2010 (http://www.treasury.gov/press-center/press-releases/Pages/tg747.aspx).
[77] *Id.*
[78] *Id.*

designated Iranian bank.  In some cases, this activity involves book-to-book transfers and the use of accounts at intermediary banks that hold accounts for the CBI and designated banks.  Further, the CBI was believed to have provided financing to the UN-sanctioned Khatem al-Anbiya Constructions Headquarters for defense-related projects.

**Front companies:** Iran has a well-established history of using front companies and complex corporate ownership structures to disguise the involvement of government entities known to be involved in Iranian proliferation activity when conducting commercial transactions.  These companies transact substantial business in Iran and elsewhere around the world.  For example, Novin, an AEOI front company that operates as the financial arm of AEOI, has transferred millions of dollars on behalf of AEOI to entities associated with Iran's nuclear program.[79]  Additionally, Mesbah Energy Company ("Mesbah"), was designated under EO 13382 for being controlled by, or acting or purporting to act for or on behalf of AEOI, and was cited in UNSCR 1737.[80]  Mesbah has been used to procure products for Iran's heavy water project.[81]  Heavy water is essential for Iran's heavy-water-moderated reactor, which will provide Iran with a potential source of plutonium that could be used for nuclear weapons.[82]

In some cases, the connection to Iran is not readily apparent, as Iranian entities have formed front companies outside of Iran in an attempt to obtain dual-use items for Iran that could be used in Iran's nuclear or missile programs and that otherwise could not

---

[79] *See* UNSCR 1747 (http://www.un.org/Docs/sc/unsc_resolutions07.htm); and "Treasury Employs Financial Sanctions Against WMD Proliferation Supporters in Iran," U.S. Treasury, January 4, 2006 (http://www.treasury.gov/press-center/press-releases/Pages/js3069.aspx).

[80] *See* UNSCR 1737 (http://www.un.org/Docs/sc/unsc_resolutions06.htm) and "Treasury Employs Financial Sanctions Against WMD Proliferation Supporters in Iran," U.S. Treasury, January 4, 2006 (http://www.treasury.gov/press-center/press-releases/Pages/js3069.aspx).

[81] "Testimony of Robert W. Werner, Director Office of Foreign Assets Control," U.S. Treasury, February 16, 2006 (http://www.treasury.gov/press-center/press-releases/Pages/js4053.aspx).

[82] *Id.*

legally be exported directly to Iran.[83]   For example, Iranian companies and their fronts have also falsified end-user information on export forms to allow prohibited items to be exported into the country.[84]   Iran has colluded with some exporters to enter fictitious end-user names in the importer section of export forms in order to evade international and national controls on shipments to Iran.[85]   For example, in May 2010, Balli Aviation Ltd., a UK subsidiary of Balli Group PLC, pled guilty in the U.S. District Court for the District of Columbia to exporting three Boeing 747 aircraft to Iran without obtaining the proper authorization from the United States.[86]

Iranian commercial entities deploy the above mentioned practices specifically to evade those controls put in place by the United States, international community, and responsible financial institutions, controls that are designed to enforce international sanctions, prevent the proliferation of nuclear weapons and their delivery systems, and protect the international financial sector from abuse by illicit actors. These practices by Iranian entities have allowed Iran to engage in illicit activities and operate undetected in the international economy.[87]

---

[83] "Testimony of Stuart Levey, Under Secretary for Terrorism and Financial Intelligence, Before the Senate Committee on Banking, Housing and Urban Affairs," March 21, 2007 (http://www.treasury.gov/press-center/press-releases/Pages/hp325.aspx).

[84] "German Report Details Smuggling of Nuclear Bomb, Missile Components to Iran," Hamburg Stem, July 16, 2009.

[85] "Kyodo: Mitutoyo Falsifies Iranian Recipient's Name to Get Export Permission," Tokyo Kyodo World Service, August 26, 2006 (http://www.freerepublic.com/focus/f-news/1690388/posts).

[86] See "U.K. Firm Fined $2 Million After Pleading Guilty to Illegally Exporting Boeing 747 Aircraft to Iran," U.S. Department of Justice, May 11, 2010 (http://www.justice.gov/opa/pr/2010/May/10-nsd-551.html).

[87] "Testimony of Stuart Levey, Under Secretary for Terrorism and Financial Intelligence, Before the Senate Committee on Banking, Housing and Urban Affairs," March 21, 2007 (http://www.treasury.gov/press-center/press-releases/Pages/hp325.aspx).

**The IRGC:** The IRGC, which was designated by the Department of State as a primary proliferator under E.O. 13382 in October 2007,[88] owns and/or controls multiple commercial entities across a wide range of sectors within the Iranian economy.  For example, the IRGC established Khatam al-Anbiya,[89] the largest major Iranian construction conglomerate, to generate income and fund IRGC operations while presenting the company as a legitimate company working on civilian projects.[90]  Khatam al-Anbiya was designated by Treasury in 2007 pursuant to E.O. 13382.[91]  U.S.-designated, Iranian-linked financial institutions have served as an important lifeline for Khatam al-Anbiya.  The U.S. and EU-designated Iranian banks Melli, Mellat, and state-owned Iranian Bank Tejarat have provided financial support to Khatam al-Anbiya-related business before and after the UN designation of Khatam al-Anbiya and fourteen of its subsidiaries.

The IRGC has continued to expand its control over commercial enterprises within Iran.  For example, Tidewater Middle East Company ("Tidewater"), a port operating company, was designated by Treasury under E.O. 13382 in June 2011 as a company that

---

[88] *See* "Fact Sheet: Designation of Iranian Entities and Individuals for Proliferation Activities and Support for Terrorism," U.S. Treasury, October 25, 2007 (http://www.treasury.gov/press-center/press-releases/Pages/hp644.aspx).

[89] In October 2007, the Treasury Department designated nine IRGC-affiliated companies and five IRGC-affiliated individuals for proliferation activity under E.O. 13382 as derivatives of the IRGC, including Khatam al-Anbiya Construction Headquarters, which secured deals worth at least $7 billion in the oil, gas and transportation sectors, among others, in 2006.  *See Id.*  The European Union also designated Khatam al-Anbiya for supporting the Iranian ballistic missile and nuclear programs. *See* "European Council Common Position 2008/479/CFSP," Official Journal of the European Union, June 23, 2008 (http://eur-lex.europa.eu/LexUriServ/LexUriServ.do?uri=OJ:L:2008:163:0043:0049:en:PDF).

[90] "Ex-Iranian Official Tells UK Daily About Likely IRGC Earnings, Activities," The Financial Times, March 16, 2007.

[91] "Fact Sheet: Designation of Iranian Entities and Individuals for Proliferation Activities and Support for Terrorism," U.S. Treasury, October 25, 2007 (http://www.treasury.gov/press-center/press-releases/Pages/hp644.aspx).

is owned by the IRGC. Tidewater has operations at seven Iranian ports,[92] some of which the Iranian government has repeatedly used to export arms or related material in violation of UNSCRs.[93] Treasury also designated Iran Air under E.O. 13382 for providing material support to the IRGC and MODAFL, both of which used the commercial airline carrier to transport military-related equipment on passenger aircraft.[94] Similarly, as noted in Treasury's designation of the leadership within the IRGC-Qods Force ("IRGC-QF"), the IRGC and the IRGC-QF engage in seemingly legitimate activities that provide cover for intelligence operations and support terrorist groups such as Hizballah, Hamas and the Taliban.[95]

**Islamic Republic of Iran Shipping Lines ("IRISL"):** Treasury designated IRISL, Iran's national maritime carrier, and affiliated entities pursuant to E.O. 13382 for providing logistical services to MODAFL.[96] The concern over IRISL's role in Iran's illicit activities has grown significantly within the international community. In October 2009, the UK and Bermuda also designated IRISL.[97] Three IRISL-related entities, Irano Hind Shipping Company, IRISL Benelux NV, and South Shipping Line Iran (SSL), were sanctioned by the UN in June 2010.[98] Subsequently, the EU, Australia, Canada, Japan,

---

[92] *See* U.S. Treasury "Fact Sheet: Treasury Sanctions Major Iranian Commercial Entities," June 23, 2011. (http://www.treasury.gov/press-center/press-releases/Pages/tg1217.aspx).
[93] *Id.*
[94] *Id.*
[95] "Fact Sheet: U.S. Treasury Department Targets Iran's Support for Terrorism," U.S. Treasury Department, August 3, 2010 (http://www.treasury.gov/press-center/press-releases/Pages/tg810.aspx).
[96] "Major Iranian Shipping Company Designated for Proliferation Activity," U.S. Treasury, September 10, 2008 (http://www.treasury.gov/press-center/press-releases/Pages/tg1067.aspx).
[97] *See* "The Financial Restrictions (Iran) Order 2009," HM Treasury, October 12, 2009 (http://www.hm-treasury.gov.uk/d/fin_crime_iran_order.pdf) and "Anti-Terrorism (Financial Restrictions Iran) Order 2010," The Minister of Justice, January 15, 2010 (http://www.bermudalaws.bm/Laws/Consolidated%20Laws/Anti-Terrorism%20(Financial%20Restrictions%20Iran)%20Order%202010.pdf).
[98] *See* UN Security Resolution 1929 (http://daccess-dds-ny.un.org/doc/UNDOC/GEN/N10/396/79/PDF/N1039679.pdf?OpenElement).

Norway, South Korea, and Switzerland adopted measures against IRISL.[99]   Additionally, as IRISL became increasingly unable to maintain adequate hull and protection-and-indemnity (P&I) insurance because of international sanctions, IRISL was forced to turn to Tehran-based Moallem Insurance Company, which was not in the business of providing maritime insurance.  Treasury designated Moallem in December 2010 for providing marine insurance to IRISL vessels.[100]

Iran's main shipping line has long relied upon deceptive techniques to conceal its behavior and to avoid international and U.S. sanctions.[101]  IRISL is increasingly employing deceptive practices to disguise its involvement in shipping operations and the designation of its cargo.  Since being subjected to U.S. and international sanctions, IRISL has renamed as many as 80 of the ships in its fleet and changed ownership information

[99] See "Council Implementing Regulation (EU) No 668/2010," European Union, July 26, 2010 (http://eur-lex.europa.eu/LexUriServ/LexUriServ.do?uri=OJ:L:2010:195:0025:0036:EN:PDF); "Accompanying Measures Pursuant to United Nations Security Council Resolution 1929," Ministry of Foreign Affairs of Japan, September 3, 2010 (http://www.mofa.go.jp/region/middle_e/iran/measures_unsc_1009.html); "Government Regarding the Implementation of UNSCR 1929," Republic of Korea, September 8, 2010; "Charter of the United Nations (Sanctions – Iran) (Specified Entities) List 2010, Government of Australia, August 4, 2010 (http://www.comlaw.gov.au/Details/F2010L02236); Special Economic Measures (Iran) Regulations, Government of Canada, August 4, 2010 (http://canadagazette.gc.ca/rp-pr/p2/2010/2010-08-04/html/sor-dors165-eng.html); "Press Release," Government of Norway, Ministry of Foreign Affairs, January 14, 2011 (http://www.regjeringen.no/mobil/en/dep/ud/press/news/2011/sanctions_iran_adopted.html?id=630820); "Iran Federal Council Takes Steps to Improve Legal Certainty and Prevent Possible Evasion," January 19, 2011, The Federal Authorities of the Swiss Federation (http://www.admin.ch/aktuell/00089/index.html?lang=en&msg-id=37283).
[100] See "Fact Sheet: Treasury Designates Iranian Entities Tied to the IRGC and IRISL," December 21, 2010, (http://www.treasury.gov/press-center/press-releases/Pages/tg1010.aspx).
[101] For example, on June 20, 2011, the District Attorney of New York announced a 317-count indictment of eleven corporations and five individuals for their roles in a conspiracy involving IRISL, its regional offices, and its agents.  The indictment alleged that the defendants evaded U.S. economic sanctions tied to bans on trade with countries that harbor foreign terrorist and proliferators of weapons of mass destruction.  In doing so, the defendants repeatedly falsified the records of banks located in New York County to access illegally the U.S. financial system. The defendants deceived Manhattan banks into processing more than $60 million worth of payments using aliases or corporate alter egos to hide their conduct.  See "Iranian Company Charged With Tricking U.S. Banks," New York Times, June 20, 2014 (http://www.nytimes.com/2011/06/20/nyregion/iranian-shipper-accused-of-sneaking-money-through-ny-banks.html).

and flag registries to evade sanctions.[102] IRISL also has renamed its offices in China, Singapore, Germany, and South Korea, has tried to mask its operations in the UAE by using a network of front companies,[103] and has moved its container operations to a subsidiary, HDS Lines.[104] Moreover, IRISL has also since stopped referring to HDS Lines in bills of lading from its shipping agent.[105]

These deceptive practices are designed to avoid scrutiny in financial transactions. As the U.S and other jurisdictions have prohibited financial institutions from processing transactions involving sanctioned entities, IRISL's deceptive practices seek to disguise IRISL's involvement in order to permit the financial transaction. In an advisory to U.S. financial institutions, FinCEN noted IRISL's efforts to rename vessels and adjust information associated with financial transactions and suggested that the International Maritime Organization ("IMO") registration number, which is a unique identifier assigned to each vessel, could provide a useful indication of whether an IRISL vessel is involved in a transaction.[106] In addition, OFAC issued an advisory to alert shippers, importers, exporters, and freight forwarders of IRISL's efforts to hide its involvement in transactions by using container prefixes registered to another carrier, omitting or listing invalid, incomplete or false container prefixes in shipping container numbers, and naming non-existent ocean vessels in shipping documents.[107]

---

[102] "Iran Shipper Evades US Blacklist," Wall Street Journal, April 10, 2010.
[103] See (http://www.treasury.gov/press-center/press-releases/Pages/tg1212.aspx)
[104] "U.S. Keeps Watch on Iranian Shipping," Wall Street Journal, May 28, 2010.
[105] Id.
[106] See "Update on the Continuing Illicit Finance Threat Emanating from Iran," FIN-2010-A008, June 22, 2010 (http://www.fincen.gov/statutes_regs/guidance/html/fin-2010-a008.html).
[107] See OFAC Nonproliferation and Weapons of Mass Destruction Advisory, "Presentation of Fraudulent Shipping Documents," March 31, 2011. (http://www.treasury.gov/resource-center/sanctions/Programs/Documents/20110331_advisory.pdf).

### B.     The substance and quality of administration of the bank supervisory and counter-money laundering laws of that jurisdiction

Iran's serious deficiencies with respect to anti-money laundering/countering the financing of terrorism ( "AML/CFT") controls has long been highlighted by numerous international bodies and government agencies.  Starting in October 2007, the FATF has issued a series of public statements expressing its concern that Iran's lack of a comprehensive AML/CFT regime represents a significant vulnerability within the international financial system.  The statements further called upon Iran to address those deficiencies with urgency, and called upon FATF-member countries to advise their institutions to conduct enhanced due diligence with respect to the risks associated with Iran's deficiencies.[108]

The FATF has been particularly concerned with Iran's failure to address the risk of terrorist financing, and starting in February 2009, the FATF called upon its members and urged all jurisdictions to apply effective counter-measures to protect their financial sectors from the terrorist financing risks emanating from Iran.[109]  In addition, the FATF advised jurisdictions to protect correspondent relationships from being used to bypass or evade counter-measures and risk mitigation practices, and to take into account money

---

[108] In response to concerns raised by these FATF and IMF reports, FinCEN issued an advisory on October 16, 2007 to financial institutions regarding the heightened risk of Iranian "money laundering, terrorist financing, and weapons of mass destruction proliferation financing."  The advisory further cautioned institutions that there may be an increased effort by Iranian entities to circumvent international sanctions and related financial community scrutiny through the use of deceptive practices.  See "Guidance to Financial Institutions on the Increasing Money Laundering Threat Involving Illicit Iranian Activity," FinCEN, October 16, 2007 (http://www.fincen.gov/statutes_regs/guidance/pdf/guidance_fi_increasing_mlt_iranian.pdf). The FATF simultaneously published guidance to assist countries with implementation of UNSCRs 1737 and 1747. See "Guidance Regarding the Implementation of Activity-Based Financial Prohibitions of United Nations Security Council Resolution 1737," October 12, 2007 (http://www.fatf-gafi.org/dataoecd/43/17/39494050.pdf), and "Guidance Regarding the Implementation of Financial Provisions of the United Nations Security Council Resolutions to Counter the Proliferation of Weapons of Mass Destruction," September 5, 2007 (http://www.fatf-gafi.org/dataoecd/23/16/39318680.pdf).
[109] See "FATF Statement on Iran," The Financial Action Task Force, February 25, 2009 (http://www.fatf-gafi.org/dataoecd/18/28/42242615.pdf).

laundering and financing of terrorism risks when considering requests by Iranian financial institutions to open branches and subsidiaries in their jurisdictions.[110] The FATF also called on its members and other jurisdictions to advise their financial institutions to give special attention to business relationships and transactions with Iran, including Iranian companies and financial institutions.[111] Over the past three years, the FATF has repeatedly reiterated these concerns and reaffirmed its call for FATF-member countries and all jurisdictions to implement countermeasures to protect the international financial system from the terrorist financing risk emanating from Iran. In response, numerous countries, including all G7 countries, have issued advisories to their financial institutions.[112]

The FATF's most recent statement in October 2011 reiterated, with a renewed urgency, its concern regarding Iran's failure to address the risk of terrorist financing and the serious threat this poses to the integrity to the international financial system.[113] The FATF reaffirmed its February 2009 call to apply effective countermeasures to protect their financial sectors from ML/FT risks emanating from Iran, and further called upon its members to consider the steps already taken and possible additional safeguards or

---

[110] *Id.*

[111] *Id.*

[112] *See* "Circular 13/2008 (GW) - Statement of the FATF of 16 October 2008," November 7, 2008 (http://www.bafin.de/cln_171/nn_721228/SharedDocs/Veroeffentlichungen/EN/Service/Circulars/rs__0813__gw.html?__nnn=true); "February 27, 2009 FINTRAC Advisory," February 27, 2009 (http://www.fintrac-canafe.gc.ca/publications/avs/2009-02-27-eng.asp); "HM Treasury warns businesses of serious threats posed to the international financial system," March 11, 2009 (http://webarchive.nationalarchives.gov.uk/+/http://www.hm-treasury.gov.uk/press_26_09.htm); "Letter from French Minister of Economy," (http://www2.economie.gouv.fr/directions_services/dgtpe/sanctions/sanctionsiran.php); and "Bank of Italy Circular," (http://www.dt.tesoro.it/it/prevenzione_reati_finanziari/).

[113] *See* "FATF Public Statement," The Financial Action Task Force, October 28, 2011 (http://www.fatf-gafi.org/document/55/0,3746,en_32250379_32236992_48966519_1_1_1_1,00.html).

strengthen existing ones.[114] In addition, the FATF stated that, if Iran fails to take concrete steps to improve its AML/CFT regime, the FATF will consider calling on its members and urging all jurisdictions to strengthen countermeasures in February 2012.[115]  The numerous calls by FATF for Iran to urgently address its terrorist financing vulnerability, coupled with the extensive record of Iranian entities using the financial system to finance terrorism, proliferation activities, and other illicit activity,[116] raises significant concern over the willingness or ability of Iran to establish adequate controls to counter terrorist financing.

C.   Whether the United States has a mutual legal assistance treaty with that jurisdiction, and the experience of U.S. law enforcement officials and regulatory officials in obtaining information about transactions originating in or routed through or to such jurisdiction

Iran has not entered into any mutual legal assistance treaties.  Additionally, U.S. law enforcement and regulatory officials have found Iran to be uncooperative regarding access to information about financial transactions.  Accordingly, Iran remains a safe haven for those who would commit financial crimes against the United States.

---

[114] *Id.*
[115] *Id.*
[116] "Update on the Continuing Illicit Finance Threat Emanating From Iran," FinCEN, June 22, 2010 (http://www.fincen.gov/statutes_regs/guidance/html/fin-2010-a008.html).

## III.   Finding

Based on the foregoing factors, the Director of FinCEN hereby finds that the

Islamic Republic of Iran is a jurisdiction of primary money laundering concern.

Dated: 11/18/2011

/S

_____

James H. Freis, Jr.
Director
Financial Crimes Enforcement Network

28