**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------------------x
                                  :

FIONA HAVLISH, individually and on behalf of
the ESTATE OF DONALD G. HAVLISH, JR.,    :    CASE NO.: 16 CIV 8075 (JFK)
Deceased, *et al*. (*see* Exhibit 1 for full list of   :
Havlish Judgment Holders); ALICE HOGLAN
individually, *et al*.                         :
(*see* Exhibit 2 for a full list of the
Hoglan Judgment Holders),              :

                    Plaintiffs,    :

            v.                    :

CLEARSTREAM BANKING S.A., a Luxembourg :
banking corporation; BANCA UBAE, SpA, an
Italian banking corporation; CENTRAL BANK OF :
IRAN, *a.k.a.* Bank Markazi; and the ISLAMIC
REPUBLIC OF IRAN,               :

                  Defendants.    :

--------------------------------------------------------------------x

# FIRST AMENDED COMPLAINT

## PRELIMINARY STATEMENT

1.     Plaintiffs are victims of the horrific, murderous terrorist attacks of September 11,

2001, upon the United States.  Each Plaintiff holds a judgment ("Judgment Holders") against the

Islamic Republic of Iran and fifteen of its political subdivisions and agencies and

instrumentalities, including Bank Markazi, the central bank of Iran (collectively, "Iranian

Judgment Debtors").  The judgments award the Judgment Holders, collectively, more than

$10,062,588,000 in compensatory and punitive damages, plus pre- and post-judgment interest.

2.     The judgments were entered in two cases, *Havlish, et al. v. bin Laden, et al.*, Case

No. 03-cv-09848 (SDNY) and *Hoglan, et al. v. Islamic Republic of Iran, et al.*, Case No. 1:11-

cv-07550 (SDNY), after the Judgment Holders submitted evidence to the Court proving that the

Iranian Judgment Debtors provided direct and material support and resources for the September

11, 2001 terrorist attacks.

3.      The Iranian Judgment Debtors are the Islamic Republic of Iran, Iran's then

Supreme Leader Ayatollah Ali Hosseini Khamenei, Ali Akbar Rafsanjani, the Iranian Ministry

of Information and Security, the Islamic Revolutionary Guard Corps, the Iranian Ministry of

Petroleum, the Iranian Ministry of Economic Affairs and Finance, the Iranian Ministry of

Commerce, the Iranian Ministry of Defense and Armed Forces Logistics, the Central Bank of

Iran, *a.k.a.* Bank Markazi, the National Iranian Petrochemical Company, the National Iranian Oil

Company, the National Iranian Tanker Company, the National Iranian Gas Company, Iran Air,

and Hezbollah.

4.      The Iranian Judgment Debtors knew thousands of Americans had been killed in

the terrorist attacks on the Twin Towers in New York City, New York and the Pentagon in

Arlington, Virginia, and in an airplane apparently being diverted to a target in Washington, D.C.

that crashed near Shanksville, Pennsylvania.  They knew they had provided direct and material

support and resources to carry out the attacks.  And, they knew the families and heirs of those

thousands of Americans killed by September 11, 2001 terrorist attacks were then seeking, and

would continue to seek, many billions of dollars in damages against them for their direct

participation in, and material support for, the attacks.

5.      Among the Americans who have sought damages against the Iranian Judgment

Debtors for their role in the September 11, 2001 terrorist attacks are the Havlish Judgment

Holders and the Hoglan Judgment Holders.

6.     In light of pending and anticipated lawsuits, and the potential for billions of dollars in damages, Defendants Islamic Republic of Iran; Bank Markazi, the central bank of Iran; Clearstream Banking, S.A. ("Clearstream"); and Banca UBAE, SpA entered into a conspiracy with the actual intent to hinder, delay, and defraud the Judgment Holders by attempting to conceal assets subject to U.S. jurisdiction belonging to Bank Markazi at Defendant Clearstream. The assets consisted of securities entitlements in certain global bonds owned by Bank Markazi and processed by Clearstream.  Clearstream received and processed Markazi's payments of principal and interest relating to the securities entitlements bank accounts at JPMorgan Chase Bank, N.A. in New York City ("JPM").  The conspiracy attempted to conceal Markazi's ownership in the bonds and the payments of principal and interest by transferring the securities entitlements from an account at Clearstream held in Bank Markazi's name to a different account at Clearstream that Banca UBAE opened for the specific purpose of furthering the conspiracy by creating a false appearance that Bank Markazi no longer owned securities entitlements.  In fact, however, Clearstream, Banca UBAE, and Bank Markazi knew and intended that Bank Markazi would maintain complete ownership and control over the assets.

7.     This Amended Complaint seeks to (i) transfer to the United States pursuant to 22 U.S.C. Section 8772 as amended by the National Defense Authorization Act for Fiscal Year 2020, Public Law 116-92, 113 Stat. 1198 (December 20, 2019), *Peterson v. Islamic Republic of Iran*, 876 F.3d 63 (2d Cir. 2017) ("*Peterson II*"), and *Peterson v. Islamic Republic of Iran*, Case No. 15-0690 (2d Cir. June 22, 2020) ("*Peterson III*") all assets held in the name of, or beneficially owned by, Bank Markazi at Clearstream; (ii) set aside, to the extent necessary, the transfers of all financial assets from Bank Markazi to accounts held in the name of Bana UBAE,

as more specifically described below; and (iii) turn those fraudulently transferred assets over to the Judgment Holders in accordance with applicable law.

8.    The Amended Complaint also asks the Court for a declaratory judgment ordering that (i) transfers undertaken in October 2012 violated Executive Order 13559, which blocked financial assets belonging to Iran and Bank Markazi in the United States, (ii) the financial assets transferred in violation of Executive Order 13559 be unwound pursuant to 31 C.F.R. 560.211-212, and (iii) the financial assets be turned over to the Havlish and Hoglan Judgment Holders.

9.    The assets being sought in this Amended Complaint are not entitled to immunity from execution under the United States Foreign Sovereign Immunities Act.  28 U.S.C. § 1601, *et seq*.  Each of the Iranian Judgment Debtors was found liable for the wrongful deaths and personal injuries caused by their participation in, and material support for, the September 11, 2001 terrorist attacks in violation of 28 U.S.C. § 1605A.  Consequently, their assets are not immune from execution.  28 U.S.C. § 1610(a)(7).   More particularly, Bank Markazi's assets are not entitled to immunity under 28 U.S.C. § 1611(b)(1) because (i) it does not operate as a central bank within the meaning of that provision, but rather is so controlled by the Government of Iran that it is a political subdivision of the government; (ii) even if it were a central bank, Bank Markazi was not holding the funds at issue in this Amended Complaint for "its own account," as required by that provision; and (iii) the assets being sought in this Amended Complaint are proceeds from commercial transactions carried out in commercial markets by an entity or entities other than Bank Markazi.

10.    The assets being sought in this Amended Complaint are not immune from execution and are subject to turnover pursuant to 22 U.S.C. Section 8772 as amended by the

National Defense Authorization Act for Fiscal Year 2020, Public Law 116-92, 113 Stat. 1198 (December 20, 2019).

11.     The assets being sought in this Amended Complaint are also not immune from execution and are subject to turnover pursuant to Section 201 of the Terrorism Risk Insurance Act of 2002, Pub. L. 107-297, Title II, § 201(a), 116 Stat. 2337 (2002) ("TRIA").

12.     Finally, the assets being sought in this Amended Complaint are also not immune from execution and are subject to turnover pursuant to *Koehler v. Bank of Berm. Ltd.*, 12 N.Y.3d 533, 911 N.E.2d 825, 883 N.Y.S.2d 763 (2009), and its progeny, because they are held by Defendant Clearstream Banking S.A., which is subject to this Court's jurisdiction.  The assets are, therefore, subject to an order compelling Clearstream to transfer them to the United States.

## THE PARTIES

### The Havlish Judgment Holder Plaintiffs

13.     The Havlish Judgment Holders are representatives of 47 Decedents' Estates and 110 individual family members of such Decedents.  A full list of the Havlish Judgment Holders is attached as Exhibit 1.  Each of the Havlish Judgment Holders is a Plaintiff in this action.

14.     The Havlish Judgment was entered against the Iranian Judgment Debtors on October 16, 2012 in *Havlish, et al. v. bin Laden, et al.*, 1:03-cv-09848 (GBD) (FM) (S.D.N.Y.) (the "Havlish Litigation").  It awarded compensatory and punitive damages in the aggregate amount of $6,737,039,127.10, comprised of $1,362,277,884 in compensatory damages, pre-judgment interest of $688,525,322.10 (on $968,000,000 in pain-and-suffering damages at 4.96% annually), and $4,686,235,921 in punitive damages.  As of the date this Amended Complaint, and after accounting for compensation received by some Havlish Judgment Holders from other sources, the total outstanding amount of the Havlish Judgment is $2,066,800,264.84, together

with post-judgment interest from October 16, 2012.  A copy of the Havlish Judgment is attached as Exhibit 3.

15.     This Court has authorized the Havlish Judgment Holders to execute their Judgments against the assets for which turnover is sought in this Amended Complaint pursuant to 28 U.S.C. § 1610(c).  Further, it has authorized the Havlish Judgment Holders to issue restraining notices on Clearstream pursuant to NYCPLR 5222.  Finally, it has issued writs of execution to Clearstream pursuant to NYCPLR 5225.

        The Hoglan Judgment Holder Plaintiffs.

16.     The Hoglan Judgment Holders are representatives of 13 Decedents' Estates and 145 individual family members of such Decedents.  A full list of the Hoglan Judgment Holders, each of whom is a Plaintiff in this action is attached as Exhibit 2.

17.     The Hoglan Judgment was entered against the Iranian Judgment Debtors on October 31, 2016, and restated on February 26, 2018, in *Hoglan, et al v. the Islamic Republic of Iran*, 1:11-cv-07550 (GBD)(SN) (S.D.N.Y.).  It awarded the Hoglan Judgment Holders compensatory damages in the aggregate amount of $3,325,549,005.58, comprised of $1,841,840,035 in compensatory damages, pre-judgment interest of $ 1,483,708,970.58 (on $1,372,375,000 in pain-and-suffering damages at 4.96% annually).  As of the date this Amended Complaint, and after accounting for compensation received by some Hoglan Judgment Holders, the total outstanding amount of the Havlish Judgment is $3,263,329,149.28, together with post-judgment from October 31, 2016.  A copy of the Hoglan Judgment is attached hereto as Exhibit 4.

18.     This Court has authorized the Hoglan Judgment Holders to execute their Judgments against the assets for which turnover is sought in this Amended Complaint pursuant

to 28 U.S.C. § 1610(c).  Further, it has authorized the Hoglan Judgment Holders to issue

restraining notices on Clearstream pursuant to NYCPLR 5222.  Finally, it has issued writs of

execution to Clearstream pursuant to NYCPLR 5225.

19.     This Amended Complaint sometimes refers to the Havlish Judgment Holders and

the Hoglan Judgment Holders collectively as the "Judgment Holders."

The Defendants.

20.     Defendant Clearstream Banking S.A. ("Clearstream") is a banking corporation

organized under the laws of the Grand Duchy of Luxembourg.  Clearstream provides

international financial services for the financial industry, including securities settlement and

custody-safe keeping services.  Clearstream holds assets belonging to Bank Markazi that are

subject to turnover in satisfaction of the Havlish Judgment and the Hoglan Judgment.

Clearstream's main office is located at 42 Avenue John F. Kennedy, L-1855 Luxembourg,

Luxembourg.  For decades, it has maintained and done business in the State of New York

through a Representative Office at 1155 Avenue of the Americas, 19th Floor, New York,

NY 10036.

21.     Defendant Banca UBAE, SpA ("UBAE") is a banking corporation organized

under the laws of Italy.  UBAE is the holder of an account at Clearstream containing assets

belonging to Bank Markazi that are subject to turnover in satisfaction of the Havlish Judgment

and the Hoglan Judgment.  UBAE maintains its principal office in Rome, Italy.  UBAE

maintains a correspondent bank account in the United States.  At the times relevant to the

allegations in this Amended Complaint, UBAE was majority owned by Libyan dictator

Muammar Gaddafi.

22.     Defendant Islamic Republic of Iran ("Iran") is an Iranian Judgment Debtor.  Iran is a foreign sovereign and has been a U.S. government-designated state sponsor of terrorism every year since 1984.  Accordingly, Iran is not immune from suit and its assets are not immune from execution arising from claims based on 28 U.S.C. § 1605A for its participation in, or material support for, acts of international terrorism.  Both the Havlish Judgment and the Hoglan Judgment were entered pursuant to 28 U.S.C. § 1605A after this Court found that Iran had participated in, and provided material support for, the terrorist attacks on September 11, 2001.

23.     Defendant, Central Bank of Iran, *a.k.a.* Bank Markazi, ("Markazi") is an Iranian Judgment Debtor.  Markazi purports to be the central bank of Iran.  However, Iran controls Markazi to such an extent that Markazi does not qualify as a central bank within the scope of the FSIA.  Among other things, Markazi maintains no independence or freedom to act.  The Government of Iran directed Markazi to engage in the conduct described in this Amended Complaint and supervised Markazi's performance of those acts.  The U.S. Department of Treasury recognizes Iran's control over Markazi in § 535.433 of the U.S. Iranian Assets Control Regulations, which states, "The Central Bank of Iran (Bank Markazi Iran) is an agency, instrumentality and controlled entity of the government of Iran for all purposes under this part [i.e., 31 C.P.R. Part 535]."  Given the nature and extent of Iran's control over Markazi, Markazi is, as a matter of law, a political subdivision of the Government of Iran within the meaning of the FSIA.  For purposes of this Complaint, the term "Markazi" will refer to Iran and Markazi collectively.

24.     On November 18, 2011, the U.S. Department of the Treasury issued a finding that Iran is a "jurisdiction of primary money laundering concern" as a result of Iran's illegal and deceptive efforts to facilitate its support for global terrorism and its pursuit of weapons of mass

destruction, including nuclear and ballistic missile capabilities.  More particularly, the U.S.

Treasury Department found that Markazi, among other state-owned Iranian banks, "willingly

engage[s] in deceptive practices to disguise illicit conduct, evade international sanctions, and

undermine efforts of responsible regulatory agencies."

26. 25.     Iran and Markazi routinely fail to comport with the strict anti-money laundering

and counter-terrorism financing controls in place worldwide (including, but not limited to,

recommendations by the Financial Action Task Force), and fail to comply with the Basal III

standards which govern risk management, corporate governance, bankruptcy laws, and other

bank safety requirements.

## SUBJECT MATTER JURISDICTION AND VENUE

26.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1605(a)(1),

1605(a)(2), 1605A, 1610(a) and (g); TRIA because this actions seeks to enforce judgments

arising from violations of 28 U.S.C. § 1605A; and 22 U.S.C. § 8772 as amended by the National

Defense Authorization Act for Fiscal Year 2020, Public Law 116-92, 113 Stat. 1198 (December

20, 2019); and *Koehler v. Bank of Berm. Ltd.*, 12 N.Y.3d 533, 911 N.E.2d 825, 883 N.Y.S.2d

763 (2009).

27.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because

this action arises out of the laws of the United States including the United States Foreign

Sovereign Immunities Act, 28 U.S.C. §§ 1605A, 1610, and the Terrorism Risk Insurance Act

H.R. 3210, Pub. L. 107-297 (2002); the International Emergency Powers Act, 50 U.S.C. § 1701,

*et seq.*; Executive Order 13599 of February 5, 2012, issued by President Obama, Exec. Order 77

Fed. Reg. 6659 (Feb. 8, 2012); and the regulations promulgated thereunder by the Office of

Foreign Assets Control, of the U.S. Department of the Treasury ("OFAC") codified at 31 C.F.R. §§ 560.211 and 560.212.

28.     This Court has subject matter jurisdiction because this proceeding arises under Fed. R. Civ. P. 69(a), which incorporates judgment enforcement laws of the State of New York and the United States, and because Clearstream, which currently holds Markazi's assets, is subject to this Court's jurisdiction.

29.     This Court has subject matter jurisdiction over the portion of the Amended Complaint requesting a declaratory judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, and Fed. R. Civ. P. 57, declaring void, as violating state and federal law, (i) certain transfers of securities entitlements in various bonds from Markazi's account at Clearstream to one or more different accounts opened in the name of UBAE at Clearstream, which account(s) was opened and maintained for the sole benefit of Markazi and for the fraudulent purpose of concealing Markazi's ownership of the assets, and (ii) certain financial transfers of interest and principal payments relating to those securities entitlements from a Clearstream account at JPM in New York to the UBAE account and/or yet another account that has been segregated and blocked by Clearstream in Luxembourg.

30.     This Court has supplemental, or ancillary, enforcement jurisdiction over this cause of action pursuant to 28 U.S.C. § 1367 because this suit is brought to enforce an unsatisfied judgment.

31.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) and (d).

## PERSONAL JURISDICTION

**A.**    **Clearstream Is Subject to Personal Jurisdiction.**

32.    This Court has specific personal jurisdiction over Clearstream pursuant to CPLR

§ 302(a)(1)-(3), the New York state long-arm statute.

33.    <u>CPLR § 302(a)(1)</u>.  Clearstream is subject to personal jurisdiction in this district

pursuant to CPLR 302(a)(1) because it transacts business in the State of New York within the

meaning of CLPR 302(a)(1) and because the Judgment Holders' claims arise from specific

business transactions that Clearstream conducted in the State of New York.  Among other things:

      i.      Clearstream is registered with the New York State Department of

Financial Services to operate a foreign representative banking office in New York

pursuant to NY Bank Law 221-c.

      ii.      Clearstream has, for decades, operated a representative banking office in

the district, from which it regularly conducts business in New York and services its

clients' needs in the United States financial markets.

      iii.      Clearstream uses its New York office to engage in and support the sales,

marketing, and administration of its international financial services business.

      iv.      Clearstream uses its New York office as an extension of its Luxembourg-

based financial operations, to seek additional business for its international financial

services business, and to ensure seamless service to its clients by maintaining points of

contact in the important United States banking and financial markets.

      v.      Clearstream employs a number of New York-based individuals and

provides those employees with access to resources and facilities that enable them to

provide sales, marketing, and administrative services to Clearstream's international

financial services operations.  The facilities and resources include, among other things, office space in New York City, telephones, email access, email addresses, and fax lines.

vi.      Among other employees, a number of corporate vice-presidents are resident in its New York office.

vii.     Clearstream pays its New York-based employees out of bank accounts maintained in New York.

viii.    Clearstream maintains multiple bank accounts at multiple financial institutions in New York City and uses its New York bank accounts to conduct billions of dollars in business on a daily basis.  One of Clearstream's New York City bank accounts includes an account within this district at JPMorgan ("NY JPM Account").  For more than twenty-five years, Clearstream has conducted its business, and serviced its clients' needs through the NY JPM Account.

ix.      Clearstream sends and receives hundreds of transactions, totaling billions of dollars, through the NY JPM Account each day.  The transactions often involve the deposit and transfer of bond-related payments.

x.       The Judgment Holders claims, as more particularly described below, arise from business transactions Clearstream conducted on behalf of Markazi using the NY JPM Account between 2008 and 2012.  During that time period, Clearstream received into the NY JPM Account more than $1.68 billion in bond proceeds in which Markazi held a beneficial interest and subsequently transferred the assets outside the jurisdiction of the United States.

34.     CLPR § 302(a)(2).  Clearstream is also subject to personal jurisdiction in this district pursuant to CLPR § 302(a)(2) because it committed a tortious act in the State of New

York when, as more particularly described below, it entered into, and purposefully acted in furtherance of, a conspiracy with Markazi and UBAE to facilitate Markazi's effort to fraudulently hinder, delay, and defraud Iran's judgment creditors, including the Havlish Judgment Holders and the Hoglan Judgment Holders, and to unlawfully help Iran and Markazi evade sanctions imposed by the United States, the European Union, and other international sanctions.  Among other things, Clearstream knowingly and intentionally helped Markazi and UBAE conceal Markazi's ownership of approximately $4.6 billion in securities Clearstream was processing through its bank accounts in New York and then helped Markazi and UBAE transfer outside the United States jurisdiction more than $1.6 billion in Markazi funds relating to securities entitlements that were subject to attachment and execution by judgment creditors of Iran and Markazi, including the Judgment Holders.

35.    CLPR § 302(a)(3). Clearstream is also subject to personal jurisdiction in this district pursuant to CLPR § 302(a)(3) because it also committed a tortious act outside the State of New York knowing that it would cause injury within the State of New York.  As more particularly described below, it entered into, and purposefully acted in furtherance of, a conspiracy with Markazi and UBAE to help Markazi's and UBAE's effort to hinder, delay, and defraud Iran's and Markazi's judgment creditors, including the Judgment Holders, and to unlawfully help Iran and Markazi evade sanctions imposed by the United States, the European Union, and other international sanctions.  Among other things, Clearstream knowingly and intentionally helped Markazi and UBAE conceal Markazi's ownership of approximately $4.6 billion in securities that Clearstream was processing through its bank accounts in New York and then helped Markazi and UBAE transfer outside the United States jurisdiction more than $1.6

billion in Markazi funds relating to those securities entitlements that were subject to attachment and execution by judgment creditors of Iran and Markazi, including the Judgment Holders.

36.     This Court also has personal jurisdiction over Clearstream pursuant to Fed. R. Civ. P. 4(k)(1) because Clearstream is subject to jurisdiction in courts of general jurisdiction in the State of New York and pursuant to Fed. R. Civ. P. 4(k)(2) because the Judgment Holders' claims arise under federal law and exercising jurisdiction over Clearstream based on the conduct described in this Amended Complaint is consistent with the United States Constitution and laws.

**B.     UBAE Is Subject to Personal Jurisdiction.**

37.     This Court has specific personal jurisdiction over UBAE pursuant to CLPR 302(a)(3) because it committed a tortious act outside the State of New York that caused injury within the State of New York.  Among other things, as more particularly described below:

  i.     UBAE knowingly and intentionally entered into, and purposefully took actions in furtherance of, the conspiracy with Markazi and Clearstream to help Markazi hinder, delay, and defraud Iran's judgment creditors, including the Havlish Judgment Holders and Hoglan Judgment Holders, to prevent them from enforcing their judgments.

  ii.    UBAE knowingly and intentionally entered into, and purposefully took actions in furtherance of, the conspiracy with Markazi and Clearstream to unlawfully help Iran's effort to evade sanctions imposed by the United States, the European Union, and other international sanctions, which had the additional effect of hindering, delaying, and defrauding the Judgment Holders.

  iii.   UBAE knowingly and intentionally helped Markazi and Clearstream conceal Markazi's ownership of approximately $4.6 billion in securities that were being

processed by banks in New York, including assets that were subject to attachment and execution by judgment creditors of Iran and Markazi, including the Judgment Holders.

      iv.      UBAE received into an account it holds at Clearstream located outside United States jurisdiction more than $1.6 billion in Markazi funds relating to the securities entitlements that were subject to attachment and execution by judgment creditors of Iran and Markazi, including the Judgment Holders.

      v.      UBAE became Clearstream's principal in January 2008, and Clearstream acted on UBAE's orders and instructions in connection with all acts relating to the receipt, deposit, and transfer of any Markazi funds or securities entitlements both inside and outside the State of New York.

      vi.      UBAE joined the conspiracy and helped further the conspiracy's goals knowing that the conspiracy would cause harm to the Judgment Holders in New York.

      vii.      UBAE's actions benefited Markazi by concealing its assets in a specific and purposeful effort to hinder, delay and defraud the Judgment Holders.

      viii.      UBAE's actions benefited Clearstream by helping it meet Markazi's need to conceal its assets and by enabling Clearstream to continue servicing Markazi and earning fees from those services.

      ix.      UBAE's actions benefited itself through fees and other compensation it received as a result of servicing Markazi.

38.      To the extent UBAE is not subject to specific personal jurisdiction pursuant to CPLR 302(a)(3), this Court has personal jurisdiction over UBAE pursuant to Fed. R. Civ. P. 4(k)(2) because the Judgment Holders' claims arise under federal law and exercising jurisdiction

over UBAE based on the conduct described in this Complaint is consistent with the United States

Constitution and laws.

## FACTUAL BACKGROUND

A. **Iran Has Been Designated a State Sponsor of Terrorism by the United States and Has Been Sanctioned by Both the United States and the European Union for Its Participation in Acts of International of Terrorism**.

39.     Iran has been using acts of international terrorism to wage an undeclared,

surreptitious war against the United States and Israel for more than thirty (30) years.  Iran wages

this undeclared war through asymmetrical, or unconventional, strategies and terrorism, often

through proxies such as Hezbollah, Hamas, al-Qaeda, and other terrorist groups.  Iran provides

extensive funding, training, and weaponry to its proxies for the purpose of promoting,

facilitating, and carrying out violent and deadly acts of international terrorism.  As part of its

strategy, Iran has been actively seeking to acquire or develop nuclear weapons.

40.     The Secretary of State officially designated Iran as a state sponsor of terrorism on

January 19, 1984.  State sponsors of terrorism are countries the United States has found to have

repeatedly provided support for acts of international terrorism.  The Secretary of State has

renewed Iran's designation as a state sponsor of terrorism every year since 1984.  Iran is

currently still designated a state sponsor of terrorism.

41.     The European Union has also condemned Iran's history of participating in, and

supporting, acts of international terrorism.  As a consequence, the European Union has

implemented a variety of sanctions against Iran with the purpose of dissuading it from

participating in or supporting international terrorism.

42.     In addition to the United States and the European Union, the governments of almost every country in the world condemn Iran's participation in, and support for, acts of international terrorism.

43.     At all times relevant to the allegations of this Amended Complaint, the Defendants had actual knowledge that Iran participated in, supported, and facilitated violent and deadly acts of international terrorism.  Defendants gained their knowledge about Iran's participation in, and support for, international terrorism in many ways.  Among others, the Defendants learned about Iran's support for international terrorism through widespread news reporting in almost every country of the world, including the news media in countries were Defendants do business.

**B.     The United States and the European Union Imposed a Series of Ever Increasing Economic Sanctions Against Iran**

44.     In addition to designating Iran a state sponsor of terrorism, the United States has attempted to prevent Iran from continuing its support acts of international terrorism and from pursuing nuclear weapons by imposing increasingly severe economic sanctions against it. Among other sanctions, the United States imposed the following:

i.     On November 14, 1979, the United States blocked all property of Iran, including Markazi, in the United States in response to the hostage crisis.  Executive Order 12170, 44 Fed. Reg. 65729 (Nov. 14, 1979).  Though disputes relating to the blocked assets have been, and continue to be, resolved through a dispute resolution process known as the Algiers Accords, Executive Order 12170 remains in effect.

ii.     On March 15, 1995, the United States prohibited United States persons from directly or indirectly developing or financing the development of petroleum

resources inside Iran.  Executive Order 12957, 60 Fed. Reg. 12957 (Mar. 15, 1995).

Executive Order 12957 remains in effect.

iii.      On May 6, 1995, the United States prohibited trade with, and investment

in, Iran.  Executive Order 12959, 60 Fed. Reg. 24757 (May 6, 1995).

iv.      May 22, 2006, the United States Treasury Department amended the

Iranian Transaction Regulation, 31 C.F.R. Part 560, to increase civil and criminal

penalties for violation trade sanctions against Iran.  Amendment of Iranian Transaction

and Sanctions Regulations, 31 CFR part 560, 71 Fed. Reg. 29251 (2006).

v.      On September 12, 2006, the United States Treasury Department amended

the Iranian Transaction and Sanctions Regulations, 31 C.F.R. Part 560, to cut off Bank

Saderat, a major Iranian bank, and various of its subsidiary banks from the U.S. financial

system because it was a significant facilitator of Hezbollah's financial activities and has

served as a conduit between the Government of Iran and numerous terrorist

organizations, including Hezbollah, Hamas, the Popular Front for the Liberation of

Palestine- General Command, and Palestinian Islamic Jihad.  Amendment of Iranian

Transaction and Sanctions Regulations, 31 CFR part 560, 71 Fed. Reg. 53569 (2006).

vi.      On January 7, 2007, the United States Treasury Department placed Bank

Sepah, an Iranian state-run bank, on its Specially Designated Nationals List for helping

Iran in developing missiles that could carry nuclear weapons.  As a result of the

designation, all of Bank Sepah's branches and subsidiaries in Italy, United Kingdom,

France and Germany were to have their assets frozen by the United States.  Additional

Designation of Entities Pursuant to Executive Order 13382, 72 Fed. Reg. 7919 (2007).

vii.    On October 25, 2007, the United States Treasury Department imposed sanctions on Bank Melli, including various subsidiary banks, because it provided financial services to Iran's nuclear and ballistic missile programs and also sent at least $100 million to Hamas, Palestinian Islamic Jihad, Hezbollah and other terrorist groups from 2002 to 2006.  Among other things, Bank Melli employed deceptive banking practices to obscure its involvement from the international banking system.  Additional Designation of Entities Pursuant to Executive Order 13382, 72 Fed. Reg. 62520 (2007); Fact Sheet: Designation of Iranian Entities and Individuals for Proliferation Activities and Support for Terrorism, October 25, 2007, https://www.treasury.gov/press-center/press-releases/Pages/hp644.aspx.

viii.    By the end of 2007, the United States Treasury Department had sanction-designated eleven Iranian banks, including state-owned banks.  Fact Sheet: Overview of Iranian-Linked Financial Institutions Designated by The United States, https://www.treasury.gov/press-center/press-releases/Documents/012312_Fact_Sheet_-_Designated_Iranian_Financial%20Institutions.pdf.

45.    As a result of the sanctions, the United States imposed greater obligations on banking and financial institutions to forebear from engaging in or facilitating, transactions involving Iran or Iranian counterparties.

46.    Like the United States, the European Union also attempted to prevent Iran from continuing its support acts of international terrorism and from pursuing nuclear weapons by imposing its own set of increasingly severe economic sanctions against Iran.  Among other sanctions, the European Union imposed the following:

i.      On April 19, 2007, the European Union prohibited any individual or entity from engaging in the sale of goods or technology that could contribute to Iran's enrichment-related, reprocessing, or heavy water-related activities, or to the development of nuclear weapon delivery systems.  Regulation (EC) No. 423/2007, promulgated April 19, 2007.

ii.     On July 26, 2010, the European Union again expanded the sanctions imposed by Regulation (EC) No. 423/2007 to restrict (i) trade in dual-use goods and technology, as well as equipment which might be used for internal repression, (ii) trade in key equipment and technology for, and restrictions on investment in the Iranian oil and gas industry, (iii) restrict investments in the uranium mining and nuclear industry, (iv) restrict transfers of funds to and from Iran, (v) restrict transactions involving the Iranian banking sector, (vi) restrict Iran's access to the insurance and bonds markets of the Union, and (vii) restrict transactions relating to services involving Iranian ships and cargo aircraft.  Decision 2010/413/CFSP, dated July 26, 2010.

iii.    On October 25, 2010, the European Union again expanded economic sanctions against Iran.  Among other things, the European Union restricted financial transactions with Iranian individuals and entities, prohibited the purchase or sale of public-guaranteed bonds to or from Iranian individuals and entities, prohibited the provision of brokerage services to Iran or Iranian individual and entities relating to public-guaranteed bonds.  Regulation (EU) No. 961/2010, dated October 25, 2010.

iv.     On January 23, 2012, the European Union expanded the sanctions to (i) prohibit trade in dual-use goods and technology, as well as on key equipment and technology which could be used in the petrochemical industry; (ii) ban the import of

Iranian crude oil, petroleum products and petrochemical products, as well as a prohibition

of investment in the petrochemical industry; (iii) prohibit trade in gold, precious metals

and diamonds with the Government of Iran; and (iv) prohibit the delivery of newly

printed banknotes and coinage to or for the benefit of the Central Bank of Iran.  Decision

2012/35/CFSP, dated January 23, 2012.  In particular, the European Union froze all

assets belonging to Markazi.  Id.

> v.       On March 23, 2012, the European Union significantly expanded the
>
> economic sanctions against Iran to include a broader array of goods, services, technology,
>
> and financial support.  In particular, the European Union precluded transferring any
>
> funds, securities, or other financial instruments to or from Iran or any Iranian person or
>
> entity and purchasing or selling bonds from or to Iran or any Iranian person or entity.
>
> Regulation (EU) 267/2012, dated March 23, 2012.

47.     The United States and European Union sanctions imposed compliance obligations

on Defendants.  As financial institutions operating in the world marketplace, Defendants were

notified of, and obligated to comply with, the sanctions.  To ensure compliance, Defendants

implemented internal procedures and systems to monitor financial transactions conducted

through their respective banking systems.  Therefore, Defendants had actual knowledge of the

sanctions and their obligations to comply with them.

**C.     United States Courts Have Repeatedly Held Iran Civilly Liable for
Supporting Acts of International Terrorism and Authorized Judgment
Creditors to Execute on Iranian Assets in the United States.**

48.     United States Courts have also repeatedly found Iran civilly liable for supporting

and facilitating acts of international terrorism that resulted in the death and injury of thousands of

United States citizens and employees of the United States government.  Judgment has been

entered against Iran and its various political subdivisions, and agencies and instrumentalities, more than ninety times for its role in the violent and deadly acts of international terrorism such as the 1983 suicide bombing of the U.S. Marine Barracks in Beirut, the 1983 and 1984 bombings of the U.S. Embassy and Embassy Annex in Beirut, the 1998 twin U.S. Embassy bombings in Kenya and Tanzania, the 1996 bombing of Khobar Towers in Saudi Arabia, which housed U.S. Air Force personnel, the terrorist attacks of September 11, 2001, and numerous kidnappings, hijackings, assassinations, and suicide bombings both here in the United States and abroad.

49.     The compensatory damages amounts entered against Iran for its terrorist acts currently exceed $60 billion in the aggregate.

50.     The Defendants were aware of the judgments against Iran and knew that victims of Iranian-supported acts of international terrorism were actively seeking to enforce their judgments against Iranian assets in the United States.

51.     Clearstream, in particular, had direct knowledge that terrorism victims were seeking to enforce judgments against Iranian assets in the United States.  On June 13, 2008, Citibank in New York City was served with a writ of execution by plaintiffs in *Peterson, et al. v. Islamic Republic of Iran, et al.*, No. 10 Civ. 4518 (KBF) (S.D.N.Y.) ("Peterson Plaintiffs"), compelling Citibank to turnover what amounted to almost $2 billion in Iranian assets held by Clearstream in a Citibank account.  On June 16, 2008, the Peterson Plaintiffs served a restraining notice on Clearstream.  On June 19, 2008, Clearstream was served with another writ of execution seeking turnover of Markazi's assets.

**D.      The Terrorist Attacks on September 11, 2001 and the Havlish Litigation.**

52.     On September 11, 2001, nineteen members of the al Qaeda terrorist network hijacked four United States passenger airplanes and flew two of them into the twin towers of the

World Trade Center in New York City and another into the Pentagon in Arlington, Virginia. Due to the courageous actions of passengers, the fourth plane crashed into an open field near Shanksville, Pennsylvania.

53.     Thousands of people on the planes, in the buildings, and on the ground were killed in those attacks, countless others were injured, and billions of dollars of property was destroyed.

     **E.**    **The Havlish Judgment Holders File Suit Seeking a Multi-billion Judgment Against Iran for Its Role in the September 11 Terrorist Attacks.**

54.     On February 19, 2002, the Havlish Judgment Holders filed their complaint against Iran, the Iranian Ministry of Information and Security ("MOIS"), the Iranian Revolutionary Guard Corps ("IRGC"), the Iranian Ministry of Petroleum ("MOP"), the Iranian Ministry of Economic Affairs and Finance ("MEAF"), the Iranian Ministry of Commerce ("MOC"), the Iranian Ministry of Defense and Armed Forces Logistics ("MOD"), and the Ayatollah Ali Hosseini-Khamenei.  ("Havlish Litigation").

55.     Iran, together with its political subdivisions, agencies, and instrumentalities, were served with notice of the Havlish Litigation and the Havlish Judgment Holders claim for billions of dollars in damages in conformity with the Foreign Sovereign Immunities Act.  Iran and Markazi monitored the progress of the Havlish Litigation as it proceeded through the United States court system.

56.     News of the Havlish Judgment Holders' claims, and its potential financial impact on defendants, spread throughout the world.

57.     Iran, together with its political subdivisions, agencies, and instrumentalities, were also served with notice of claims by additional victims of the September 11, 2001 terrorist seeking many hundreds of billions of dollars in damages.  The Judgment Holders understand and

believe that Iran and Markazi monitored the progress of those additional claims as they proceeded through the United States court system.

58.     On September 7, 2006, the Havlish Plaintiffs amended their complaint to add Markazi, the National Iranian Tanker Corporation ("NITC"), the National Iranian Oil Corporation ("NIOC"), the National Iranian Gas Company ("NIGC"), the National Iranian Petrochemical Company ("NIPC"), Iran Airlines ("Iran Air"), and Ali Akbar Hashemi Rafsanjani ("Rafsanjani") as Defendants.  All of the new Defendants were properly served pursuant to the Foreign Sovereign Immunities Act.

59.     On October 29, 2007, the Havlish Plaintiffs filed a motion asking the Court to enter default against Iran, Markazi, and the other Iranian Defendants so they could, thereafter, ask for a hearing pursuant to 28 U.S.C. § 1608(e) and prove their entitlement to a multi-billion dollar judgment for compensatory and punitive damages.

**F.     Congress Enhances and Expands the Ability of Terrorism Victims to Enforce Their Judgments Against Iranian Assets**.

60.     In September 2007, as the Havlish Judgment Holders were preparing their case for entry of multi-billion dollar judgments against Iran and Markazi, Congress began considering amendments to the FSIA that would enhance and expand the ability of victims of terrorism to collect judgments against state sponsors of terrorism, like Iran ("FSIA Amendments").  Senate Amendment; H.R. 1585, 110th Cong., 1st Sess., § 1087, *et. seq.*, 2007 HR Cong US 1585 (Oct. 1, 2007).

61.     The FSIA Amendments were intended, among other things, to permit judgment creditors of Iran to levy assets belonging to any of Iran's political subdivisions or agencies and instrumentalities – including Markazi – regardless whether the judgment creditors had judgments specifically against any of those juridical entities.

62.     The FSIA Amendments received widespread attention in the news media.

63.     The Judgment Holders understand and believe that Iran, Markazi, and their counsel were closely following the FSIA Amendment process in Congress and were aware of the impact the FSIA Amendments would have on their ability to shield Iran's assets from existing and future judgment creditors.  Iran has long sought to protect its assets from efforts by victims of its acts of terrorism to collect on the substantial judgments against it and its political subdivisions, agencies, and instrumentalities.  Iran has attempted to evade collection efforts by maneuvering its assets outside the reach of United States judgment creditors.  Iran and Markazi recognized that the FSIA Amendments would place at risk assets they had previously thought to be outside the reach of judgment creditors.

64.     The FSIA Amendments became law on January 28, 2008.  One portion of the amendment created a federal cause of action for terror victims under 28 U.S.C. § 1605A.  Another portion of the amendment, codified as part of 28 U.S.C. § 1610, expanded the rights of terror victims to enforce their judgments, including authorizing terror victims to enforce their judgments against a foreign state's agencies and instrumentalities, like Markazi.  National Defense Authorization Act for 2008, Pub.L.No. 110-181, § 1083, 122 Stat. 3.

**G.     The United States Government Warns Clearstream About Doing Business With Iran And Markazi.**

65.     During the same period of time Congress was considering the FSIA Amendments, and the U.S. Treasury Department was implementing a series of sanctions directed at state-owned Iranian banks, the Office of Foreign Asset Control ("OFAC")[1] began to investigate

---

[1]OFAC administers and enforces economic sanctions against targeted foreign countries, regimes, terrorists, international narcotics traffickers, and persons engaged in activities related to the proliferation of weapons of mass destruction, among others.  OFAC acts under Presidential national emergency authorities, as well as authority granted by specific legislation, to impose controls on transactions and freeze assets under U.S. jurisdiction.

Clearstream's business dealings with Iran and Markazi.  Among other things, OFAC met with

Clearstream to (a) discuss United States sanctions regimes restricting economic activity with

Iran, including the Iranian Transactions Regulations, 31 C.F.R. § 560.101, *et seq*. (2008)

("ITR"); (b) place Clearstream on notice of its apparent violations of those regulations through

its ongoing business dealings with, and provision of financial services to, Iran and Markazi; and

(c) warn Clearstream about the consequences of continuing to violate U.S. sanctions laws in

connection with its Iranian business dealings ("OFAC Inquiry").

66.     As a result of the OFAC Inquiry, Clearstream represented to OFAC in December

2007 that it would terminate its business dealings with Markazi.

67.     Contrary to its representations to OFAC, Clearstream did not terminate its

business dealings with Markazi.

**H.     Markazi And Clearstream Enter Into A Conspiracy to Conceal U.S. Dollar-
Denominated Assets From Iran's Judgment Creditors and From the United
States Government**.

68.     Instead of terminating its business relationship with Iran and Markazi,

Clearstream entered into a conspiracy with Markazi to (i) conceal Markazi's assets from the

United States Government, from the Havlish Judgment Holders who were in the process of

obtaining enforceable judgments, and from other judgment creditors of Iran, like the Hoglan

Judgment Holders, who Defendants knew would also obtain judgments against Iran, and (ii)

place Markazi's assets outside the jurisdiction of United States courts where Iran's and

Markazi's judgment creditors were seeking to enforce their judgments (the "Conspiracy").

69.     Clearstream and Markazi entered into the Conspiracy with full knowledge that (i)

Iran was a designated state sponsor of terrorism; (ii) financial transactions involving Iran were

severely restricted, and often prohibited, by U.S., European Union, and other international

economic sanctions; (iii) OFAC was investigating Clearstream specifically for violating U.S. sanctions law in connection with its business dealings with Iran and Markazi; (iv) the FSIA Amendments were about to become law and would expose Markazi's assets in the United States to judgment creditors; (v) the Havlish Judgment Holders were in the process of proceeding to judgment on a multi-billion damages claim; (vi) other 9/11 Plaintiffs, like the Hoglan Judgment Holders, would also obtain judgments against Iran; (vii) existing judgment creditors were actively seeking to enforce their judgments against Iranian assets; and (viii) many additional victims of other Iran-sponsored acts of international terrorism were filing complaints and obtaining judgments against Iran.

70.     Clearstream, Iran, and Markazi, entered into the Conspiracy with the specific intent to (i) conceal Iran's and Markazi's assets from the United States Government; (ii) enable Iran and Markazi to continue investing through Clearstream in bonds denominated in U.S. dollars while simultaneously enabling Clearstream to represent to the United States government that it no longer provided services to Iran or Markazi; and (iii) hinder, delay, and defraud Iran's and Markazi's creditors, including the Havlish Judgment Holders, who had filed suit against Iran and Markazi and who were, at that time, proceeding to a multi-billion judgment, and also hinder, delay, and defraud anticipated additional judgment creditors like the Hoglan Judgment Holders.

71.     Clearstream has long assisted Iran and Markazi to launder U.S. dollar-dominated assets through the American financial system.

72.     The panoply of international economic sanctions caused Iran and Markazi to rely heavily on a small group of financial institutions to assist them in laundering money and in conducting the financial activity relating to Iran's substantial international sales of oil.  The same

financial network conducts money laundering activities that support Iran's international terrorism and its attempts to acquire and develop weapons of mass destruction, including nuclear weapons.

73.     Clearstream's loyalty to Iran in the face of mounting international sanctions allowed it to develop a significant business relationship with Iran and Markazi.  Between the early 1996 and 2008, Markazi substantially increased its business with Clearstream.

74.     In late 2007 and early 2008, Markazi held, among other assets invested with Clearstream, beneficial interests in at least two sets of U.S. dollar-denominated sovereign and corporate bonds.

### 1.     **Markazi's Citibank Bonds**.

75.     Markazi owned securities entitlements recorded as book entries in Clearstream Luxembourg in connection with certain corporate and sovereign bonds held in the United States ("Citibank Bonds").

76.     Central securities depositories in the United States served as the ultimate place of safekeeping for the Citibank Bonds.  Issuers of the Citibank Bonds deposited interest and principal payments relating to those bonds into a bank account Clearstream maintained at Citibank in New York City ("Citibank Account").  Markazi's securities entitlements in the Citibank Bonds had an aggregate, nominal value of approximately $2.813 billion.

77.     By virtue of its securities entitlements, Markazi had a beneficial interest in the Citibank Bonds, together with principal and interest payments deposited into the Citibank Account.

78.     The deposits into the Citibank Account of principal and interest relating to the Citibank Bonds were a financial asset owned by Markazi by virtue of its security entitlements in the Citibank Bonds.

79.     Clearstream acted as the securities intermediary for Markazi in connection with the Citibank Bonds.  In that capacity, Clearstream provided custody and related financial services from its location in the United States to Markazi.

## 2.     Markazi's JPM Bonds.

80.     Markazi also owned securities entitlements in connection with certain other bonds issued by foreign entities ("JPM Bonds").  The JPM Bonds were issued by non-U.S. sovereigns, like the United Kingdom, or "supranationals" like the European Investment Bank.

81.     Each JPM Bond was issued in either the physical form of one or more global notes or in a dematerialized form that was registered and deposited with a foreign affiliate of a United States bank, acting as depository or sub-depository for Clearstream, who acted as depository.

82.     Markazi's ownership in JPM Bonds was recorded as book entries in Clearstream Luxembourg.

83.     Issuers of the JPM Bonds deposited interest and principal payments relating to those bonds into a bank account maintained by Clearstream at the NY JPM Account.

84.     The deposits of principal and interest payments relating to the JPM Bonds into the NY JPM Account comprised a financial asset owned by Markazi by virtue of its security entitlements in the JPM Bonds.  Therefore, Markazi had a beneficial interest in the JPM Bonds, together with the related principal and interest payments deposited into Clearstream's NY JPM Account.

85.     A prospectus for a bond issued by the United Kingdom, bearing International Securities Identification Number XS0171740961 is an exemplar of the language creating Markazi's beneficial interest in the JPM Bonds.  It states in relevant part:

Ownership of beneficial interests in the Global Notes will be
limited to persons that have accounts with Euroclear, Clearstream,
Luxembourg, or DTC or persons that may hold interests through
such accountholders.  Beneficial interests in the Global Notes will
be shown on, and transfers thereof will be effected only through,
records maintained in book entry form by Euroclear, Clearstream,
Luxembourg or DTC and their account holders, as applicable.

\* \* \*

Payments shall be made in U.S. dollars by cheque drawn on a bank
in New York City and mailed to the account holder (or to the first
named of joint holders) of such Notes at its address appearing in
the Register.  Upon application by the holder to the specified office
of the Registrar before the Record Date, such payment may be
made by transfer to a U.S. dollar accounted maintained by the
payee with a bank in New York City.

\* \* \*

Each of the persons shown in the records of Euroclear,
Clearstream, Luxembourg or DEC as holders of a Note represented
by a Global Note must look solely to Euroclear, Clearstream,
Luxembourg, or DCT (as the case may be) for his share of each
payment made by H.M. Treasury to the holder of such Global Note
and in relation to all other rights arising under the Global Note,
subject to and in accordance with the respective rules and
procedures of Euroclear, Clearstream, Luxembourg or DTC (as the
case may be).

86.     Clearstream acted as the securities intermediary for Markazi in connection with

the JPM Bonds.  In that capacity, Clearstream provided financial services in the United States to

Markazi in connection with the JPM Bonds.  Clearstream's role as securities intermediary

enabled Markazi to hold interests in the JPM Bonds, as well as the principal and interest

deposited into Clearstream's NY JPM Account, and, in furtherance of the Conspiracy, also

provided means to enable Iran and Markazi to conceal Markazi's interest in the JPM Bonds from

Iran's judgment creditors and from the United States Government.

I.   **Markazi, Clearstream, And UBAE Attempt to Hinder, Delay, And Defraud Iran's Judgment Creditors.**

87.   In furtherance of the Conspiracy to place Markazi's financial assets, including the Citibank Bonds and the JPM Bonds, beyond the reach of United States judgment creditors and conceal them from both judgment creditors and the United States government, Markazi and Clearstream enlisted UBAE as a co-conspirator.

88.   UBAE is a small bank that was, at the time, controlled by the regime of Libyan dictator Muammar Gaddafi.  UBAE agreed to participate in the Conspiracy by, among other things, holding the assets that Markazi had invested with Clearstream in accounts opened in UBAE's name but created solely for the benefit of Markazi.

89.   Other than surreptitiously holding Markazi's assets, UBAE served no financial or business purpose in connection with the JPM Bonds, and UBAE provided no financial services to Markazi other than concealing Markazi's ownership.  Markazi would have continued to conduct transactions relating to the Citibank Bonds and JPM Bonds in its own Clearstream account but for the fear that the financial assets would be subject to seizure if Markazi continued to own the bonds directly.

90.   Markazi agreed to pay UBAE substantial fees as compensation for serving as Markazi's undisclosed agent in connection with the Citibank Bonds and the JPM Bonds.

91.   As a result, UBAE joined the Conspiracy.

92.   At the time, it joined the Conspiracy, UBAE knew the goals of the Conspiracy and joined it for the express purpose of helping Markazi and Clearstream to accomplish the goals of the Conspiracy.  UBAE also joined the Conspiracy knowing and intending that Iran's and Markazi's judgment creditors would be harmed in New York.

93.     On January 17, 2008, only days before the FSIA Amendments become law and less than one month after Clearstream fraudulently represented to OFAC that it was terminating all business relationships with Iran and Markazi, Markazi opened a bank account  with UBAE at its Rome headquarters ("Rome Account").  The Rome Account was opened in furtherance of the Conspiracy and for the specific purpose of acting as Markazi's custodial account in connection with Markazi's securities entitlements at Clearstream.

94.     On January 18, 2008, the day after Markazi opened the Rome Account, UBAE opened a new account at Clearstream Luxembourg ("UBAE/Markazi Account").   During the preceding 25 years, UBAE had maintained only one account at Clearstream.  The UBAE/Markazi Account was opened in UBAE's name in furtherance of the Conspiracy to conceal Markazi's ownership of the assets held in the account.  Markazi, Clearstream, and UBAE agreed that Iran and Markazi would be the sole beneficial owners of any financial assets deposited into the UBAE/Markazi Account and would have full control over the account and the assets in the account.

95.     In furtherance of the Conspiracy, Markazi instructed Clearstream to transfer $4.6 billion in securities from its account ("Markazi Account") at Clearstream to the UBAE/Markazi Account ("2008 Fraudulent Transfers").  Markazi's securities entitlements in the Citibank Bonds and the JPM Bonds were among the financial assets transferred to the UBAE/Markazi Account. The securities were transferred "free of payment" ("FOP"), meaning that there was no exchange of cash or other payment from UBAE to Markazi within Clearstream's settlement system.

96.     The 2008 Fraudulent Transfers were accomplished by internal accounting entries on Clearstream's books in Luxembourg.  Although the book entries changed the record ownership in order to make it appear as though Markazi did not have any interest in the financial

assets in the UBAE/Markazi Account, the beneficial ownership of the transferred assets did not change.  As Markazi, Clearstream, and UBAE intended, Markazi continued to own the sole beneficial interest in the Citibank Bonds and the JPM Bonds, together with all principal and interest payments relating to them, as well as hold the sole beneficial ownership of any other financial assets transferred from Markazi's Clearstream account to the UBAE/Markazi Account.

97.     Markazi maintained full control over all financial assets transferred into the UBAE/Markazi Account and full authority to direct the disposition of all financial assets maintained in the UBAE/Markazi Account.  At all times, Clearstream and UBAE acted as Markazi's agents, pursuant to Markazi's express instructions, in connection with the financial assets in the UBAE/Markazi Account, including specifically the Citibank Bonds and the JPM Bonds.

98.     By virtue of its role in the Conspiracy, and its ownership of the UBAE/Markazi Account, UBAE also became Clearstream's principal.  Therefore, UBAE was responsible for instructing and directing Clearstream's acts concerning the receipt, deposit, and transfer of the Citibank Bonds and the JPM Bonds, as well as any payments of interest and principal relating to the bonds.

99.     Markazi, Clearstream, and UBAE made the 2008 Fraudulent Transfers for the specific purpose of concealing Iran's and Markazi's continued financial activity in the United States, with the actual intent to hinder, delay, and defraud Iran's and Markazi's judgment creditors, including the Havlish Judgment Holders and future judgment creditors like the Hoglan Judgment Holders.

J.      **The Fraudulent Transfers Enabled Markazi to Continue Receiving Principal And Interest Payments Relating to The Citibank Bonds and the JPM Bonds in the United States.**

100.      Both before and after the 2008 Fraudulent Transfers, significant commercial activity occurred in the United States to provide Markazi financial remuneration arising from its beneficial ownership in the Citibank Bonds and the JPM Bonds.

101.      The Citibank Bonds and the JPM Bonds were all denominated in U.S. dollars.

102.      The terms of the Citibank Bonds and the JPM Bonds provided that all payments of periodic interest and payments of principal at maturity to be made by the issuers were sent from a bank in New York in U.S. dollars and were to be received by Clearstream into accounts at banks in New York in U.S. dollars.

103.      In conformity with those terms, Clearstream received all payments of periodic interest and payments of principal at maturity at its Citibank Account (in the case of the Citibank Bonds) and at its NY JPM Account (in the case of the JPM Bonds).  Upon receipt by Clearstream, Markazi was the sole beneficial owner of the interest and principal payments held in the Citibank Account and the NY JPM Account, respectively.

104.      Before the 2008 Fraudulent Transfers, Clearstream credited Markazi's Clearstream Luxembourg account with the full value of each deposit of interest or principal relating to the Citibank Bonds and the JPM Bonds.  After the Fraudulent Transfers, and with the intent to further the Conspiracy, and pursuant to UBAE's instructions, Clearstream credited the UBAE/Markazi Account with the full value of each deposit of interest or principal relating to the Citibank Bonds and the JPM Bonds.

105.      Clearstream did so knowing that the assets credited to the UBAE/Markazi Account belonged solely to Markazi despite being held in an account in the name of UBAE.

34

106.    Clearstream's acts to credit the interest and principal payments to the UBAE/Markazi Account were intended to give the false appearance that UBAE, and not Markazi, owned all right, title, and interest in the Citibank Bonds and the JPM Bonds.

107.    Nevertheless, both before and after the 2008 Fraudulent Transfers, Markazi, Clearstream, and UBAE knew, and intended, that Markazi owned the sole beneficial interest in all interest and principal payments relating to the Citibank Bonds and the JPM Bonds.

108.    The actions undertaken by Clearstream, Markazi, and UBAE to credit the UBAE/Markazi Account with the full value of each deposit of interest and principal was in furtherance of the Conspiracy and intended to hinder, delay, and defraud Iran's and Markazi's judgment creditors, including the Havlish Judgment Holders and other 9/11 Litigation judgment creditors like the Hoglan Judgment Holders, by attempting to (1) hide Markazi's beneficial ownership in the financial assets maintained in the UBAE/Markazi Account, and (2) place the financial assets in the UBAE/Markazi Account, together with any payments of interest and principal relating to the JPM Bonds, beyond the reach of United States courts.

**K.    The Citibank Bonds and the JPM Bonds, Together with Any Payments of Interest or Principal Relating to Either Set of Bonds, Were Restrained in June 2008.**

109.    On June 13, 2008, victims of Iran's terrorist activities relating to the 1983 bombing of the United States Marine Corps barracks in Beirut, Lebanon ("Peterson Plaintiffs")[2] served Citibank with a writ of execution issued by this Court seeking to execute on the Markazi-Citibank Bonds, together with any payments of interest or principal on deposit in Clearstream's Citibank Account.

---

[2]The Peterson Plaintiffs hold a September 7, 2007 judgment in the amount of $2,656,944,877.00 against Iran and the Iranian Ministry of Information and Security arising from Iran's participating in, and support for, the bombing of the United States Marine Barracks. *Peterson v. Islamic Republic of Iran*, Case Nos. 01-cv-2094 and 01-cv-2684 (RCL) (D.D.C.).

110.    On June 16, 2008, the Peterson Plaintiffs served Clearstream with a restraining notice pursuant to NY CPLR 5222.  Under New York and federal law, the restraining notice restrained any transfer of the Citibank Bonds and the JPM Bonds, as well as any payments of interest or principal relating to either set of bonds, and any other asset of any kind in which Markazi held any right or interest.

111.    On October 27, 2008, the Peterson Plaintiffs served Clearstream with a writ of execution issued by this Court seeking to execute on, among other things, any property in which Markazi had an interest, which by definition, would also include the Citibank Bonds, the JPM Bonds, and any payments of interest or principal relating to either the Citibank Bonds or the JPM Bonds.

112.    Under New York and federal law, the writs of execution and restraining notices (collectively, "Restraints") restrained the Citibank Bonds, the JPM Bonds, and any payments of interest or principal relating to those bonds.  The Restraints were extended by court order and remain in effect with respect to the Citibank Bonds and the JPM Bonds.

113.    In June 2008, after being served with the Restraints, Clearstream opened a new account, which it has identified as a "sundry blocked account," created for the purpose holding any payments of interest or principal relating to the Citibank Bonds or the JPM Bonds after June 2008 ("Blocked Account").  After opening the Blocked Account, Clearstream credited it with all payments of interest or principal relating to the Citibank Bonds or the JPM Bonds and stopped crediting the UBAE/Markazi Account.

L.   **Markazi, Clearstream, and UBAE Continued Their Efforts to Hinder, Delay, and Defraud Judgment Creditors After the Markazi-Clearstream Bonds and Markazi-JPM Bonds Were Restrained.**

114.   Between July 8, 2008 and January 31, 2012, issuers of the JPM Bonds deposited sixty payments of principal and interest totaling more than $1.5 billion into Clearstream's NY JPM Account ("2008-2012 JPM Bond Proceeds").  Because Markazi, and only Markazi, possessed the beneficial ownership interest in the 2008-2012 Bond JPM Proceeds, each payment, upon deposit, became property of Markazi and, as a consequence, became subject to the Restraints.

115.   In knowing violation of the Restraints, and in furtherance of the Conspiracy to hinder, delay, and defraud Iran's and Markazi's judgment creditors, including the Judgment Holders, the 2008-2012 JPM Bond Proceeds were knowingly and intentionally transferred out of Clearstream's NY JPM Account and into the UBAE/Markazi Account, as each such deposit was received.  ("2008-2012 Fraudulent Transfers").

116.   As a result of the 2008-2012 Fraudulent Transfers, and in furtherance of their Conspiracy, Markazi, Clearstream, and UBAE have asserted that the 2008-2012 JPM Bond Proceeds are outside this Court's jurisdiction and, therefore, can no longer be subject to execution in United States courts by Iran's and Markazi's judgment creditors, including the Judgment Holders.

M.   **On February 5, 2012, President Obama Signed Executive Order 13599 Freezing All of Bank Markazi's Funds in the United States.**

117.   On December 31, 2011, President Obama signed the National Defense Authorization Act of 2012 ("NDAA") into law.  Among other provisions, Congress adopted a November 21, 2011 finding by the United States Department of the Treasury that Markazi had used a variety of schemes to help other sanctioned Iranian banks to transfer billions of dollars in

an effort to "evade sanctions."  Congress also adopted the Treasury Department's finding that

Markazi posed "terrorist financing, proliferation financing, and money laundering risks for the

global financial system."  National Defense Authorization Act for Fiscal Year 2012, Pub. L. No.

112-81, § 1245(a)(1)-(3), 125 STAT. 1647.  Congress directed President Obama to freeze all of

Markazi's assets in the United States or otherwise within the control of a U.S. person.  National

Defense Authorization Act for Fiscal Year 2012, Pub. L. No. 112-81, § 1245(c)-(d), 125 STAT.

1647-48.

118.     President Obama implemented § 1245 of the NDAA of 2012 by issuing Executive

Order 13599 on February 5, 2012 ("E.O. 13599").  E.O. 13599 freezes all assets in the United

States, or otherwise within the control of a United States person, in which Markazi or any other

Iranian bank had an interest.

119.     Clearstream and JPM are both United States persons within the meaning of E.O.

13599 and, therefore, were obligated to block all assets coming into their custody or possession

in which Markazi had any interest.  Moreover, Clearstream and JPM were obligated to block all

Markazi assets deposited into the NY JPM Account because, among other reasons, the NY JPM

Account is located "in the United States."  E.O. 13599, § 1.

120.     Clearstream and JPM had actual knowledge of E.O. 13599 and their obligations to

comply with its directive to block Markazi's assets.  To ensure compliance with E.O. 13599,

Clearstream and JPM implemented internal procedures and systems to monitor financial

transactions conducted through their respective banking systems.

N. **Even After E.O. 13599, Clearstream, Markazi, and UBAE Continued Their Efforts to Hinder, Delay, and Defraud Judgment Creditors by Transferring More than $100 Million USD Outside the United States.**

121.   On or about October 15, 2012, Clearstream received into its NY JPM Account approximately $104 million USD relating to the JPM Bonds. ("Oct 2012 Bond Proceeds").  In furtherance of the Conspiracy, and pursuant to UBAE's instructions, Clearstream received and administered the Oct 2012 Bond Proceeds for the benefit of Markazi.

122.   Defendants knew the Oct 2012 Bond Proceeds belonged to Markazi and that E.O. 13599 required them to block the funds.

123.   In knowing and intentional violation of E.O. 13599, and in furtherance of the Conspiracy to hinder, delay, and defraud Iran's and Markazi's judgment creditors, including the Havlish Judgment Holders and the Hoglan Judgment Holders, the Oct 2012 Bond Proceeds were knowingly and intentionally transferred to the Blocked Account ("Oct 2012 Fraudulent Transfers").

124.   In violation of E.O. 13599, JPM failed to block the Oct 2012 Fraudulent Transfers despite knowing that the Oct 2012 JPM Bond Proceeds belonged to Markazi and were required to have been blocked.

125.   As a result of the Oct 2012 Fraudulent Transfers, and in furtherance of the Conspiracy, Defendants now assert that the Oct 2012 Bond Proceeds are outside this Court's jurisdiction and are no longer subject to execution in United States courts by Iran's and Markazi's judgment creditors, including the Havlish Judgment Creditors and the Hoglan Judgment Creditors.

O.  **The U.S. Government OFAC and Criminal Investigations Into Clearstream's Illegal Conduct.**

126.  As a result of Clearstream's knowing and intentional violations of U.S. sanctions, OFAC investigated the illegal transactions by Clearstream, Markazi, and UBAE.

127.  On or about January 15, 2014, Clearstream and OFAC entered into a settlement agreement under which Clearstream agreed to pay $151,902,000 in connection with its potential civil violations of U.S. sanctions against Iran.

128.  On or about April 2, 2014, the United States Attorney for the Southern District of New York opened a criminal investigation into Clearstream's participation in the Conspiracy. The criminal investigation is still ongoing.

P.  **The 2019 National Defense Authorization Act.**

129.  On December 20, 2019, the National Defense Authorization Act for Fiscal Year 2020 ("2020 NDAA") became law.

130.  The 2020 NDAA amended 22 U.S.C. § 8772 to provide the victims of terrorism, like the Judgment Holders, with the legal redress against to deal with the Conspiracy and with Defendants efforts to hinder, delay, and defraud them.

131.  The 2020 NDAA gives this Court authority, by virtue of its jurisdiction over Clearstream, to compel Clearstream to transfer assets in (i) Markazi Account, (ii) the UBAE/Markazi Account, and (iii) the Blocked Account (collectively, the "Markazi Concealed Accounts") to the United States and then to determine whether such assets are subject to execution.

**MARKAZI'S ASSETS AND INTERESTS ARE NOT IMMUNE FROM EXECUTION**

132.  The assets in the Markazi Concealed Accounts are not immune from execution and are subject to turnover pursuant to 22 U.S.C. § 8772, as amended by the National Defense

Authorization Act for Fiscal Year 2020, Public Law 116-92, 113 Stat. 1198 (December 20, 2019).

133.    Pursuant to 28 U.S.C. § 1610(a)(7), assets in the Markazi Concealed Accounts are not immune from execution in satisfaction of the Havlish Judgment and the Hoglan Judgment because both Judgments relate to claims against the Iranian Judgment Debtors for which they are not immune under 28 U.S.C. § 1605A(a)(1) and (c).

134.    Pursuant to 28 U.S.C. Sections 1610(a)(l) and 1611(b), the assets in the Markazi Concealed Accounts are not immune from execution because Iran has, explicitly and implicitly, waived any immunity that might otherwise apply to Markazi or Iran's other agencies and instrumentalities.

135.    Assets in the Markazi Concealed Accounts are also not immune from execution because the immunity provided to central banks by the FSIA does not apply to Markazi.  In particular, Markazi does not hold the Markazi Concealed Accounts for its own account because they are not held for normal central banking functions.

136.    Among other reasons, Markazi cannot demonstrate that the assets in the Markazi Concealed Accounts were used for legitimate central banking purposes because:

i.    Markazi held the assets in the Markazi Concealed Accounts for commercial purposes.

ii.    Markazi did not purchase the JPM Bonds with its own funds or with funds used by Iran for governmental purposes.  The funds used to purchase the JPM Bonds were, instead, proceeds from the commercial sale of oil by the National Iranian Oil Company, a state-owned corporation, and an Iranian Judgment Debtor of the Havlish and Hoglan Judgment Holders, on commercial markets.

iii.     Markazi cannot pledge any of the assets held in its Clearstream account.

iv.     Markazi does not segregate its foreign currency reserve funds from money that it (i) utilizes to facilitate Iran's illicit efforts to develop weapons of mass destruction ("WMDs") and support international terrorism; (ii) maintains for the benefit of lran and Iran's agencies and instrumentalities; (iii) derives from its role as the commercial banker involved in Iran's sale of oil.

137.    Among other reasons, Markazi is not entitled to the immunity afforded legitimate central banks because it is a rogue financial institution, as demonstrated by the following:

    i.    On November 21, 2011, three governments announced sanctions against Iran, Markazi, and other Iranian financial institutions.

        a)    the United States Treasury Department designated Iran a jurisdiction of "primary money laundering concern" and imposed sanctions on Iran and Markazi under § 311 of the USA Patriot Act.  It found that Markazi had a long history of (i) engaging in illegal and deceptive actions to evade U.S. sanctions, finance terrorism, spread technology relating to weapons of mass destruction, and other, illicit Iranian government conduct and (ii) encourages Iranian state-owned banks to engage in those illicit practices.  Finding that the Islamic Republic of Iran is a Jurisdiction of Primary Money Laundering Concern, a copy of which is attached as Exhibit 5.

        b)    The United Kingdom announced that British financial institutions would cut all financial ties with Iran's banks, including Markazi.  The British government's announcement highlighted that its measures represented the "first

time the British government has cut an entire country's banking sector off from the UK's financial sector."[3]

      c)     The Canadian government adopted similar sanctions against Iran and Markazi.[4]

ii.    When announcing the United States Treasury Department's sanctions against Markazi, then Secretary of the Treasury, Timothy Geithner, stated, "If you are a financial institution and you engage in any transaction involving [Markazi] or any other Iranian bank operating inside or outside Iran, you are at risk of supporting Iran's illicit activities: its pursuit of nuclear weapons, its support for terrorism, and its efforts to deceive responsible financial institutions and evade sanctions."[5]  He further stated that "[a]ny and every financial transaction with Iran poses grave risk of supporting" the same illicit activities and that "[f]inancial institutions around the world should think hard about the risks of doing business with Iran."

iii.    Markazi is the principal financier of the Iranian oil supply chain, which is controlled by, and funds, the efforts of Iran's Islamic Revolutionary Guard Corps ("IRGC"), which the United States Treasury Department designated a global terrorist organization on August 15, 2007 for its role in supporting

---

[3]http://www.telegraph.co.uk/news/worldnews/middleeast/iran/8904713/Britain-to-cut-financial-ties-with-Iranbanks-George-Osborne-announces.html.

[4]http://www.washingtonpost. com/world/middle-east/canada-joins-us-britain-to-impose-more-sanctions-on-iran-over-nuclear-program/2011/11/21/gIQAOvDfiN_story.html.

[5]http://www.treasury.gov/press-center/press-releases/Pages/tg1368.aspx.

terrorism and the acquisition and proliferation of weapons of mass

destruction.[6]

    iv.    Markazi is a financial facilitator for more than twenty state-owned Iranian

financial institutions that help to fund the terrorist activities by the IRGC;

    v.    Markazi provides financing to Khatam al-Anbiya ("KAA"), a massive IRGC-

controlled conglomerate, which has been sanctioned by the United Nations,

the United States and the European Union for the KAA's role in supporting

Iran's WMD proliferation activities.[7]  Indeed, the United Nations, the United

States, the European Union, Canada, Japan, and South Korea have designated

KAA as a terrorist entity for its role in running Iran's nuclear and ballistic

missile programs.[8]

    vi.    Markazi launders the funds that Iran uses to underwrite its sponsorship of

international terrorism and its efforts to acquire weapons of mass destruction.

138.    Markazi is not entitled to the immunity afforded to legitimate central banks

because of the extensive efforts it undertook to hide its ownership of the JPM Bonds, the 2008-

2012 JPM Bond Proceeds, and the Oct 2012 JPM Bond Proceeds.  No legitimate central bank

would have engaged in the subterfuge practiced by Markazi in order to hinder, delay, and

defraud judgment creditors and conceal financial transactions in the United States.

---

[6]http://www.washingtonpost.com/wp-dyn/content/article/2007/08/14/AR2007081401662.html.  On August 15, 2007, the U.S. Department of Treasury named the IRGC as a Specially Designated National ("SDN") for the IRGC's role in supporting global terrorism and proliferation of weapons of mass destruction. http://www.washingtonpost.com/wp-dyn/content/article/2007/08/14/AR2007081401662.html.

[7]http://online.wsj.com/article/SB10001424052970204443404577051061458557058.html?mod=googlenews_wsj.

[8]U.S. Treasury, Executive Order 13382, October 25, 2007; UNSC Resolution 1929, June 9, 2010; EU Commission Regulation No. 532/2010.

139.    As a consequence, the assets in the Markazi Concealed Accounts are not immune from execution and are subject to turnover pursuant to 28 U.S.C. § 1610.

140.    The assets in the Markazi Concealed Accounts are not immune from execution and are subject to turnover pursuant to TRIA.

141.    The Havlish Judgment Holders and the Hoglan Judgment Holders are, therefore, entitled to enforce their Judgments against The JPM Bonds, the 2008-2012 JPM Bond Proceeds and the Oct 2012 JPM Bond Proceeds.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF
(Turnover Pursuant to 2020 NDAA)

142.    The Judgment Holders repeat and re-allege each of the preceding Paragraphs as if fully set forth herein.

143.    The Judgment Holders hold terrorism-related judgments entered against Iran pursuant to 28 U.S.C. § 1605A.

144.     Clearstream is a "foreign securities intermediary doing business in the United States."

145.    The assets in the Markazi Concealed Accounts are the "financial assets" at issue in *Peterson v. Islamic Republic of Iran*, 13-cv-9195-LAP.

146.    Clearstream is holding assets in the Markazi Concealed Accounts.

147.    Markazi holds "equitable title to, or a beneficial interest in" the assets in the Markazi Concealed Accounts.

148.     The assets in the Markazi Concealed Accounts are "equal in value to a financial asset of" Markazi that Clearstream is holding abroad.

149.    The assets in the Markazi Concealed Accounts would be blocked assets if Clearstream were holding them in the U.S.

150.    No other entity holds a constitutionally protected interest in the assets in the Markazi Concealed Accounts.

151.    The Judgment Holders are entitled to an order compelling Clearstream to transfer the assets in the Markazi Concealed Accounts to the United States and into a location within Southern District of New York.

152.    The Judgment Holders are further entitled to an Order compelling Clearstream to turnover to the Judgment Holders the assets in the Markazi Concealed Accounts.

### SECOND CLAIM FOR RELIEF
(Set Aside All Fraudulent Transfers -- NY Debtor & Creditor Law § 278)

153.    The Judgment Holders repeat and re-allege each of the preceding Paragraphs as if fully set forth herein.

154.     Markazi, Clearstream, and UBAE knowingly and intentionally entered into the Conspiracy to make the 2008 Fraudulent Transfers and the Oct 2012 Fraudulent Transfers (collectively, the "Markazi Fraudulent Transfers").

155.    Markazi, Clearstream, and UBAE carried out the Markazi Fraudulent Transfers with the actual intent to hinder, delay, and defraud the Havlish Judgment Holders and other anticipated additional victims of the September 11, 2001 terror attacks, like the Hoglan Judgment Holders, within the meaning of NY Debtor & Creditor Law § 276, and to evade the United States, European Union, and other international sanctions.

156.    Markazi, Clearstream, and UBAE further undertook the Markazi Fraudulent Transfers with the actual knowledge that Iran and Markazi were defendants *Havlish v. bin Laden*, Case No. 1:03-cv-9848 (S.D.N.Y. 2003), which is an action for money damages within

the meaning of NY Debtor & Creditor Law § 273-a, and with the actual knowledge that other judgment creditors, like the Hoglan Judgment Creditors, would also claim damages against Markazi and enforce their judgments against its assets.

157.    Before they entered into the Conspiracy and made the Markazi Fraudulent Transfers, Defendants knew Iran, Markazi, and the other Iranian Judgment Debtors, were in the process of being found civilly liable for money damages to the Havlish Judgment Holders, and other victims of the September 11, 2001 terror attacks, like the Hoglan Judgment Holders, who would, in the future, obtain judgments.

158.    The Markazi Fraudulent Transfers were made without fair consideration.

159.    The Iranian Judgment Debtors have failed to satisfy either the Havlish Judgment or the Hoglan Judgment.

160.    The Markazi Fraudulent Transfers constitute fraudulent conveyances within the meaning of NY Debtor & Creditor Law § 270, *et seq.*

161.    The Havlish Judgment and the Hoglan Judgment are final and amounts owing under those judgments remain unsatisfied.  Both the Havlish Judgment Holders and the Hoglan Judgment Holders have orders from the Court pursuant to 28 U.S.C. § 1610(c) authorizing them to enforce their Judgments against the JPM Bonds, the 2008-2012 JPM Bond Proceeds, and the Oct 2012 JPM Bond Proceeds.

162.    Pursuant to NY Debtor & Creditor Law § 278, the Judgment Holders are entitled to set aside or annul each of the Markazi Fraudulent Transfers.

163.    The Judgment Holders are, therefore, entitled to an Order from the Court setting aside or annulling the Markazi Fraudulent Transfers, and each of them, and Markazi's effort to

conceal its ownership interests in the JPM Bonds, the 2008-2012 JPM Bond Proceeds, and Oct 2012 JPM Bond Proceeds.

164.    The Judgment Holders are also entitled to an Order compelling Defendants to disregard the Markazi Fraudulent Transfers and directing them restore all Markazi assets to Clearstream's NY JPM Account so that they can execute upon those assets in satisfaction of their Judgments.

165.    Alternatively, the Judgment Holders are entitled to compensatory damages against Markazi, Clearstream, and UBAE in an amount equal to the Havlish Judgment and the Hoglan Judgment, limited only by the value of the Markazi Fraudulent Transfers.

166.    Pursuant to NY Debtor & Creditor Law § 276-a, the Judgment Holders are entitled to an aware of attorneys' fees and costs of suit against Markazi, Clearstream, and UBAE.

### THIRD CLAIM FOR RELIEF
(Declaratory Judgment re Violation of ITSR, 31 C.F.R. § 560.212)

167.    The Judgment Holders repeat and re-allege each of the preceding Paragraphs as if fully set forth herein.

168.    Executive Order 13599, and ITSR 31 C.F.R. Part 360, § 211 blocked all assets belonging to Markazi in the United States, effective February 6, 2012.  As a result, on and after February 6, 2012, it became illegal for Markazi, Clearstream, UBAE, and JPM to transfer any funds received into Clearstream's NY JPM Account relating to the JPM Bonds or the proceeds of those bonds.

169.    In furtherance of the Conspiracy to hinder, delay, and defraud Iran's and Markazi's creditors, and evade United States, European Union, and other international sanctions, Defendants knowingly and intentionally violated Executive Order 13599 by making the Oct 2012 Fraudulent Transfers.

170.    Pursuant to ITSR 31 C.F.R. 560.212(b) the Oct 2012 Fraudulent Transfers are "null and void."  Consequently, as a matter of law, the transfers cannot "be the basis for the assertion or recognition of any interest in or right, remedy, power, or privilege with respect to such property or property interests."

171.    An actual controversy now exists between the Judgment Holders and the Defendants concerning the validity of the Oct 2012 Fraudulent Transfers.

172.    Pursuant to 28 U.S.C. § 2201, the Judgment Holders are entitled to a declaration that the Oct 2012 Fraudulent Transfers (1) violated Executive Order 13599 and ITSR 31 C.F.R. § 560.212(b), (2) are null and void, and (3) must be unwound and the funds returned to Clearstream's NY JPM Account.

173.    Pursuant to 28 U.S.C. § 2202, the Judgment Holders are also to further relief compelling Defendants to comply with the Court's declarations.

### FOURTH CLAIM FOR RELIEF
(Turnover – CPLR § 5225(b))

174.    The Judgment Holders repeat and re-allege each of the preceding Paragraphs as if fully set forth herein.

175.    Markazi has a beneficial interest in the assets in the Markazi Concealed Accounts, including the JPM Bonds, the 2008-2012 JPM Bond Proceeds and the Oct 2012 JPM Bond Proceeds, which Defendants contend are currently located in the Markazi Account, the UBAE/Markazi Account, and the Blocked Account at Clearstream Luxembourg.

176.    Pursuant to the 22 U.S.C. § 8772, as amended by the 2020 NDAA, all assets in the Markazi Concealed Accounts must be transferred to the United States and into the Southern District of New York.

177.     Pursuant to NY Debtor & Creditor Law § 278, the Markazi Fraudulent Transfers must be set aside and annulled.   All funds relating to the Markazi Fraudulent Transfers must be returned to Clearstream's NY JPM Account.

178.     Under such circumstances, Clearstream is a person in possession of assets belonging to Markazi within the meaning of CPLR 5225(b).

179.     CPLR 5225(b) provides, in relevant part, as follows:

> (b)  Property not in the possession of judgment debtor.  Upon a special proceeding commenced by the judgment creditor, against a person in custody of money or other personal property in which the judgment debtor has an interest, or against a person who is a transferee of money or other personal property from the judgment debtor, where it is shown that the judgment debtor is entitled to the possession of such property or that the judgment creditor's rights to the property are superior to those of the transferee, the court shall require such person to pay the money, or so much of it as sufficient to satisfy the judgment, to the judgment creditor and, if the amount so paid is insufficient to satisfy the judgment, to deliver any other personal property, or so much of it as is of sufficient value to satisfy the judgment, to a designated sheriff.

180.     Litigants in federal court, such as the Judgment Holders, need not commence a "special proceeding" as contemplated by CPLR article 52.  *See Northern Mariana Islands v. Millard*, 287 F.R.D. 204, 208 (S.D.N.Y. 2012).

181.     The Judgment Holders' rights to the funds returned to Clearstream's NY JPM Account are superior to the rights of Clearstream and UBAE, who are merely stakeholders or account keepers.

182.     Pursuant to Fed. R. Civ. P. 69(a) and CPLR § 5225, the Judgment Holders are entitled to an Order enforcing their Judgments by conveying, assigning, and directing payment to them all of Markazi's right, title, and interest in the assets returned to the United States, as well as any proceeds thereof.

183.     The Judgment Holders are entitled to an award of attorneys' fees and costs of suit against Markazi, Clearstream, and UBAE.

## FIFTH CLAIM FOR RELIEF
### (Turnover – CPLR § 5227)

184.    The Judgment Holders repeat and re-allege each of the preceding Paragraphs as if fully set forth herein.

185.    Pursuant to the 22 U.S.C. § 8772, as amended by the 2020 NDAA, all assets in the Markazi Concealed Accounts must be transferred to the United States and into the Southern District of New York.

186.    Pursuant to NY Debtor & Creditor Law § 278, the Markazi Fraudulent Transfers must be set aside and annulled and all funds transferred in connection with the Markazi Fraudulent Transfers must be returned to Clearstream's NY JPM Account.

187.    Accordingly, Clearstream is a person who either is, or will become, indebted to Markazi within the meaning of CPLR § 5227.

188.    Civil Practice Law and Rules §r 5227 of the New York Code provides, in relevant part, as follows:

> Upon a special proceeding commenced by the judgment creditor, against any person who it is shown is or will become indebted to the judgment debtor, the court may require such person to pay to the judgment creditor the debt upon maturity, or so much of it as is sufficient to satisfy the judgment, and to execute and deliver any document necessary to effect payment; or it may direct that a judgment be entered against such person in favor of the judgment creditor. Costs of the proceeding shall not be awarded against a person who did not dispute the indebtedness.

189.    Litigants in federal court, such as the Judgment Holders, need not commence a "special proceeding" as contemplated by CPLR article 52. *See Northern Mariana Islands v. Millard*, 287 F.R.D. 204, 208 (S.D.N.Y. 2012).

190.    Pursuant to Fed. R. Civ. P. 69(a) and CPLR § 5227, the Judgment Holders are entitled to an Order enforcing their Judgment by conveying, assigning, and directing payment to

them all of Markazi's right, title, and interest in the assets returned to the United States, as well as any proceeds thereof.

191.    The Judgment Holders are also entitled to an award of attorneys' fees and costs of suit against Markazi, Clearstream, and UBAE.

**SIXTH CLAIM FOR RELIEF**
(Turnover – TRIA)

192.    The Judgment Holders repeat and re-allege each of the preceding Paragraphs as if they were fully set forth herein.

193.    The Judgment Holders hold judgments for compensatory damages against the Judgment Debtors, including Markazi, based on an act of terrorism or for which Iran and Markazi are not immune under 28 U.S.C. § 1605A.

194.    Iran has been designated a terrorist party pursuant to Section 6(j) of the Export Administration Act of 1979, 50 U.S.C. App. § 2405(j), beginning January 19, 1984, and therefore is a "terrorist party" as defined by TRIA § 201(d)(4), 116 Stat. at 2340.

195.    As set forth above, Markazi is political subdivision of Iran.

196.    Clearstream is a United States person as defined in Section 7 of Executive Order 13599, who controls, or will control, the assets in the Markazi Concealed Accounts, including the 2008-2012 JPM Bond Proceeds and the Oct 2012 JPM Bond Proceeds.  Moreover, payments of principal and interest relating to the JPM Bonds, which were deposited into the NY JPM Account, constituted, upon deposit, "property and interests in property of the government of Iran, including the Central Bank of Iran, that [were] in the United States" within the meaning of Executive Order 13599, § 1.

197.    Consequently, the 2008-2012 JPM Bond Proceeds and the Oct 2012 JPM Bond Proceeds deposited into Clearstream's NY JPM Account were blocked assets as defined in TRIA.

198.    If held by Clearstream in the United States, all assets in the Markazi Concealed Accounts would be blocked assets.

199.    All funds returned to Clearstream's NY JPM Account pursuant to NY Debtor & Creditor Law § 278, and by virtue of 22 U.S.C. § 8772, will be, upon deposit, blocked assets as defined in TRIA.

200.    The Judgment Holders are, therefore, entitled to an Order pursuant to TRIA, directing Clearstream, Markazi, and UBAE to turn over to them all assets returned to the United States, as well as any proceeds thereof.

201.    The Judgment Holders are also entitled to an award of attorneys' fees and costs of suit against Markazi, Clearstream, and UBAE.

### SEVENTH CLAIM FOR RELIEF
(Rescission of All Markazi Fraudulent Transfers)

202.    The Judgment Holders repeat and re-allege each of the preceding Paragraphs as if fully set forth herein.

203.    If, and to the extent that, any of the JPM Bonds, the 2008-2012 JPM Bond Proceeds, and the Oct 2012 JPM Bond Proceeds are located outside the United States, the Court has the power to set aside any transfer made by Markazi, Clearstream, and UBAE that resulted those proceeds being removed from the United States pursuant to New York Debtor and Creditor Law §§ 273-a, 276, 278, and New York common law.

204.     Markazi, Clearstream, and UBAE had actual knowledge of attempts by judgment creditors to execute on the 2008-2012 JPM Bond Proceeds and the Oct 2012 JPM Bond Proceeds as early as June 16, 2008 when the Peterson Plaintiffs served a restraining notice on Clearstream.

205.     The restraining notice had the effect of restraining Clearstream from transferring the 2008-2012 JPM Bond Proceeds and the Oct 2012 JPM Bond Proceeds from its NY JPM Account.

206.     At all times since January, 2008, Clearstream knew that Markazi beneficially owned the 2008-2012 JPM Bond Proceeds and the Oct 2012 Bond Proceeds.

207.     After January, 2008, any transfer of the 2008-2012 JPM Bond Proceeds and the Oct 2012 Bond Proceeds from Clearstream's NY JPM Account to Luxembourg, or any other location, was made as agent for Markazi and in furtherance of the Conspiracy, with intent to hinder, delay or defraud the Judgment Holders, and other judgment creditors, and was made without fair consideration.

208.     Clearstream, as agent for Markazi, is in possession or control of the 2008-2012 JPM Bond Proceeds and the Oct 2012 Bond Proceeds even after the Markazi Fraudulent Transfers.

209.     As a result, the Court has the power to direct Clearstream and Markazi to take such actions as may be required to set aside the Markazi Fraudulent Transfers and return the October 2012 JPM Bond Proceeds to Clearstream's NY JPM Account.

210.     The Judgment Holders are also entitled to an award of attorneys' fees and costs of suit against Markazi, Clearstream, and UBAE.

## EIGHTH CLAIM FOR RELIEF
(Equitable Relief)

211.     The Judgment Holders repeat and re-allege each of the preceding Paragraphs as if fully set forth herein.

212.     Pursuant to Fed. R. Civ. P. 69(a), federal and New York state common law, and the inherent equitable power of the Court, the Judgment Holders are, as an alternative remedy, entitled to a Creditor's Bill to reach the equitable interest of the Judgment Debtors in the assets in the Markazi Concealed Accounts, including the 2008-2012 JPM Bond Proceeds and the Oct 2012 JPM Bond Proceeds.

213.     To the extent that enforcement of the Havlish Judgment and the Hoglan Judgment against the 2008-2012 JPM Bond Proceeds and the Oct 2012 JPM Bond Proceeds, is unavailable through remedies at law, the Court should exercise its equitable powers to grant the Judgment Holders a Creditor's Bill.

214.     The Judgment Holders are entitled to a declaration by the Court that the Judgment Debtors have an ownership interest in the 2008-2012 JPM Bond Proceeds and the Oct 2012 JPM Bond Proceeds.

215.     An objective weighing of the equities underlying the terrorism exception to the FSIA and TRIA, on the one hand, and those underlying any applicable legal remedies, on the other, compels the conclusion that the Court should use its equitable powers to grant the Judgment Holders a Creditor's Bill that will allow them to enforce their judgments against the 2008-2012 JPM Bond Proceeds and the Oct 2012 JPM Bond Proceeds.

216.     The Court's exercise of discretion to grant a Creditor's Bill is reasonable and equitable here because, among other factors: (a) the 2008-2012 JPM Bond Proceeds and the Oct 2012 JPM Bond Proceeds are readily traced by Clearstream; (b) Markazi, Clearstream, and

UBAE entered into a conspiracy to knowingly and intentionally disguise and keep secret Markazi's identity as beneficial owner of the JPM Bonds, the 2008-2012 JPM Bond Proceeds, and the Oct 2012 JPM Bond Proceeds in order to hinder, delay or defraud creditors, including the Judgment Holders; (c) Clearstream and UBAE knew, or should have known, that Markazi was the beneficial owner of the JPM Bonds, the 2008-2012 JPM Bond Proceeds, and the Oct 2012 JPM Bond Proceeds; (d) Defendants have knowingly and intentionally conspired to evade United States, European Union, and international sanctions imposed because of Iran's long history of state-sponsored terrorism against U.S. nationals, and aggressive and illicit efforts to develop WMDs; and (e) applying that exception will serve the important policy interests codified in the FSIA, which promotes compensation of the victims of state-sponsored terrorism and the punishment of rogue terrorist nations, while doing no damage to the policies of fostering finality and speed in securities transactions.

217.     Moreover, applying an equitable exception in these circumstances is consistent with U.C.C. 8-112(e), which provides that "[a] creditor whose debtor is the owner of a ... security entitlement is entitled to aid from a court of competent jurisdiction, by injunction or otherwise, in reaching the security entitlement or in satisfying the claim by means allowed at law or in equity in regard to property that cannot readily be reached by other legal process."

218.     Pursuant to the Court's equitable powers embodied in a Creditor's Bill and otherwise, the Judgment Holders are further entitled to an order directing Defendants to turnover to them the 2008-2012 JPM Bond Proceeds and Oct 2012 JPM Bond Proceeds in partial satisfaction of the Judgment.

219.     The Judgment Holders are also entitled to an award of attorneys' fees and costs of suit against Markazi, Clearstream, and UBAE.

## NINTH CLAIM FOR RELIEF
### (*Prima Facie* Tort)

220.    The Judgment Holders repeat and re-allege each of the preceding Paragraphs as if fully set forth herein.

221.    Markazi, Clearstream, and UBAE entered into the Conspiracy, and undertook the Markazi Fraudulent Transfers, with the actual intent to hinder, delay, defraud the Judgment Holders.  Markazi, Clearstream, and UBAE.  Thus, Markazi, Clearstream, and UBAE acted with the intent to inflict harm on the Judgment Holders.

222.    Markazi, Clearstream, and UBAE did not have any excuse or justification for the harm they intended to cause, and have in fact caused, by participating in the Conspiracy and undertaking the Markazi Fraudulent Transfers.

223.    Markazi, Clearstream, and UBAE undertook the Markazi Fraudulent Transfers with the malicious intent to harm the Judgment Holders by preventing them from enforcing their Judgments.

224.    As a direct and proximate cause of the Conspiracy and the Markazi Fraudulent Transfers, the Judgment Holders have suffered the following special damages as a result of Markazi, Clearstream, and UBAE attempting to put the JPM Bonds, the 2008-2012 JPM Bond Proceeds, and the Oct 2012 JPM Bond Proceeds beyond the jurisdiction of United States courts: (i) compensatory and punitive damages in the aggregate amount of $6,737,039,127.10, (ii) post-judgment interest accruing from the date of the Havlish Judgment, and (iii) the attorney's fees and costs incurred seeking to enforce the Havlish Judgment.

225.    As a direct and proximate cause of the Conspiracy and the Markazi Fraudulent Transfers, the Hoglan Judgment Holders have suffered the following special damages as a result of Markazi, Clearstream, and UBAE attempting to put the JPM Bonds, the 2008-2012 JPM Bond

Proceeds, and the Oct 2012 JPM Bond Proceeds beyond the jurisdiction of United States courts: (i) compensatory damages in the aggregate amount of $3,325,549,005.58, and (ii) post-judgment interest accruing from the date of the Hoglan Judgment.

226.    The Conspiracy and the Markazi Fraudulent Transfers were undertaken with malice, spite, ill will, vengeance, or deliberate intent to harm the Judgment Holders. Accordingly, they are entitled to an award of punitive damages arising from the Markazi Fraudulent Transfers.

227.    The Judgment Holders are also entitled to an award of attorneys' fees and costs of suit against Markazi, Clearstream, and UBAE.

WHEREFORE, the Judgment Holders ask the Court to enter Judgment against Defendants, and each of them, including as follows:

1.     An Order compelling Clearstream to transfer to the United States, and into the Southern District of New York, all assets in the Markazi Concealed Accounts.

2.     An Order setting aside all Markazi Fraudulent Transfers.

3.     An Order conveying, assigning, and directing the transfer to the Judgment Holders all of Markazi's rights, title, and interest in the assets in the Markazi Concealed Accounts, including the JPM Bonds, the 2008-2012 JPM Bond Proceeds, and the Oct 2012 JPM Bond Proceeds.

4.     An award of compensatory damages against Defendants, together with interest at the legal rate.

5.     An Order declaring that the Oct 2012 Fraudulent Transfers (1) violated Executive Order 13599 and ITSR 31 C.F.R. § 560.212(b); (2) are null and void; and (3) be unwound and the funds returned to Clearstream's NY JPM Account.

6.      Alternatively, a Creditor's Bill allowing the Judgment Holders to attach the JPM

Bonds, the 2008-2012 JPM Bond Proceeds and the Oct 2012 JPM Bond Proceeds

if they are not otherwise reachable by any legal remedy.

7.      An award of attorney's fees and costs incurred by the Judgment Holders in

connection with prosecuting the claims in this Complaint.

8.      Such other and further relief as the Court may deem appropriate under the

circumstances.

Dated: September 28, 2020                    Respectfully submitted,


 /s/  Timothy B. Fleming_____
TIMOTHY B. FLEMING, ESQ.
**WIGGINS CHILDS PANTAZIS FISHER GOLDFARB, PLLC**
1211 Connecticut Avenue, NW, Suite 420
Washington, D.C. 20036
Ph: 202-467-4489
Fax: 202-467-4489
*tfleming@wigginschilds.com*